IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No.  18-60521 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY, INC., | ) | Chapter 11 |
| | ) | |
| _____ Debtor. | ) | |

| | | |
|---|---|---|
| In re: | ) | Case No.  18-60523 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY OF MISSOURI, LLC, | ) | Chapter 11 |
| | ) | |
| _____ Debtor. | ) | |

| | | |
|---|---|---|
| In re: | ) | Case No.  18-60526 |
| | ) | (Joint Administration Pending) |
| HEALTHTAC LOGISTICS, LLC, | ) | Chapter 11 |
| | ) | |
| _____ Debtor. | ) | |

| | | |
|---|---|---|
| In re: | ) | Case No.  18-60525 |
| | ) | (Joint Administration Pending) |
| FAMILY PROPERTY MANAGEMENT, LLC, | ) | Chapter 11 |
| | ) | |
| _____ Debtor. | ) | |

| | | |
|---|---|---|
| In re: | ) | Case No.  18-60524 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY OF STRAFFORD, INC., | ) | Chapter 11 |
| | ) | |
| _____ Debtor. | ) | |

**EMERGENCY MOTION FOR (I) AUTHORIZATION FOR DEBTORS TO
OBTAIN POST-PETITION FINANCING FROM JM SMITH CORPORATION, AS
LENDER, PURSUANT TO SECTION 364 OF THE BANKRUPTCY CODE,
(II) GRANTING LIENS AND SUPER-PRIORITY CLAIMS, (III) FOR AN
EXPEDITED ORDER PURSUANT TO §§ 361 AND 363 OF THE BANKRUPTCY
CODE AND BANKRUPTCY RULE 4001(B) AUTHORIZING DEBTORS TO USE
CASH COLLATERAL AND GRANT OF ADEQUATE PROTECTION AND
(IV) SCHEDULING THE FINAL HEARING ON THE DEBTORS' MOTION
AND APPROVING THE FORM AND METHOD OF NOTICE THEREOF**

Family Pharmacy, Inc. ("INC"), Family Pharmacy of Missouri, LLC ("LLC"),

HealthTAC Logistics, LLC ("HealthTAC"), Family Property Management, LLC ("FPM"), and

KCP-8363892-3

Family Pharmacy of Strafford, Inc. ("Strafford"), as debtors and debtors-in-possession

(collectively, the "Debtors"), by and through their undersigned attorneys, and submit their

*Emergency Motion for (i) Authorization for Debtors to Obtain Post-Petition Financing from JM*

*Smith Corporation, as Lender, Pursuant to Section 364 of the Bankruptcy Code, (ii) Granting*

*Liens and Super-Priority Claims, (iii) for an Expedited Order Pursuant to §§ 361 and 363 of the*

*Bankruptcy Code and Bankruptcy Rule 4001(b) Authorizing Debtors to Use Cash Collateral and*

*Grant of Adequate Protection and (iv) Scheduling the Final Hearing on the Debtors' Motion and*

*Approving the Form and Method of Notice Thereof* (the "Motion").  In support of this Motion,

Debtors state as follows:

## Introduction

1.      The Debtors seek entry of an interim order, substantially in the form attached

hereto as Exhibit A (the "Interim DIP Order"), and a final DIP order[1] (a) authorizing the Debtors

to enter into the Senior Secured Debtor-in-Possession Loan Agreement ("DIP Facility Credit

Agreement") (attached hereto as Exhibit B), (b) granting liens and providing superpriority claims

with respect to such postpetition financing; (c) authorizing the Debtors to use cash collateral; (d)

approving the form of adequate protection to be provided to certain prepetition lenders; (e)

modifying the automatic stay on a limited basis as set forth herein; (f) scheduling a final hearing

(the "Final Hearing") to consider entry of a final DIP order; and (g) granting related relief.

## Concise Statement of Material Provisions
## Pursuant to Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B)

---

[1] The Debtors shall submit to the Court prior to the final hearing on this Motion a proposed Final DIP Order.  It is anticipated to be in a form substantially identical to the proposed Interim DIP Order included with this Motion.

2.      Pursuant to Bankruptcy Rule 4001(b)(1)(B) and (c)(1)(B), the Debtors provide the following concise statement of the material provisions relating to their request to request to obtain post-petition financing and to use cash collateral.

