IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No.  18-60521 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY, INC., | ) | Chapter 11 |
| | ) | |
| _____Debtor._____ | ) | |
| In re: | ) | Case No.  18-60523 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY OF MISSOURI, LLC, | ) | Chapter 11 |
| | ) | |
| _____Debtor._____ | ) | |
| In re: | ) | Case No.  18-60526 |
| | ) | (Joint Administration Pending) |
| HEALTHTAC LOGISTICS, LLC, | ) | Chapter 11 |
| | ) | |
| _____Debtor._____ | ) | |
| In re: | ) | Case No.  18-60525 |
| | ) | (Joint Administration Pending) |
| FAMILY PROPERTY MANAGEMENT, LLC, | ) | Chapter 11 |
| | ) | |
| _____Debtor._____ | ) | |
| In re: | ) | Case No.  18-60524 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY OF STRAFFORD, INC., | ) | Chapter 11 |
| | ) | |
| _____Debtor._____ | ) | |

**EMERGENCY MOTION FOR DETERMINATION THAT SECTION 333 IS NOT
APPLICABLE IN THIS CASE OR, IN THE ALTERNATIVE, APPOINTMENT
<u>OF A PATIENT CARE OMBUDSMAN IS NOT NECESSARY</u>**

Family Pharmacy, Inc. ("<u>INC</u>"), Family Pharmacy of Missouri, LLC ("<u>LLC</u>"), HealthTAC Logistics, LLC ("<u>HealthTAC</u>"), Family Property Management, LLC ("<u>FPM</u>"), and Family Pharmacy of Strafford, Inc. ("<u>Strafford</u>"), as debtors and debtors-in-possession (collectively, the "<u>Debtors</u>"), submit this motion (the "<u>Motion</u>"), by and through their counsel,,

move this Court for an expedited order determining that 11 U.S.C. § 333 is not applicable in this case or, in the alternative, appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333 is not needed given the particular facts of this case. In support of this motion, the Debtors state as follows:

## BACKGROUND

**A.     The Chapter 11 Filings**

1.      On April 30, 2018 ("Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

2.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

**B.     The Debtors' Businesses, Background Information and Organizational Structure**

3.      The Debtors own and operate the largest group of independently-owned retail pharmacy stores in southwestern Missouri. Collectively, throughout southwestern Missouri, the Debtors operate approximately 20 retail pharmacy locations, two (2) long term care pharmacy locations and one (1) specialty pharmacy location located in Ozark, MO. In addition, Debtors have their corporate headquarters located at 4101 N. State Hwy NN, Ozark, MO, a warehouse facility which is contiguous to the corporate headquarters and a leased billing office in Ozark, MO. The Debtors operate their pharmacies under the "Family Pharmacy" banner.[1]  Family Pharmacy has been operating continuously since 1977. Family Pharmacy is ranked as a top 100 U.S. drug store chain, last year ranking number 41 in the U.S. in total sales.

---

[1] www.thefamilyrx.com  "BEST Service + LOW Prices"

4. A typical Family Pharmacy retail store is approximately 2,500 – 3,000 square feet in size, and offers health screenings, serves prescription needs, offers wellness and holistic care products, health & beauty products, home medical supplies and equipment, and gifts for sale.

5. All of the Debtors' retail locations are leased from third-parties, other than Bolivar, Fair Grove and Strafford which are owned by FPM and the Joplin location, which is owned by INC. Bank of Missouri has deeds of trust encumbering Fair Grove, Joplin, Strafford, the corporate headquarters and the warehouse. UMB Bank has a deed of trust encumbering Bolivar.

6. The Debtors' two long term care ("LTC") pharmacy locations, one of which (Ozark) is a "closed shop" pharmacy, meaning it is not open to the general retail public. The other LTC (Joplin) is located inside the Joplin retail pharmacy. The LTCs serve over 120 nursing homes, assisted living and residential care facilities, hospices and other specialty providers across southwestern Missouri. All prescriptions from the LTCs are either delivered via drivers who are employees of the Debtors or delivered via courier (e.g. FedEx, UPS, etc.). As noted above, the Debtors have LTCs in Joplin, Missouri and Ozark, Missouri. The Debtors also have LTC customers serviced from the Bolivar, Branson West and Strafford retail pharmacies.