| Bankr. Rule | Obtaining Credit – Summary of Material Terms |
|---|---|
| Borrowers | Family Pharmacy, Inc., Family Pharmacy of Missouri, LLC, Family Property Management, LLC, Family Pharmacy of Strafford, LLC, and HealthTAC Logistics, LLC, each as a debtor and debtor-in-possession under the Bankruptcy Code (Preamble) |
| Interest Rate 4001(c)(1)(B) | 6% annual rate (Section 3(a)); 18% default rate (Section 1, Default Rate definition) |
| Maturity 4001(c)(1)(B) | As late as 90 days after the Closing Date (Section 1, Maturity Date definition) |
| Events of Default 4001(c)(1)(B) | (a)      The Borrowers shall fail to pay (i) the principal of any Loan as and when due and payable, or (ii) interest on any Loan, or any other amount payable under this Agreement, as and when due and payable.<br><br>(b)      Any representation or warranty made or deemed made by the Borrowers in this Agreement or by the Borrowers or any Third Party in any DIP Loan Document to which it is a party, or in any certificate, document, opinion or financial or other statement furnished under or in connection with a DIP Loan Document, shall prove to have been incorrect in any material respect on or after the date hereof.<br><br>(c)      The Borrowers shall fail to perform or observe any term, covenant or agreement contained in any DIP Loan Document on their part to be performed or observed.<br><br>(d)      Any Lien or security interest purported to be created by any DIP Loan Document or DIP Financing Order shall cease to be, or shall be asserted by the Borrowers not to be, a valid, perfected, first-priority (except as otherwise expressly provided in such DIP Loan Document or any DIP Financing Order) security interest in the assets or properties covered thereby.<br><br>(e)      Any of the following shall occur in the Chapter 11 Cases:<br><br>(i)      filing of a plan of reorganization or liquidation under Chapter 11 of the Bankruptcy Code by the Borrowers that does not propose to indefeasibly repay the Obligations in full in cash, unless otherwise consented to by the DIP Lender;<br><br>(ii)      the Borrowers shall file a pleading seeking to vacate or modify any of the DIP Financing Orders without the prior written consent of the DIP Lender; |

(iii)    Borrowers' failure to execute an Asset Purchase Agreement ("APA") acceptable to FPSMS, LLC, an affiliate of the DIP Lender, and file a Sale Motion (as defined in and required by the APA) on or before May 4, 2018, and

(iv)    entry of an order without the prior consent of the DIP Lender amending, supplementing or otherwise modifying any DIP Financing Order;

(v)    reversal, vacation or stay of the effectiveness of any DIP Financing Order;

(vi)    any violation of the terms of any DIP Financing Order;

(vii)    dismissal of any of the Chapter 11 Cases or conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code;

(viii)    appointment of a Chapter 11 trustee in any of the Chapter 11 Cases;

(ix)    the Borrowers seek to sell any of their assets outside the ordinary course of business, without the prior written consent of the DIP Lender, which consent shall not be unreasonably withheld;

(x)    appointment of a responsible officer or examiner with expanded or enlarged powers relating to the operation of the businesses of the Borrowers without the prior written consent of the DIP Lender;

(xi)    granting of relief from the automatic stay in any of the Chapter 11 Cases to permit foreclosure or enforcement on, or any right or remedy with respect to, assets of any of the Borrowers;

(xii)    the Borrowers' filing of (or supporting another party in the filing of) a motion seeking entry of, or the entry of an order, granting any superpriority claim or Lien (except as contemplated herein) which is senior to or *pari passu* with the DIP Lender's claims and Liens under the DIP Facility Credit Agreement;

(xiii)    payment of or granting adequate protection with respect to prepetition debt, other than as expressly provided herein or in the DIP Financing Orders;

(xiv)    the Borrowers' loss of their exclusive right, pursuant to Section 1121 of the Bankruptcy Code, to file a plan of reorganization (or any modification of such right);

|  | (xv)    unless otherwise provided in the Interim Order or the Final Order, or unless undertaken with the prior written permission of the DIP Lender, any Borrower seeks or if there is entered, an order under Section 365 of the Bankruptcy Code rejecting a material lease that is part of (or whose premises contain any of ) the Collateral; or |
|  | (xvi)    cessation of the Liens of the DIP Lender to be valid, perfected and enforceable in all respects in accordance with the DIP Financing Orders. The Borrowers shall use cash collateral or Loan proceeds for any item other than those set forth in, and in accordance with, the Approved Budget[2] and as approved by the Bankruptcy Court or prepays any pre-petition debt. |
|  | (f)  A Change in Control shall occur. |
|  | (g)  Any Borrower is enjoined, restrained or in any way prevented by court order from continuing to conduct all or any material part of its business affairs, for more than ten (10) days. |
|  | (h)  Any material provision of any DIP Loan Document shall for any reason cease to be valid and binding on, or enforceable against, a Borrowers in accordance with the terms thereof without the express prior written agreement, consent or approval of the DIP Lender. |
|  | (i)  From and after Borrowers' entry into the APA, any material violation, breach or inaccuracy of any representation, warranty, covenant or agreement of one or more of the Borrowers contained in the APA. |
|  | (Section 9) |
| **Liens** 4001(c)((1)(B) | To secure the Obligations, effective immediately upon entry of the Interim Order, pursuant to Sections 361, 362, 364(c)(2), (c)(3) and (d) of the Bankruptcy Code, the DIP Lender is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected post-petition first-priority security interests in and liens on all Collateral, including Collateral that is otherwise subject to a valid, properly perfected and unavoidable security interest or lien as of the Petition Date. Nothing herein shall be deemed to grant the DIP Lender a security interest in or a lien on any avoidance actions under Chapter 5 of the Bankruptcy Code; provided, however, that the Superpriority DIP Claim and the DIP Liens shall attach to any of the Debtor's assets that are subject to a Lien that is subsequently avoided pursuant to Chapter 5 of the Bankruptcy Code (collectively, the "Avoided Liens"), including, without limitation, any Avoided Liens granted in connection with the Existing Facility. |