7. The Debtors' two primary operating entities are INC and LLC. INC operates nine (9) retail locations including Strafford[2] and the two (2) LTCs in Joplin and Ozark[3]. LLC operates 11 retail locations[4] and the one separate LTC portion of the retail store in Bolivar[5].

---

[2] These INC retail locations include: (1) 7154 State Hwy 14E, Sparta, MO 65753; (2) 285 US Hwy 60W, Republic, MO 65738; (3) 4728 S. Campbell Avenue, Suite 132, Springfield, MO 65810; (4) 916 NW 12th Avenue, Suite F, Ava, MO 65608; (5) 1156 W. Jackson Street, Ozark, MO 65721;(6) 3202 Indiana Avenue, Joplin, MO 64804; (7) 527 W. Kearney Street, Springfield, MO 65803; (8) 520 E. Jackson Street, Willard, MO 65781; and (9) 307 E. Old Route 66, Strafford, Missouri 665757.
[3] These LTC locations include: (1) 3202 Indiana Avenue, Joplin, MO 64804 and (2) 1142 W. Jackson Street, Ozark, MO 65721.
[4] These LLC retail locations include: (1) 1326 W. Broadway Street, Bolivar, MO 65613; (2) 1494 State Hwy 248, Suite D, Branson, MO 65616; (3) 18192 Business 13, Suite A, Branson West, MO 65737; (4) 6809 State Highway 14W, Suite A, Clever, MO 65631; (5) 105 S. Ridgecrest Avenue, Suite 1, Nixa, MO 65714; (6) 225 Cross Creek Blvd., Suite A, Branson, MO 65616; (7) 49 E. Old Mill Road, Fair Grove, MO 65648; (8) 14974 US Highway 160, Forsyth, MO 65653; (9) 180 Mall Road, Hollister,

Again, LTC customers are also serviced from the Branson West Strafford retail pharmacies. Strafford is a wholly-owned subsidiary of INC, which operates one retail pharmacy in Strafford, Missouri. HealthTAC is a Missouri limited liability company. HealthTAC is in the business of purchasing generic prescription drugs for resale to INC, LLC and Strafford, and to other non-debtor, unrelated customers. FPM is a holding company whose primary purpose is to be the owner of various parcels of real estate which FPM leases to INC, LLC and Strafford.[6]

8. INC, LLC, FPM and HealthTAC are wholly-owned by Lynn A. Morris.[7] As referenced above, INC wholly owns Strafford.

9. Collectively, as of the Petition Date, the Debtors employ approximately 182 employees system wide. These employees consist of pharmacists, pharmacy technicians, customer service representatives, front end managers, delivery drivers, district managers and various personnel in the warehouse and corporate facilities referenced above.

**C.    Financial Performance, Capital Structure and Overview**

10. For calendar year-end 2017, the Debtors posted gross revenues of approximately $60.3 million, compared to $66.8 million for 2016 and $68.3 for 2015. System wide, the Debtors filled approximately 1 million prescriptions in 2017, compared to a high point of approximately 1.4 million prescriptions filled in each of 2014 and 2015.

11. Traditionally, 97% - 98% of the Debtors' gross revenues are derived from prescriptions, with the balance of the revenues being derived from immunizations, wellness and holistic care products, health & beauty products, home medical supplies and equipment, and gifts for sale (collectively, the "Non-Rx Sales").

---

MO 65672; (10) 759 W. Washington Street, Marshfield, MO 65706; and (11) 432 S. Mill Street, Suite 100, Rogersville, MO 65742.
[5] 1328 W. Broadway Street, Bolivar, MO 65613.
[6] The Debtors' business facility in Joplin is owned by INC.
[7] Certain ownership interests are pledged to various creditors of either one or more of the Debtors or creditors of Lynn A. Morris.

12. Of the total prescription revenues, the majority are derived from retail prescriptions, compared to LTC. For instance, the $60.3 million in 2017 revenues is comprised of $49.7 million retail prescription sales, $9.1 million LTC prescription sales and $1.46 million in Non-Rx Sales. Likewise, 2016 reflected total revenues of $66.8 million, consisting of $55.1 million in retail prescription sales, $10.2 million in LTC prescription sales and $1.52 million in Non-Rx Sales. 2015 reflected total revenues of $68.3 million, consisting of $56.1 million in retail prescription sales, $10.8 million in LTC prescription sales and $1.46 million in Non-Rx Sales.