---

[2] A copy of the Approved Budget is attached hereto as Exhibit C.

| | (Section 11(a)) |
|---|---|
| **Collateral Subject to Liens** 4001(c)((1)(B) | "Collateral" shall mean all real[3] and personal property and other assets, whether now owned by or owing to, or hereafter acquired by or arising in favor of the Borrowers (including under any trade names, styles or derivations thereof), and whether owned or consigned by or to, or leased from, the Borrowers, and regardless of where located, including, without limitation: (a) accounts, accounts receivable, payment intangibles, instruments, intercompany claims, and other rights to receive payments of the Borrowers (including, without limitation, the accounts), (b) commercial lockboxes, government lockboxes and collection accounts, together with all funds received thereby or deposited therein, and any checks or instruments from time to time representing or evidencing the same, (c) cash and cash equivalents; (d) funds in any account of the Borrowers; (e) contract rights; (f) instruments, documents and chattel paper; (g) securities (whether or not marketable); (h) equipment, inventory and fixtures; (i) leaseholds and interests in leaseholds; (j) franchise rights; (k) patents, tradenames, trademarks, copyrights and all other intellectual property; (l) general intangibles; (m) capital stock; (n) investment property; (o) supporting obligations; (p) letter of credit rights; (q) except for avoidance actions under Chapter 5 of the Bankruptcy Code, all commercial tort claims and all other claims and causes of action; (r) except for the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code, the proceeds of all claims or causes of action; (s) all information and data compiled or derived by the Borrowers with respect to any of the foregoing; (t) all patient records in whatever form (such as hard copy, computer systems or electronic media), including but not limited to prescription files, patient profiles, practice records, prescription transactions and medication therapy management records; (u) all rights to payment under any insurance or warranty, guaranty or indemnity payable with respect to the foregoing; (v) all business licenses and other federal, state and local government operating licenses and permits; (w) all public and private payor contracts; (x) all books and records of the Borrowers evidencing or relating to or associated with any of the foregoing; (y) the owned real property listed on Exhibit C attached to the DIP Facility Credit Agreement, which is herein referred to as the "owned real property", and (z) to the extent not covered by the foregoing, all other assets or property of the Borrowers, whether tangible, intangible, personal or mixed, and all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing, any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Borrowers from time to time with respect to any of the foregoing.<br><br>(Section 1, Collateral Definition) |
| **Borrowing Limits** | Not to exceed $2,000,000 (Section 2(a)) |

---

[3] FPM owns the Bolivar pharmacy located at 1326 and 1328 W. Broadway, Bolivar, MO 65613 ("Bolivar"). UMB Bank, N.A. has a deed of trust encumbering Bolivar. For the avoidance of doubt, the DIP Facility Credit Agreement will not constitute a lien of any sort on the Bolivar real estate.