13. Debtors' suffered net losses for 2017 and 2016 of approximately $3.5 million[8] and $4.04 million, respectively. For 2015, the Debtors generated net profit of approximately $686,000.

14. The Debtors' primary wholesale pharmaceutical distributor is Smith Drug Company, a division of J M Smith Corporation ("Smith"). Other than various generic pharmaceuticals purchased by HealthTAC, substantially all Debtors' pharmaceuticals are purchased from Smith.

15. The Debtors have three primary secured creditors: Bank of Missouri, Cardinal Health and Smith.

16. Bank of Missouri is the Debtors' first priority secured creditor, asserting a blanket security interest on the personal property of INC and LLC. Additionally, Bank of Missouri asserts real estate liens as a result of two separate Deeds of Trust on the corporate headquarters and the warehouse, which are owned by FPM. Bank of Missouri also asserts real estate liens on the Fair Grove, Joplin and Strafford locations. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to Bank of Missouri was approximately $11 million.

---

[8] This figure for 2017 is preliminary and subject to review and adjustment.

17. Cardinal Health is the Debtors' second priority secured lender, asserting blanket security interests in the personal property of INC and LLC. To the best of the Debtors' knowledge and belief, Cardinal Health does not have any liens in any real estate owned by any of the Debtors. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to Cardinal Health was approximately $1 million.

18. Smith is the Debtors' third priority secured lender, asserting security interests in (i) the accounts receivable, inventory, computer systems, equipment (including, but not limited to, removable racks, furniture, appliances and other office equipment and supplies), and (ii) customer lists, patient lists and patient records in whatever form (such as hard copy, computer systems or electronic media), including but not limited to, prescription files, patient profiles containing the pharmacy practice records, prescription transactions, and medication therapy management records (the items described in clause (ii), collectively, the "Pharmacy Records") of INC, LLC, Strafford and FPM (except that Smith does not assert a security interest in the Pharmacy Records, if any, of FPM), regardless of when any of the foregoing are acquired, and proceeds from the sale or transfer of any of the foregoing. Smith also asserts a security interest in 20,000 shares of the common stock of Strafford, which common stock is owned by INC. To the best of the Debtors' knowledge and belief, Smith does not have any liens in any real estate owned by any of the Debtors. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to Smith was approximately $18 million.

19. In addition and as referenced above, UMB Bank asserts real estate liens as a result of a deed of trust encumbering Bolivar. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to UMB Bank was approximately $241,000. Also, Michael and Carolyn Langston ("Langston") have a security interest in 20,000 shares of common stock issued by

Strafford securing indebtedness owed by INC to Langston in the approximate amount of $215,000. The Debtors are also parties to various capital leases, financing agreements and similar agreements that the Debtors and their counsel are in the process of reviewing and analyzing.

**D.     Events Leading to the Chapter 11 Cases**

20.     The primary causes of the Debtors' Chapter 11 filings are due to a variety of factors, including, among other things:

   a. a precipitous drop in the number of prescriptions filled from a high of approximately 1.4 million just three years ago to 1 million in 2017. As referenced above, this drop in prescriptions was mostly reflected in the reduced retail prescription revenue (i.e. from $56.1in 2016 to 49.7 in 2017);

   b. Nationally, the numbers of prescriptions being filled are down year-over-year;

   c. Increased competition from national pharmacy chains;

   d. Increased operating expenses and overhead;

   e. Downward pricing pressure from insurance providers and carriers, including the elimination of reimbursement for certain dispensing fees;

   f. Persistent cash flow and liquidity issues;

   g. A decrease in reimbursements for higher priced prescriptions; and

   h. The Debtors' failure to adapt and adjust their business model, overhead and expenses quickly enough to remain profitable in changing market conditions.

21.     The net effect is that the Debtors do not have sufficient liquidity to continue their businesses outside the protection of this Court and have been forced to seek relief pursuant to Chapter 11 of the Bankruptcy Code.