| 4001(c)((1)(B) | |
|---|---|
| **Borrowing Conditions** 4001(c)((1)(B) | The Borrowers shall give the DIP Lender irrevocable notice of each borrowing by delivering a Borrowing Request by 5:00 p.m. New York, New York time not less than one (1) Business Day prior to the date of each requested borrowing of a Loan; provided, however, that (i) no Loan shall be in an amount less than $50,000, and (ii) Borrowers shall not be permitted to request Loans (and DIP Lender shall not be required to fund Loans) in excess of the Borrowers' cash needs for the two (2) calendar weeks immediately following the date of the Borrowing Request (as set forth in the Approved Budget).<br><br>(Section 2(b)) |
| **Automatic Stay Waiver** 4001(c)((1)(B) | In the event of an Event of Default, the DIP Lender may, without limitation of its cumulative rights and remedies under applicable law and the Bankruptcy Code, (a) notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to or order from the Bankruptcy Court, suspend the DIP Facility Credit Agreement with respect to additional Loans, whereupon any additional Loans shall be made or incurred in the DIP Lender's sole discretion so long as an Event of Default is continuing and (b) deliver written notice to the Borrowers of the existence of an Event of Default whereupon if Borrowers do not seek, within two (2) Business Days of the receipt of such written notice, a determination by the Bankruptcy Court that an Event of Default has not occurred or is no longer continuing, and obtain within five (5) Business Days of the receipt of such written notice an order by the Bankruptcy Court re-imposing the automatic stay, the automatic stay provisions of Section 362 of the Bankruptcy Code shall be deemed vacated and modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided for in the DIP Loan Documents.<br><br>(Section 9) |
| **Bankr. Rule** | **Cash Collateral – Summary of Material Terms** |
| **Borrowers** 4001(b)(1)(B)(i) | Family Pharmacy, Inc., Family Pharmacy of Missouri, LLC, Family Property Management, LLC, Family Pharmacy of Strafford, LLC, and HealthTAC Logistics, LLC, each as a debtor and debtor-in-possession under the Bankruptcy Code. |
| **Purpose of Use** 4001(b)(1)(B)(ii) | Finance ordinary course of business operations and bankruptcy related expenses during the course of the Debtors' bankruptcy proceedings. |
| **Material Terms** 4001(b)(1)(B)(iii) | Use of cash collateral during the pendency of the Chapter 11 case or sale of the Debtors' assets subject to lenders' liens (whichever is earlier). |
| **Lien and/or Adequate Protection** 4001(b)(1)(B)(iv) | The Pre-Petition Lenders are entitled pursuant to sections 361, 363(c)(2), and 364(d)(1) of the Bankruptcy Code, to adequate protection of their interest in the Collateral, including Cash Collateral, in an amount equal to the diminution in value of their interests in such Collateral, including any such diminution resulting from the sale, lease, or use by the Debtors (or |

other decline in value) of such Collateral, the priming by the DIP Facility Credit Agreement Lien, as well as the imposition of the automatic stay (such diminution, the "Adequate Protection Obligations").  The DIP Facility Credit Agreement itself affords adequate protection to the Pre-Petition Lenders, as without such credit, the Debtors would be unable to continue to operate their businesses and the Debtors' estates would be irreparably harmed and the interests of the Pre-Petition Lenders would be irreparably diminished as the value of their Collateral would be substantially and materially reduced.  As additional adequate protection, the Pre-Petition Lenders are hereby granted the following:

Adequate Protection Liens.   As security for the payment of the  Adequate Protection Obligations, the Pre-Petition Lenders are hereby granted (effective and perfected upon the date of this Interim Order and without the necessity of the execution by the Debtors of security agreements, pledge agreements, mortgages, financing statements or other agreements) a valid, perfected replacement security interest in and lien on all of the Collateral to the same extent, validity, and priority of their respective pre-petition liens (the "Adequate Protection Liens"), subject and subordinate only to (i) the DIP Facility Credit Agreement Lien, and (ii) the Carve Out.

Section 507(b) Claim.   The Adequate Protection Obligations shall  constitute superpriority claims as provided in section 507(b) of the Bankruptcy Code, with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code (and with priority as between the Pre-Petition Lenders to the same extent of priority of their respective pre-petition liens), including without limitation, sections 326, 328, 330, 331 and 726 of the Bankruptcy Code, subject and subordinate only to (i) the Carve Out and (ii) the DIP Superpriority Claims.

## Factual and Procedural History

### A. The Chapter 11 Filings

3.      On April 30, 2018 ("Petition Date"), the Debtors filed voluntary petitions in this

Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

The Debtors continue to operate their businesses and manage their properties as debtors-in-

possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**B.  The Debtors' Businesses, Background Information and Organizational Structure**

5.      The Debtors own and operate the largest group of independently-owned retail pharmacy stores in southwestern Missouri.  Collectively, throughout southwestern Missouri, the Debtors operate approximately 20 retail pharmacy locations, two (2) long term care pharmacy locations and one (1) specialty pharmacy location located in Ozark, MO.  In addition, Debtors have their corporate headquarters located at 4101 N. State Hwy NN, Ozark, MO, a warehouse facility which is contiguous to the corporate headquarters and a leased billing office in Ozark, MO. The Debtors operate their pharmacies under the "Family Pharmacy" banner.[4]  Family Pharmacy has been operating continuously since 1977.  Family Pharmacy is ranked as a top 100 U.S. drug store chain, last year ranking number 41 in the U.S. in total sales.

6.      A typical Family Pharmacy retail store is approximately 2,500 – 3,000 square feet in size, and offers health screenings, serves prescription needs, offers wellness and holistic care products, health & beauty products, home medical supplies and equipment, and gifts for sale.

7.      All of the Debtors' retail locations are leased from third-parties, other than Bolivar, Fair Grove and Strafford which are owned by FPM and the Joplin location, which is owned by INC.  Bank of Missouri has deeds of trust encumbering Fair Grove, Joplin, Strafford, the corporate headquarters and the warehouse.  UMB Bank has a deed of trust encumbering Bolivar.  For the avoidance of doubt, the DIP Facility Credit Agreement will not constitute a lien of any sort on the Bolivar real estate.