22.     On or about April 3, 2018, the Debtors engaged James G.M. MacLaughlin to serve as the Debtors' Chief Restructuring Officer ("CRO").  The CRO has continued in that role and has already lead the implementation of several cost savings measures all in an effort to return the Debtors to profitability and viability.

23.     The Debtors anticipate that these bankruptcy proceeding, including a § 363 sale process, will enable them to effectively address their outstanding debt issues, maximize the value of their assets, and enable them to focus on their core mission of providing high quality and low cost products to their customers through southwestern Missouri.  Specifically, no later than May 4, 2018, the Debtors intend to file an application seeking approval of proposed sale and bidding procedures with respect to a proposed stalking horse bid by an affiliate or designee of Smith pursuant to which Smith's affiliate or designee will acquire substantially all the assets of the Debtors.  The Debtors anticipate that the timeline for the sale process will be such that the sale can be completed in approximately 90-days from the Petition Date.

E.     **Background Facts relevant to whether appointment of a patient care ombudsman is appropriate or necessary**.

24.     The Debtors offer vaccination services at their various locations.

25.     The revenue from the vaccination services constitutes significantly less than one percent of the Debtors' total revenue.

26.     The Debtors are not engaged in routine patient care.

27.     The Debtors do not report to any state or federal regulatory bodies.

28. Some of the locations[9] operated by Debtors do participate in the St. Louis County Prescription Drug Monitoring Program, which requires INC, LLC and Strafford to report information regarding certain pharmaceuticals designated as "controlled substances."

29. The Debtors are currently accredited by the Healthcare Quality Association on Accreditation ("HQAA") for the narrow designation for pharmacies that sell durable medical goods.

## RELIEF REQUESTED

30. By this motion, the Debtors request that this Court determine that the appointment of a patient care ombudsman under 11 U.S.C. § 333 is not needed because Debtors are not "health care businesses" or, in the alternative, because of the particular facts and circumstances of this case.

## LAW & ARGUMENT

**A.    Debtors are not "health care businesses" as defined by the Bankruptcy Code and therefore Section 333 is not applicable**.

31. Section 333(a)(1) of the Bankruptcy Code provides:

> (a)(1) *If the debtor* in a case under chapter 7, 9, or 11 *is a health care business*, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case.

11 U.S.C. § 333(a)(1) (emphasis added).

32. The Bankruptcy Code defines "health care business" as:

---

[9] These include: 4728 S. Campbell Avenue, Suite 132, Springfield, MO 65810; 3202 Indiana Avenue, Joplin, MO 64804; 527 W. Kearney Street, Springfield, MO 65803; 520 E. Jackson Street, Willard, MO 65781; 307 E. Old Route 66, Strafford, Missouri 665757; 1326 W. Broadway Street, Bolivar, MO 65613; 49 E. Old Mill Road, Fair Grove, MO 65648; 14974 US Highway 160, Forsyth, MO 65653; 180 Mall Road, Hollister, MO 65672; 1494 State Hwy 248, Suite D, Branson, MO 65616; 18192 Business 13, Suite A, Branson West, MO 65737; and 225 Cross Creek Blvd., Suite A, Branson, MO 65616

  (A) means any public or private entity (without regard to whether that entity is organized for profit or not for profit) that is primarily engaged in offering to the general public facilities and services for--

   (i) the diagnosis or treatment of injury, deformity, or disease; and

   (ii) surgical, drug treatment, psychiatric, or obstetric care; and

  (B) includes--

   (i) any--

    (I) general or specialized hospital;

    (II) ancillary ambulatory, emergency, or surgical treatment facility;

    (III) hospice;

    (IV) home health agency; and

    (V) other health care institution that is similar to an entity referred to in subclause (I), (II), (III), or (IV); and

   (ii) any long-term care facility, including any--

    (I) skilled nursing facility;

    (II) intermediate care facility;

    (III) assisted living facility;

    (IV) home for the aged;

    (V) domiciliary care facility; and

    (VI) health care institution that is related to a facility referred to in subclause (I), (II), (III), (IV), or (V), if that institution is primarily engaged in offering room, board, laundry, or personal assistance with activities of daily living and incidentals to activities of daily living.