---

[4] www.thefamilyrx.com  "BEST Service + LOW Prices"

8.      The Debtors' two long term care ("LTC") pharmacy locations, one of which (Ozark) is a "closed shop" pharmacy, meaning it is not open to the general retail public.  The other LTC (Joplin) is located inside the Joplin retail pharmacy.  The LTCs serve over 120 nursing homes, assisted living and residential care facilities, hospices and other specialty providers across southwestern Missouri.  All prescriptions from the LTCs are either delivered via drivers who are employees of the Debtors or delivered via courier (e.g. FedEx, UPS, etc.).  As noted above, the Debtors have LTCs in Joplin, Missouri and Ozark, Missouri.  The Debtors also have LTC customers serviced from the Bolivar, Branson West and Strafford retail pharmacies.

9.      The Debtors' two primary operating entities are INC and LLC.  INC operates nine (9) retail locations including Strafford[5] and the two (2) LTCs in Joplin and Ozark[6].  LLC operates 11 retail locations[7] and the one separate LTC portion of the retail store in Bolivar[8].  Again, LTC customers are also serviced from the Branson West and Strafford retail pharmacies.  Strafford is a wholly-owned subsidiary of INC, which operates one retail pharmacy in Strafford, Missouri.  HealthTAC is a Missouri limited liability company.  HealthTAC is in the business of purchasing generic prescription drugs for resale to INC, LLC and Strafford, and to other non-

---

[5] These INC retail locations include: (1) 7154 State Hwy 14E, Sparta, MO 65753; (2) 285 US Hwy 60W, Republic, MO 65738; (3) 4728 S. Campbell Avenue, Suite 132, Springfield, MO 65810; (4) 916 NW 12th Avenue, Suite F, Ava, MO 65608; (5) 1156 W. Jackson Street, Ozark, MO 65721;(6) 3202 Indiana Avenue, Joplin, MO 64804; (7) 527 W. Kearney Street, Springfield, MO 65803; (8) 520 E. Jackson Street, Willard, MO 65781; and (9) 307 E. Old Route 66, Strafford, Missouri 665757.

[6] These LTC locations include: (1) 3202 Indiana Avenue, Joplin, MO 64804 and (2) 1142 W. Jackson Street, Ozark, MO 65721.

[7] These LLC retail locations include: (1) 1326 W. Broadway Street, Bolivar, MO 65613; (2) 1494 State Hwy 248, Suite D, Branson, MO 65616; (3) 18192 Business 13, Suite A, Branson West, MO 65737; (4) 6809 State Highway 14W, Suite A, Clever, MO 65631; (5) 105 S. Ridgecrest Avenue, Suite 1, Nixa, MO 65714; (6) 225 Cross Creek Blvd., Suite A, Branson, MO 65616; (7) 49 E. Old Mill Road, Fair Grove, MO 65648; (8) 14974 US Highway 160, Forsyth, MO 65653; (9) 180 Mall Road, Hollister, MO 65672; (10) 759 W. Washington Street, Marshfield, MO 65706; and (11) 432 S. Mill Street, Suite 100, Rogersville, MO 65742.

[8] 1328 W. Broadway Street, Bolivar, MO 65613.

debtor, unrelated customers.  FPM is a holding company whose primary purpose is to be the owner of various parcels of real estate which FPM leases to INC, LLC and Strafford.[9]

10.    INC, LLC, FPM and HealthTAC are wholly-owned by Lynn A. Morris.[10]  As referenced above, INC wholly owns Strafford.

11.    Collectively, as of the Petition Date, the Debtors employ approximately 182 employees system wide.  These employees consist of pharmacists, pharmacy technicians, customer service representatives, front end managers, delivery drivers, district managers and various personnel in the warehouse and corporate facilities referenced above.

### C.  Financial Performance, Capital Structure and Overview

12.    For calendar year-end 2017, the Debtors posted gross revenues of approximately $60.3 million, compared to $66.8 million for 2016 and $68.3 for 2015.  System wide, the Debtors filled approximately 1 million prescriptions in 2017, compared to a high point of approximately 1.4 million prescriptions filled in each of 2014 and 2015.

13.    Traditionally,  97% - 98% of the Debtors' gross revenues are derived from prescriptions, with the balance of the revenues being derived from immunizations, wellness and holistic care products, health & beauty products, home medical supplies and equipment, and gifts for sale (collectively, the "Non-Rx Sales").