11 U.S.C. § 101(27A).

  33. "Subsections of § 101(27A)(A) and of subsection (B) are connected by the conjunctive. Thus a debtor who is a 'health care business' must meet <u>every</u> requirement under both subsections for a patient care ombudsman to be appointed." *In re William L. Saber, M.D.*,

*P.C.*, 369 B.R. 631, 636 (Bankr. D. Colo. 2007) (emphasis added); *see also In re Banes*, 355 B.R. 532, 534 (Bankr. M.D.N.C. 2006).

34. "Subsection (A) of the definition of health care business in section 101(27A) requires the existence of the following four elements in order for a debtor to qualify as a "health care business":

> 1. The debtor must be a public or private entity;
>
> 2. The debtor must be primarily engaged in offering to the general public facilities and services;
>
> 3. The facilities and services must be offered to the public for the diagnosis or treatment of injury, deformity or disease; and
>
> 4. The facilities and services must be offered to the public for surgical care, drug treatment, psychiatric care or obstetric care.

*In re Med. Assocs. of Pinellas, L.L.C.*, 360 B.R. 356, 359 (Bankr. M.D. Fla. 2007).

35. Here, the Debtors are not primarily engaged in offering to the general public facilities and services. The only services that conceivably meet the definition of "diagnosis or treatment of injury, deformity or disease," are the vaccination services offered by the Debtors at their various locations. However, the percentage of revenue generated by these vaccination services is significantly less than one percent (1%) of the Debtors' total revenue, and therefore cannot be an activity in which Debtors are "primarily engaged." Furthermore, the LTCs are not engaged in offering services to the "general public."

36. Additionally, a "pharmacy" is not one of the enumerated types of businesses in subpart (B), nor does it reasonably fit in any of the catch-all subcategories. *See* 11 U.S.C. § 101(27A).

37. The Debtors meet neither the requirements of subpart (A) or (B) of Section 101(27A). Both are required for the Court to find that the Debtors are "health care businesses"

under Section 101(27B). *See In re William L. Saber, M.D., P.C.*, 369 B.R. at 636; *In re Banes*, 355 B.R. at 534.

38. Accordingly, the Court should find that Section 333 does not apply and the appointment of an ombudsman is not appropriate in this case.

**B. Even if the Debtors are "health care businesses," the appointment of a patient care ombudsman is not necessary**.

39. Section 333(a)(1) of the Bankruptcy Code provides:

> (a)(1) If the debtor in a case under chapter 7, 9, or 11 is a health care business, the court shall order, not later than 30 days after the commencement of the case, the appointment of an ombudsman to monitor the quality of patient care and to represent the interests of the patients of the health care business *unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific facts of the case*.

11 U.S.C. § 333(a)(1) (emphasis added).

40. Fed. R. Bankr. P. 2007.2 further provides that, in cases where the debtor is a health care business, the Bankruptcy Court shall appoint a patient care ombudsman unless, within 21 days following the commencement of the bankruptcy case, the trustee or a party in interest moves the court for a determination that "the appointment of a patient care ombudsman is not necessary under the specific circumstances of the case for the protection of patients." FED. R. BANKR. P. 2007.2.

41. In dealing with these issues, numerous bankruptcy courts have determined that the appointment of a patient care ombudsman was not necessary. *See e.g., In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. 7 (Bankr. E.D.N.Y. 2008); *In re Valley Health System*, 381 B.R. 756 (Bankr. C.D. Cal. 2008); *In re Alternate Family Care*, 377 B.R. 754 (Bankr. S.D. Fla. 2007); *In re William L. Saber, M.D., P.C.*, 369 B.R. 631. In these cases, an ombudsman was not required because there was no evidence that the health care provider's

bankruptcy was due to poor quality patient care, there was no serious concern about on-going patient issues and/or the bankruptcy filing was precipitated by ordinary business debt issues. *See e.g., In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. 7 (Bankr. E.D.N.Y. 2008); *In re Valley Health System*, 381 B.R. 756 (Bankr. C.D. Cal. 2008); *In re Alternate Family Care*, 377 B.R. 754 (Bankr. S.D. Fla. 2007); *In re William L. Saber, M.D., P.C.*, 369 B.R. 631 (Bankr. D. Colo. 2007).