14.    Of the total prescription revenues, the majority are derived from retail prescriptions, compared to LTC.  For instance, the $60.3 million in 2017 revenues is comprised of $49.7 million retail prescription sales, $9.1 million LTC prescription sales and $1.46 million in Non-Rx Sales.  Likewise, 2016 reflected total revenues of $66.8 million, consisting of $55.1 million in retail prescription sales, $10.2 million in LTC prescription sales and $1.52 million in Non-Rx Sales.

---

[9] The Debtors' business facility in Joplin is owned by INC.
[10] Certain ownership interests are pledged to various creditors of either one or more of the Debtors or creditors of Lynn A. Morris.

2015 reflected total revenues of $68.3 million, consisting of $56.1 million in retail prescription sales,

$10.8 million in LTC prescription sales and $1.46 million in Non-Rx Sales.

15.     Debtors' suffered net losses for 2017 and 2016 of approximately $3.5 million[11]

and $4.04 million, respectively.  For 2015, the Debtors generated net profit of approximately

$686,000.

16.     The Debtors' primary wholesale pharmaceutical distributor is Smith Drug

Company, a division of J M Smith Corporation ("Smith").  Other than various generic

pharmaceuticals purchased by HealthTAC, substantially all Debtors' pharmaceuticals are

purchased from Smith.

17.     The Debtors have three primary secured creditors:  Bank of Missouri, Cardinal

Health and Smith (collectively the "Pre-Petition Lenders").

18.     Bank of Missouri is the Debtors' first priority secured creditor, asserting a blanket

security interest on the personal property of INC and LLC.  Additionally, Bank of Missouri

asserts real estate liens as a result of two separate Deeds of Trust on the corporate headquarters

and the warehouse, which are owned by FPM.  Bank of Missouri also asserts real estate liens on

the Bolivar, Joplin and Strafford locations.  The Debtors estimate that, as of the Petition Date, the

total indebtedness owed to Bank of Missouri was approximately $11 million.

19.     Cardinal Health is the Debtors' second priority secured lender, asserting blanket

security interests in the personal property of INC, LLC and Strafford.  To the best of the

Debtors' knowledge and belief, Cardinal Health does not have any liens in any real estate owned

by any of the Debtors.  The Debtors estimate that, as of the Petition Date, the total indebtedness

owed to Cardinal Health was approximately $1 million.

---

[11] This figure for 2017 is preliminary and subject to review and adjustment.

20.     Smith is the Debtors' third priority secured lender, asserting security interests in (i) the accounts receivable, inventory, computer systems, equipment (including, but not limited to, removable racks, furniture, appliances and other office equipment and supplies), and (ii) customer lists, patient lists and patient records in whatever form (such as hard copy, computer systems or electronic media), including but not limited to, prescription files, patient profiles containing the pharmacy practice records, prescription transactions, and medication therapy management records (the items described in clause (ii), collectively, the "Pharmacy Records") of INC, LLC, Strafford and FPM (except that Smith does not assert a security interest in the Pharmacy Records, if any, of FPM), regardless of when any of the foregoing are acquired, and proceeds from the sale or transfer of any of the foregoing. Smith also asserts a security interest in 20,000 shares of the common stock of Strafford, which common stock is owned by INC.  To the best of the Debtors' knowledge and belief, Smith does not have any liens in any real estate owned by any of the Debtors.  The Debtors estimate that, as of the Petition Date, the total indebtedness owed to Smith was approximately $18 million.

21.     In addition and as referenced above, UMB Bank asserts real estate liens as a result of a deed of trust encumbering Bolivar.  The Debtors estimate that, as of the Petition Date, the total indebtedness owed to UMB Bank was approximately $241,000.  Also, Michael and Carolyn Langston ("Langston") have a security interest in 20,000 shares of common stock issued by Strafford securing indebtedness owed by INC to Langston in the approximate amount of $215,000.  The Debtors are also parties to various capital leases, financing agreements and similar agreements that the Debtors and their counsel are in the process of reviewing and analyzing.

**D.  Events Leading to the Chapter 11 Cases; Proposed § 363 Sale Process**

22.      The primary causes of the Debtors' Chapter 11 filings are due to a variety of factors,

including, among other things:

> a.      A precipitous drop in the number of prescriptions filled from a high
> of approximately 1.4 million just three years ago to 1 million in 2017.
> As referenced above, this drop in prescriptions was mostly reflected
> in the reduced retail prescription revenue (i.e. from $56.1in 2016 to
> 49.7 in 2017);
>
> b.      Nationally, the numbers of prescriptions being filled are down year-
> over-year;
>
> c.      Increased competition from national pharmacy chains;
>
> d.      Increased operating expenses and overhead;
>
> e.      Downward pricing pressure from insurance providers and carriers,
> including the elimination of reimbursement for certain dispensing
> fees;
>
> f.      Persistent cash flow and liquidity issues;
>
> g.      A decrease in reimbursements for higher priced prescriptions; and
>
> h.      The Debtors' failure to adapt and adjust their business model,
> overhead and expenses quickly enough to remain profitable in
> changing market conditions.