42. The bankruptcy court considers the totality of the circumstances in determining whether to excuse the appointment of a patient care ombudsman under 11 U.S.C. § 333. *In re Alternate Family Care*, 377 B.R. at 758. To assist in that determination, bankruptcy courts have considered the following factors:

1. The cause of the bankruptcy;

2. The presence and role of licensing or supervising entities;

3. Debtor's past history of patient care;

4. The ability of the patients to protect their rights;

5. The level of dependency of the patients on the facility;

6. The likelihood of tension between the interests of the patients and the debtor;

7. The potential injury to the patients if the debtor drastically reduced its level of patient care;

8. The presence and sufficiency of internal safeguards to ensure appropriate level of care;

9. The impact of the cost of an ombudsman on the likelihood of a successful reorganization;

10. The high quality of the debtor's existing patient care;

11. The debtor's financial ability to maintain high quality patient care;

    12. The existence of an internal ombudsman program to protect the rights of patients; and/or

    13. The level of monitoring and oversight by federal, state, local, or professional association programs which renders the services of an ombudsman redundant.

*In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. at 11; *see also In re Pediatrics at Whitlock, P.C.*, 507 B.R. 10, 11 (Bankr. N.D. Ga. 2014); *In re Valley Health System*, 381 B.R. at 761; *In re Alternate Family Care*, 377 B.R. at 758.

    43.    The weight afforded to each of these factors is left to the sound discretion of the Court. *In re North Shore Hematology-Oncology Associates, P.C.*, 400 B.R. at 11; *In re Valley Health System*, 381 B.R. at 762 (Bankr. C.D. Cal. 2008).

    44.    The decision to excuse the appointment of a patient care ombudsman is not permanent. Pursuant to 11 U.S.C. § 333 and Fed. R. Bankr. P. 2007.2(b), a bankruptcy court may reconsider at a future date the necessity of appointing a patient care ombudsman.

    45.    There are substantial reasons why the appointment of a patient care ombudsman is not warranted in this case. As noted above, the Debtors' bankruptcy filing has been wholly driven by ordinary debt issues. None of the debt issues which have precipitated this bankruptcy filing relate to "patient care" issues.

    46.    The Debtors are not subject to any kind of state or federal monitoring or regulation. The Debtors do provide reporting to the St. Louis County Prescription Drug Monitoring Program, which is a program designed to monitor the use of controlled substances, not one designed with patient care in mind. Accordingly, factors 2 and 13 do not favor the appointment of a patient care ombudsman.

    47.    The Debtors are not engaged in any kind of patient care, excepting the walk-in vaccination services described above. The vaccination services are the most routine and minor of treatments, and those services, even if discontinued, would be available to customers from other

providers in the various markets where the Debtors operate. Therefore, factors 3, 4, 5, 6, 7, 8, 10, 11, and 12, to the extent they are even applicable, do not favor the appointment of a patient care ombudsman.

48.  Lastly, the appointment of a patient care ombudsman would be a solution in search of a problem. Given the almost complete absence of patient care in the Debtor's operation of their businesses, it is unclear that an ombudsman would actually have anything to do, other than drive up costs of the bankruptcy unnecessarily. Accordingly, factor 9 does not favor the appointment of a patient care ombudsman.

49.  All factors weighing against the appointment of a patient care ombudsman, the Debtors request that the Court find that such an appointment is not necessary.

WHEREFORE, the Debtors request that this Court enter an Order finding that 11 U.S.C. § 333 is not applicable in this case or, in the alternative, appointment of a patient care ombudsman pursuant to 11 U.S.C. § 333 is not necessary, and enter all other relief in favor of the Debtors that is just and equitable.

Dated: April 30, 2018.

Respectfully submitted,

HUSCH BLACKWELL LLP

*/s/ Christopher C. Miles*
| John J. Cruciani | #43073 |
| Michael D. Fielding | #53124 |
| Christopher C. Miles | #63654 |

4801 Main Street, Suite 1000
Kansas City, Missouri 64112
Telephone: (816) 983-8000
Facsimile: (816) 983-8080
john.cruciani@huschblackwell.com
michael.fielding@huschblackwell.com
christopher.miles@huschblackwell.com

*Proposed Attorneys for the
Debtors and Debtors-in-Possession*