23.      The net effect is that the Debtors do not have sufficient liquidity to continue their

businesses outside the protection of this Court and have been forced to seek relief pursuant to

Chapter 11 of the Bankruptcy Code.

24.      On or about April 3, 2018, the Debtors engaged James G.M. MacLaughlin to serve as

the Debtors' Chief Restructuring Officer ("CRO").  The CRO has continued in that role and has

already lead the implementation of several cost savings measures all in an effort to return the

Debtors to profitability and viability.

25.      The Debtors anticipate that these bankruptcy proceeding, including a § 363 sale

process, will enable them to effectively address their outstanding debt issues, maximize the value of

their assets, and enable them to focus on their core mission of providing high quality and low cost products to their customers through southwestern Missouri.  Specifically, no later than May 4, 2018, the Debtors intend to file an application seeking approval of proposed sale and bidding procedures with respect to a proposed stalking horse bid by an affiliate or designee of Smith pursuant to which Smith's affiliate or designee will acquire substantially all the assets of the Debtors.  The Debtors anticipate that the timeline for the sale process will be such that the sale can be completed in approximately 90-days from the Petition Date.

## RELIEF REQUESTED

26.     The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of the DIP Facility Credit Agreement and cash collateral.  The Debtors ability to preserve their relationships with employees, vendors and suppliers and to otherwise finance their operations is essential to the Debtors' continued viability and to their ability to provide pharmaceuticals to their customers (many of whom are senior citizens).  In the absence of an order approving the DIP Facility Credit Agreement and granting the use of cash collateral, serious and irreparable harm to the Debtors and their estates will occur.

27.     By this Motion, Debtors seek, *inter alia*, pursuant to Bankruptcy Code  §§ 105, 361, 362(a), 363(c), 364(c)(l), 364(c)(2), 364(c)(3) and 364(d)(l), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Rules"), the following:

a.      Authority for Debtors to use cash collateral of the Pre-Petition Lenders and granting adequate protection to the Pre-Petition Lenders for use of cash collateral as allowed in the proposed Interim DIP Order;

b.      Authority to obtain secured post-petition financing from the DIP Lender in accordance with the terms and conditions set forth in the DIP Facility Credit Agreement and the proposed Interim DIP Order, including, without limitation, being secured by

automatically perfected first priority senior liens and security
interests in all of the Debtors' real property (other than Bolivar)
and presently owned and after-acquired personal property and pre-
petition collateral, pursuant to Code §§ 364(c) and (d);

c.   Granting the DIP Lender super-priority status pursuant to
Bankruptcy Code § 364(c) and (d); and

d.   Approval of the terms and conditions of the DIP Facility Credit
Agreement and the proposed Interim DIP Order on a final basis.

28.   Debtors are unable to obtain working capital financing allowable as an

administrative expense under Bankruptcy Code § 503(b)(1).  Except for the proposed financing

from the DIP Lender described herein, the Debtors are also unable to obtain working capital

financing (1) allowable with priority as a superpriority administrative expense under Code §

364(c)(1) of the Code; (2) secured by a senior lien on the Debtors' unencumbered assets under

Code § 364(c)(2); or (3) secured by a junior lien on the Debtors' encumbered assets under Code

§ 364(c)(3).

29.   The DIP Lender has agreed to extend the DIP Facility Credit Agreement to

finance the Debtors' operations during a 90-day period while they seek to sell substantially all of

their assets.  A copy of the DIP Facility Credit Agreement is included herewith as Exhibit B.

30.   After considering all alternatives, the Debtors have concluded, in the exercise of

their business judgment, that the financing offered by the DIP Lender represents the best

working capital financing option.

31.   Pursuant to Bankruptcy Code § 364(c) and (d), Debtors will grant to Smith a

super-priority priming lien on all of the assets of Debtors (other than the Bolivar real property),

as more fully described in the proposed Interim DIP Order to secure the indebtedness represented

by the DIP Facility Credit Agreement.  As additional security for the DIP Facility Credit

Agreement, the DIP Lender shall be accorded a super-priority administrative claim pursuant to

Bankruptcy Code § 364(c)(1) with priority over all costs and expenses of administration of the Debtors' estates.

32.     Pursuant to Bankruptcy Code § 364(c)(2), Debtors shall also grant to the DIP Lender a first priority, perfected lien upon all of the Debtors' right, title and interest in, to and under all other Collateral which is not presently subject to any lien or security interest.

33.     The Superpriority DIP Claims and the DIP Facility Lien shall be subject to the payment of an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) to the extent allowed by the Court at any time, and solely to the extent provided for in the Approved Budget submitted by the Debtors pursuant to the DIP Facility Credit Agreement in form and substance satisfactory to the DIP Lender, all accrued and unpaid fees, disbursements, costs and expenses of professionals or professional firms retained by the Debtors and any official committee of creditors incurred at any time after the Petition Date, not to exceed $300,000 in the aggregate, and with such sum automatically reduced by each payment made by the Debtors under an Approved Budget for such fees, disbursements, costs and expenses (collectively, the "Carve-Out"); provided, however, that the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Debtors, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender or its affiliates, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Obligations or the security interests and liens of the DIP Lender in respect thereof, or asserting any claims or causes of action,

KCP-8363892-3

17

including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the

DIP Lender or its affiliates.

34.     As further adequate protection for Debtors' use of the Pre-Petition Lenders' cash

collateral, Debtors will agree to use cash collateral only in strict accordance with the terms of the

proposed Interim DIP Order, the DIP Facility Credit Agreement and the Approved Budget.

35.     Additionally, as adequate protection for any diminution in the value of the Pre-

Petition Lenders' collateral resulting from (i) the liens and security interests granted by the DIP

Facility Credit Agreement and this Order or otherwise pursuant to Bankruptcy Code § 364(d),

(ii) the Debtors' use of cash collateral pursuant to Bankruptcy Code § 363(c), (iii) the use, sale or

lease of the collateral (other than cash collateral) pursuant to Bankruptcy Code § 363(c) and (iv)

the imposition of the automatic stay pursuant to Bankruptcy Code § 362(a), the Pre-Petition

Lenders are granted replacement liens in all of Debtors' collateral to the same extent, validity,

and priority that existed as of the Petition Date except that the DIP Lender shall be entitled to its

super-priority priming lien as set forth in the DIP Facility Credit Agreement and proposed

Interim DIP Order solely for the obligations owed to it under the DIP Facility Credit Agreement.

36.     Debtors shall not use cash collateral to pay prepetition interest or principal on any

existing indebtedness other than as ordered by the Court.

37.     The relief requested in this Motion is necessary, essential, and appropriate for the

preservation of the Debtors' estates, and is in the best interests of the Debtors, their estates, and

their creditors. Debtors submit that the terms and conditions of the DIP Facility Credit

Agreement are fair, reasonable, and the best available under the circumstances, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and

constitute reasonably equivalent value and fair consideration. Finally, Debtors have concluded

that use of cash collateral and obtaining the DIP Facility Credit Agreement which the DIP

Lender is willing to provide is the only credit, secured or unsecured, available to Debtors.

Without such credit, the Debtors would be unable to continue to operate their businesses and

serve their customers, and the Debtors' estates would be irreparably harmed and the interests of

the Pre-Petition Lenders would be irreparably diminished as the value of their Collateral would

be substantially and materially reduced.

38.     Debtors request that the Court hold an emergency hearing pending a final hearing on

interim use of cash collateral and an interim extension of credit as authorized by Fed. R. Bankr. P.

4001(b)(2).

39.     Pending the final hearing on use of cash collateral and extension of credit, Debtors

need authorization on an interim basis to use sufficient cash collateral and to borrow up to $600,000

in funds to avoid immediate and irreparable harm to the bankruptcy estates.

40.     Debtors further request that they be authorized to immediately use cash collateral to

the extent necessary to avoid immediate and irreparable harm to the estate pending an emergency

hearing on use of cash collateral.

41.     Debtors further request an order of this Court directing that the instant Motion and

any order entered with respect to the instant Motion, including the setting of any hearing by this

Court with respect to this Motion, be served by overnight mail on parties with an interest in cash

collateral, secured creditors, the United States Trustee, the Debtors consolidated list of 20 largest

unsecured creditors and parties requesting notice in the cases.

WHEREFORE, Debtors request that this Court (a) approve this Motion; (b) grant the

relief requested in this Motion, including approving the interim post-petition financing under the

terms and conditions set forth herein, in the DIP Facility Credit Agreement, and the proposed

Interim DIP Order; (c) enter the proposed Interim DIP Order; and (d) granting such other and

further relief as may be just and proper.

Dated: April 30, 2018.                    Respectfully submitted,

HUSCH BLACKWELL LLP

*/s/ John J. Cruciani*
John J. Cruciani              #43073
Michael D. Fielding           #53124
Christopher C. Miles          #63654
4801 Main Street, Suite 1000
Kansas City, Missouri 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
john.cruciani@huschblackwell.com
michael.fielding@huschblackwell.com
christopher.miles@huschblackwell.com

*Proposed Attorneys for the*
*Debtors and Debtors-in-Possession*

**<u>Table of Exhibits</u>**

| <u>Exhibit</u> | <u>Description</u> |
| --- | --- |
| A. | Interim DIP Order |
| B. | DIP Facility Credit Agreement |
| C. | Approved Budget |