IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MISSOURI

| | | |
|---|---|---|
| In re: | ) | Case No.  18-60521 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | | |
| In re: | ) | Case No.  18-60523 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY OF MISSOURI, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | | |
| In re: | ) | Case No.  18-60526 |
| | ) | (Joint Administration Pending) |
| HEALTHTAC LOGISTICS, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | | |
| In re: | ) | Case No.  18-60525 |
| | ) | (Joint Administration Pending) |
| FAMILY PROPERTY MANAGEMENT, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | | |
| In re: | ) | Case No.  18-60524 |
| | ) | (Joint Administration Pending) |
| FAMILY PHARMACY OF STRAFFORD, INC., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

**DECLARATION OF JAMES G.M. MACLAUGHLIN**
**IN SUPPORT OF DEBTORS' EMERGENCY FIRST DAY MOTIONS**

I, James G.M. MacLaughlin make the following declaration under penalty of perjury:

1. My name is James G.M. MacLaughlin and I am over 21 years of age and am competent to testify to the matters herein.

2. I am the Chief Restructuring Officer ("CRO") of Family Pharmacy, Inc. ("INC") and the other above-captioned Debtors (collectively the "Debtors") and have served in this capacity since April 3, 2018.

3. In my capacity as CRO for the Debtors I am responsible for, among other things,

   a. Serving as CRO, responsible and with authority, for all of the duties of the Debtors' chief executive officer, for all aspects of the Debtors' day-to-day operations and finances and empowered to direct the activities of the Company with the goal of raising profitability and cash flow and restoring the Company to compliance with its creditors' financing arrangements;

   b. Exercising authority over all members of management and staff with the authority to hire, terminate, and change the compensation and benefits of all employees;

   c. maintaining communications with the Debtors' creditors including but not limited to J M Smith Corporation and secured creditors, including Bank of Missouri, and other constituencies (collectively, "Creditors") to keep them fully informed as to the Debtors' status as it implements its plans;

   d. facilitating the involvement of other outside consultants, including pharmacy management experts, to evaluate the Debtors' operations and make recommendations for changes to improve profitability and cash flow;

   e. analyzing historical financial performance;

   f. evaluating the Debtors' current liquidity situation and quantify any near-term funding requirements;

   g. preparing budgets for the Debtors' ongoing operations;

   h. analyzing any and all restructuring options for the Company; and

   i. Leading forbearance and restructuring arrangements with the Creditors, and manage the Debtors' negotiations with Creditors, including negotiations relating to the Debtors' restructuring plan, which arrangements shall remain subject to final Board of Director/Shareholder and Manager/Member approval of the Company

4. I am familiar with the Debtors' day-to-day operations, businesses and financial affairs.

5. I am a member of Lloyd & MacLaughlin LLC ("L&M"). I have over 30 years of experience in accounting and distressed corporate settings. Mr. MacLaughlin regularly provides restructuring and financial advisory services to parties in a broad array of distressed corporate settings.

6. I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that compelled the commencement of these chapter 11 cases and in support of: (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on April 30, 2018 (the "Petition Date"); and (ii) the relief, in the form of motions and applications, that the Debtors have requested of the Court (collectively, the "First Day Pleadings").

7. Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, or my opinion based upon experience, knowledge, and information concerning the Debtors' operations and financial affairs. If called upon to testify, I would testify competently to the facts set forth in this Declaration. I am authorized to submit this Declaration on behalf of the Debtors.

8. This Declaration is intended to provide a summary overview of the Debtors and these chapter 11 cases. Sections I through IV of this Declaration provide an overview of the Debtors businesses, organizational structure, capital structure, and the circumstances giving rise to the commencement of these chapter 11 cases. Section V provides an overview of the relief requested in the First Day Pleadings.

*The Chapter 11 Filings*

9. On April 30, 2018 ("Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

*The Debtors' Businesses, Background Information and Organizational Structure*

10. The Debtors own and operate the largest group of independently-owned retail pharmacy stores in southwestern Missouri. Collectively, throughout southwestern Missouri, the Debtors operate approximately 20 retail pharmacy locations, two (2) long term care pharmacy locations and one (1) specialty pharmacy location located in Ozark, MO. In addition, Debtors have their corporate headquarters located at 4101 N. State Hwy NN, Ozark, MO, a warehouse facility which is contiguous to the corporate headquarters and a leased billing office in Ozark, MO. The Debtors operate their pharmacies under the "Family Pharmacy" banner.[1] Family Pharmacy has been operating continuously since 1977. Family Pharmacy is ranked as a top 100 U.S. drug store chain, last year ranking number 41 in the U.S. in total sales.

11. A typical Family Pharmacy retail store is approximately 2,500 – 3,000 square feet in size, and offers health screenings, serves prescription needs, offers wellness and holistic care products, health & beauty products, home medical supplies and equipment, and gifts for sale.

12. All of the Debtors' retail locations are leased from third-parties, other than Bolivar, Fair Grove and Strafford which are owned by FPM and the Joplin location, which is owned by INC. Bank of Missouri has deeds of trust encumbering Fair Grove, Joplin, Strafford,

---

[1] www.thefamilyrx.com  "BEST Service + LOW Prices"

the corporate headquarters and the warehouse. UMB Bank has a deed of trust encumbering Bolivar.

13. The Debtors have two long term care ("LTC") pharmacy locations, one of which (Ozark) is a "closed shop" pharmacy, meaning it is not open to the general retail public. The other LTC (Joplin) is located inside the Joplin retail pharmacy. The LTCs serve over 120 nursing homes, assisted living and residential care facilities, hospices and other specialty providers across southwestern Missouri. All prescriptions from the LTCs are either delivered via drivers who are employees of the Debtors or delivered via courier (e.g. FedEx, UPS, etc.). As noted above, the Debtors have LTCs in Joplin, Missouri and Ozark, Missouri. The Debtors also have LTC customers serviced from the Bolivar, Branson West and Strafford retail pharmacies.

14. The Debtors' two primary operating entities are INC and LLC. INC operates nine (9) retail locations including Strafford[2] and the two (2) LTCs in Joplin and Ozark[3]. LLC operates 11 retail locations[4] and the one separate LTC portion of the retail store in Bolivar[5]. Again, LTC customers are also serviced from the Branson West and Strafford retail pharmacies. Strafford is a wholly-owned subsidiary of INC, which operates one retail pharmacy in Strafford, Missouri. HealthTAC is a Missouri limited liability company. HealthTAC is in the business of purchasing generic prescription drugs for resale to INC, LLC and Strafford, and to other non-

---

[2] These INC retail locations include: (1) 7154 State Hwy 14E, Sparta, MO 65753; (2) 285 US Hwy 60W, Republic, MO 65738; (3) 4728 S. Campbell Avenue, Suite 132, Springfield, MO 65810; (4) 916 NW 12th Avenue, Suite F, Ava, MO 65608; (5) 1156 W. Jackson Street, Ozark, MO 65721;(6) 3202 Indiana Avenue, Joplin, MO 64804; (7) 527 W. Kearney Street, Springfield, MO 65803; (8) 520 E. Jackson Street, Willard, MO 65781; and (9) 307 E. Old Route 66, Strafford, Missouri 665757.
[3] These LTC locations include: (1) 3202 Indiana Avenue, Joplin, MO 64804 and (2) 1142 W. Jackson Street, Ozark, MO 65721.
[4] These LLC retail locations include: (1) 1326 W. Broadway Street, Bolivar, MO 65613; (2) 1494 State Hwy 248, Suite D, Branson, MO 65616; (3) 18192 Business 13, Suite A, Branson West, MO 65737; (4) 6809 State Highway 14W, Suite A, Clever, MO 65631; (5) 105 S. Ridgecrest Avenue, Suite 1, Nixa, MO 65714; (6) 225 Cross Creek Blvd., Suite A, Branson, MO 65616; (7) 49 E. Old Mill Road, Fair Grove, MO 65648; (8) 14974 US Highway 160, Forsyth, MO 65653; (9) 180 Mall Road, Hollister, MO 65672; (10) 759 W. Washington Street, Marshfield, MO 65706; and (11) 432 S. Mill Street, Suite 100, Rogersville, MO 65742.
[5] 1328 W. Broadway Street, Bolivar, MO 65613.

KCP-8362058-3                                5

debtor, unrelated customers. FPM is a holding company whose primary purpose is to be the owner of various parcels of real estate which FPM leases to INC, LLC and Strafford.[6]

15. INC, LLC, FPM and HealthTAC are wholly-owned by Lynn A. Morris.[7] As referenced above, INC wholly owns Strafford.

16. Collectively, as of the Petition Date, the Debtors employ approximately 182 employees system wide. These employees consist of pharmacists, pharmacy technicians, customer service representatives, front end managers, delivery drivers, district managers and various personnel in the warehouse and corporate facilities referenced above.

17. The Debtors offer vaccination services at their various locations.

18. The revenue from the vaccination services constitutes significantly less than one percent of the Debtors' total revenue.

19. The Debtors are not engaged in routine patient care.

20. The Debtors do not report to any state or federal regulatory bodies.

21. Some of the locations[8] operated by Debtors do participate in the St. Louis County Prescription Drug Monitoring Program, which requires INC, LLC and Strafford to report information regarding certain pharmaceuticals designated as "controlled substances."

22. The Debtors are currently accredited by the Healthcare Quality Association on Accreditation ("HQAA") for the narrow designation for pharmacies that sell durable medical goods.

---

[6] The Debtors' business facility in Joplin is owned by INC.
[7] Certain ownership interests are pledged to various creditors of either one or more of the Debtors or creditors of Lynn A. Morris.
[8] These include: 4728 S. Campbell Avenue, Suite 132, Springfield, MO 65810; 3202 Indiana Avenue, Joplin, MO 64804; 527 W. Kearney Street, Springfield, MO 65803; 520 E. Jackson Street, Willard, MO 65781; 307 E. Old Route 66, Strafford, Missouri 665757; 1326 W. Broadway Street, Bolivar, MO 65613; 49 E. Old Mill Road, Fair Grove, MO 65648; 14974 US Highway 160, Forsyth, MO 65653; 180 Mall Road, Hollister, MO 65672; 1494 State Hwy 248, Suite D, Branson, MO 65616; 18192 Business 13, Suite A, Branson West, MO 65737; and 225 Cross Creek Blvd., Suite A, Branson, MO 65616

*Financial Performance, Capital Structure and Overview*

23.     For calendar year-end 2017, the Debtors posted gross revenues of approximately $60.3 million, compared to $66.8 million for 2016 and $68.3 for 2015. System wide, the Debtors filled approximately 1 million prescriptions in 2017, compared to a high point of approximately 1.4 million prescriptions filled in each of 2014 and 2015.

24.     Traditionally, 97% - 98% of the Debtors' gross revenues are derived from prescriptions, with the balance of the revenues being derived from immunizations, wellness and holistic care products, health & beauty products, home medical supplies and equipment, and gifts for sale (collectively, the "Non-Rx Sales").

25.     Of the total prescription revenues, the majority are derived from retail prescriptions, compared to LTC. For instance, the $60.3 million in 2017 revenues is comprised of $49.7 million retail prescription sales, $9.1 million LTC prescription sales and $1.46 million in Non-Rx Sales. Likewise, 2016 reflected total revenues of $66.8 million, consisting of $55.1 million in retail prescription sales, $10.2 million in LTC prescription sales and $1.52 million in Non-Rx Sales. 2015 reflected total revenues of $68.3 million, consisting of $56.1 million in retail prescription sales, $10.8 million in LTC prescription sales and $1.46 million in Non-Rx Sales.

26.     Debtors' suffered net losses for 2017 and 2016 of approximately $3.5 million[9] and $4.04 million, respectively. For 2015, the Debtors generated net profit of approximately $686,000.

27.     The Debtors' primary wholesale pharmaceutical distributor is Smith Drug Company, a division of J M Smith Corporation ("Smith"). Other than various generic

---

[9] This figure for 2017 is preliminary and subject to review and adjustment.

pharmaceuticals purchased by HealthTAC, substantially all Debtors' pharmaceuticals are purchased from Smith.

28. The Debtors have three primary secured creditors: Bank of Missouri, Cardinal Health and Smith.

29. Bank of Missouri is the Debtors' first priority secured creditor, asserting a blanket security interest on the personal property of INC and LLC. Additionally, Bank of Missouri asserts real estate liens as a result of two separate Deeds of Trust on the corporate headquarters and the warehouse, which are owned by FPM. Bank of Missouri also asserts real estate liens on the Fair Grove, Joplin and Strafford locations. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to Bank of Missouri was approximately $11 million.

30. Cardinal Health is the Debtors' second priority secured lender, asserting blanket security interests in the personal property of INC and LLC. To the best of the Debtors' knowledge and belief, Cardinal Health does not have any liens in any real estate owned by any of the Debtors. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to Cardinal Health was approximately $1 million.

31. Smith is the Debtors' third priority secured lender, asserting security interests in (i) the accounts receivable, inventory, computer systems, equipment (including, but not limited to, removable racks, furniture, appliances and other office equipment and supplies), and (ii) customer lists, patient lists and patient records in whatever form (such as hard copy, computer systems or electronic media), including but not limited to, prescription files, patient profiles containing the pharmacy practice records, prescription transactions, and medication therapy management records (the items described in clause (ii), collectively, the "Pharmacy Records") of INC, LLC, Strafford and FPM (except that Smith does not assert a security interest in the

Pharmacy Records, if any, of FPM), regardless of when any of the foregoing are acquired, and proceeds from the sale or transfer of any of the foregoing. Smith also asserts a security interest in 20,000 shares of the common stock of Strafford, which common stock is owned by INC. To the best of the Debtors' knowledge and belief, Smith does not have any liens in any real estate owned by any of the Debtors. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to Smith was approximately $18 million.

32.     In addition and as referenced above, UMB Bank asserts real estate liens as a result of a deed of trust encumbering Bolivar. The Debtors estimate that, as of the Petition Date, the total indebtedness owed to UMB Bank was approximately $241,000. Also, Michael and Carolyn Langston ("Langston") have a security interest in 20,000 shares of common stock issued by Strafford securing indebtedness owed by INC to Langston in the approximate amount of $215,000. The Debtors are also parties to various capital leases, financing agreements and similar agreements that the Debtors and their counsel are in the process of reviewing and analyzing.

### *The Utility Providers*

33.     In connection with the operation of their businesses, the Debtors obtain gas, water, sewer, electric, telephone, and other similar utility services. The Utility Providers service Debtors' various locations. Without utilities, Debtors' locations would be inoperable.

34.     In the aggregate, the Debtors pay the Utility Providers approximately $35,000 to $40,000 per month for services rendered.

35.     The Debtors maintained excellent payment histories with the Utility Providers prior to the Petition Date. To the best of their knowledge, the Debtors were not in default or arrearages with respect to any material utility bill as of the Petition Date.

36. Due to the length of time in operation and their excellent payment history, Debtors maintain nominal deposits with the Utility Providers. Debtors estimate that total current deposits across all locations with all Utility Providers are less than $1,500.

*Employee Wages, Payroll Taxes And Benefits*

37. As of the Petition Date, the Debtors employ approximately 182 employees system wide, including pharmacists and executives (the "Employees").

38. The Debtors process their respective payroll obligations on one unified schedule. Employees are paid bi-weekly, every other Friday, with one week's wages and benefits always in arrears. For example, the Debtors most recent pay date was Friday, April 27, 2018, which covered the period from April 9 through April 22, 2018. Thus, as of the Petition Date, the Debtors owed Employees prepetition wages and benefits from April 23 through April 30, 2018. The next scheduled pay date is May 11, 2018.

39. The Debtors use a third-party payroll service, Paycor ("Paycor"), to process their payroll. Debtors provide accounting data regarding the hours worked and salaries of each Employee to Paycor. All payroll is processed through INC for INC, LLC and Strafford. FPM and HealthTac do not have any employees. The Debtors then reconcile the amounts attributable to each Debtor through due to/due from accounts in the ordinary course of their business. Paycor "pulls" the required amounts due from INC's accounts in three transactions (for (a) pay, (b) taxes and (c) benefits/misc. items) the day before each regularly pay day. For example, Paycor pulled funds from INC's accounts on April 26 for the most recent pay day of April 27, 2018. Net pay due each Employee is then electronically transferred via direct deposit on the pay day. All Employees are paid via direct deposit. Similarly, payroll taxes, both employer and employee

portions, are transferred by automatic EFT to Paycor, and Paycor pays the payroll, payroll taxes and benefits/misc. items from its disbursing account.

40. Because the bankruptcy filing occurred in mid-pay cycle, many, if not all, of Debtors' currently active working Employees are owed various sums and benefits for work prior to the Petition Date ("Compensation").

41. Additionally, Debtors customarily reimburse Employees who incur a variety of business expenses in the ordinary course of Debtors' operations. Because these Employees do not always submit their claims for reimbursement promptly, it is difficult for Debtors to determine the amount outstanding at any particular time, but, based on prior experience, the amount should be approximately $10,000.

42. Debtors provide group health, dental and vision insurance for its Employees. Debtors subsidize each Employee's portion of the group health insurance. Debtors collect the Employees' portion of the group health insurance premium as a payroll deduction each pay period. The Debtors also collect the Employees' group health insurance premium for spouses or dependents, as well as the premiums for group dental and vision.

43. The Debtors intend to continue to provide these benefits post-petition on the same terms and conditions as their pre-petition policies and practices.

44. The Debtors also provide paid vacation, sick-leave and paid-time off (collectively "PTO"). Employees accumulate hours of PTO based on seniority and hours worked, in addition to set holidays each year.[10]

45. Rather than monetize such unpaid sums, the Debtors propose honoring PTO requests in the ordinary course of business such that an Employee who decides to take a day off or take a vacation may continue to do so provided it is scheduled in accordance with ordinary

---

[10] Each year, Employees receive the following paid pays off: six holiday days, their birthday and four sick days.

and customary practices for requesting PTO. As such, the Debtors do not expect to have any significant expenditures relating to PTO.

46. Given that the most recent pay day was the business day before the Petition Date, the Debtors have not yet estimated the amount of Compensation for the May 11, 2018 pay day. However, the Debtors believe that the total Compensation will be similar to if not less than the most recent pay roll for April 27, 2018. Attached hereto and incorporated herein as Exhibit A is the summary of the total payroll obligations for the April 27, 2018 payroll.

47. Failure to pay Employees the Compensation would jeopardize Debtors' reorganization by seriously undermining Employee morale and by posing a serious risk of the loss of valuable Employees.

48. The Debtors' ability to preserve their businesses and assets and ultimately reorganize or sell substantially all their assets will be adversely affected if they are unable to retain the services of a dedicated and loyal employee group. Accordingly, it is essential that the undue hardships that they may suffer as a consequence of the Chapter 11 filing are minimized and that morale is maintained.

49. As a result of this Chapter 11 filing, the Debtors are prohibited from paying claims that arose before the Petition Date unless Debtors receive specific Court authorization. Amounts owed to the Employees with respect to the period before the bankruptcy filings are claims with respect to which such prohibition applies.

50. To avoid the hardship that Debtors' Employees may otherwise suffer and maintain morale, Debtors seek authority to satisfy and pay Debtors' pre-petition Employee claims. Debtors also request authority to pay any related deductions and payroll tax withholdings. In addition, Debtors seek authorization to continue all of its present employee

benefit plans. Certain of these amounts overlap from pre-petition to post-petition and Debtors also seek authority to pay these limited pre-petition Employee claims to and on behalf of the Employees whenever such payment obligations fall due.

51. Furthermore, as has been Debtors' practices, to the extent deductions were made from the Employee's wages and salaries prior to the Petition Date, the Debtors propose to continue such pre-petition arrangements. The Debtors seek authorization to apply or deliver such deducted sums which represent property of the Employees for such purposes as contributions to insurance programs and savings plans, government and child support withholdings, in accordance with the Employees' prior requests and instructions and Debtors' standard ordinary practices.

52. Failure to continue the foregoing Employee Benefit Plans for the benefit of the Debtors' Employees would jeopardize Debtors' reorganization by undermining Employee morale.

*Existing Bank Accounts*

53. As of the Petition Date, the Debtors maintained numerous bank accounts with several financial institutions, including Bank of Missouri, Great Southern Bank, First Home Savings Bank, Commerce Bank, Bank of Bolivar, Central Bank of the Ozarks, First Community Bank, First Home Savings Bank and Citizens Bank. Bank of Missouri is a secured creditor herein, while the balance of the financial institutions set forth in this paragraph are merely depository banks for the Debtors.

54. The Debtors' cash management system is governed by numerous documents, agreements, internal procedures and understandings between the Debtors and the various banks set forth above. Debtors believe that the rights and remedies afforded to the banks are consistent

with the rights and remedies afforded to any financial institution providing cash management services to similarly situated and sized businesses.

55. Debtors' source of funds primarily consist of reimbursements from Medicaid, cash, check and credit card receipts, private and self-pay from customers and payments from various insurance companies.

56. In very general terms, the Debtors have a cash management system that sweeps funds "up" into their five (5) primary operating accounts with Bank of Missouri for each Debtor. Each retail pharmacy location has a depository account with a particular local bank to facilitate regular local deposits. The Debtors also maintain separate accounts with Great Southern Bank for the purpose of receiving Medicaid deposits. As daily deposits are made locally, funds deposited into a Bank of Missouri account are swept into the applicable entity operating account. For local deposits into banks other than Bank of Missouri, the Debtors access the accounts daily to ascertain the balance. If the balance is sufficient to justify an ACH while also maintaining a minimum balance in the account, and ACH is initiated to the corresponding Debtor operating account at Bank of Missouri. Once funds are on deposit at the Bank of Missouri operating accounts, each Debtor pays its vendor claims in due course, Smith is paid fund via ACH, and the Debtors reconcile due to/due from intercompany obligations in the ordinary course of business.

57. Maintaining Debtors' existing accounts will preserve business continuity and lessen the confusion among employees, vendors, and customers that often follows a Chapter 11 filing. Opening new bank accounts and establishing new electronic transfer instructions for electronic funds transfer of payroll checks, receipts from the sources set forth above, customer credit card payments, as well as the sweep of the credit card deposit account would be unduly

burdensome, disrupt Debtors' ongoing business operations during the initial stages of the reorganization process, and take several weeks to complete.

58. To prevent the possibility of the payment of obligations incurred by Debtors prior to the Petition Date, Debtors will instruct the banks holding the disbursement account to refuse to honor any check or disbursement drawn on those accounts (with the exception of the payroll, related expenses and other obligations which represent the payment of critical or post-petition obligations, if this Court so authorizes) by providing a "stop payment" request for checks so designated by the Debtors.

*Events Leading to the Chapter 11 Cases*

59. The primary causes of the Debtors' Chapter 11 filings are due to a variety of factors, including, among other things:

    i. a precipitous drop in the number of prescriptions filled from a high of approximately 1.4 million just three years ago to 1 million in 2017. As referenced above, this drop in prescriptions was mostly reflected in the reduced retail prescription revenue (i.e. from $56.1in 2016 to 49.7 in 2017);

    ii. Nationally, the numbers of prescriptions being filled are down year-over-year;

    iii. Increased competition from national pharmacy chains;

    iv. Increased operating expenses and overhead;

    v. Downward pricing pressure from insurance providers and carriers, including the elimination of reimbursement for certain dispensing fees;

    vi. Persistent cash flow and liquidity issues;

    vii. A decrease in reimbursements for higher priced prescriptions; and

    viii. The Debtors' failure to adapt and adjust their business model, overhead and expenses quickly enough to remain profitable in changing market conditions.

60. The net effect is that the Debtors do not have sufficient liquidity to continue their businesses outside the protection of this Court and have been forced to seek relief pursuant to Chapter 11 of the Bankruptcy Code.

61. On or about April 3, 2018, the Debtors engaged James G.M. MacLaughlin to serve as the Debtors' Chief Restructuring Officer ("CRO"). The CRO has continued in that role and has already lead the implementation of several cost savings measures all in an effort to return the Debtors to profitability and viability.

62. The Debtors anticipate that these bankruptcy proceedings, including a § 363 sale process that will be proposed in near term, will enable them to effectively address their outstanding debt issues, maximize the value of their assets, and enable them to focus on their core mission of providing high quality and low cost products to their customers through southwestern Missouri. Specifically, no later than May 4, 2018, the Debtors intend to file an application seeking approval of proposed sale and bidding procedures with respect to a proposed stalking horse bid by an affiliate or designee of Smith pursuant to which Smith's affiliate or designee will acquire substantially all the assets of the Debtors. The Debtors anticipate that the timeline for the sale process will be such that the sale can be completed in approximately 90-days from the Petition Date.

*Proposed Debtor-in-Possession Financing*

63. The Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the use of the DIP Facility Credit Agreement and cash collateral. The Debtors ability to preserve their relationships with employees, vendors and suppliers and to otherwise finance their operations is essential to the

Debtors' continued viability and to their ability to provide pharmaceuticals to their customers (many of whom are senior citizens).

64. The Debtors have negotiated a Senior Secured Debtor-in-Possession Loan Agreement ("DIP Facility Credit Agreement") with Smith.

65. In the absence of an order approving the DIP Facility Credit Agreement and granting the use of cash collateral, serious and irreparable harm to the Debtors and their estates will occur.

66. Debtors are unable to obtain working capital financing allowable as an administrative expense under the Bankruptcy Code. Except for the proposed financing from the DIP Lender described herein, the Debtors are also unable to obtain working capital financing (1) allowable with priority as a superpriority administrative expense; (2) secured by a senior lien on the Debtors' unencumbered assets; or (3) secured by a junior lien on the Debtors' encumbered assets.

67. The DIP Lender has agreed to extend the DIP Facility Credit Agreement to finance the Debtors' operations during a 90-day period while they seek to sell substantially all of their assets.

68. After considering all alternatives, the Debtors have concluded, in the exercise of their business judgment, that the financing offered by the DIP Lender represents the best working capital financing option.

69. Debtors will grant to Smith a super-priority priming lien on all of the assets of Debtors (other than the Bolivar real property) to secure the indebtedness represented by the DIP Facility Credit Agreement. As additional security for the DIP Facility Credit Agreement, the

DIP Lender shall be accorded a super-priority administrative claim with priority over all costs and expenses of administration of the Debtors' estates.

70. Debtors shall also grant to the DIP Lender a first priority, perfected lien upon all of the Debtors' right, title and interest in, to and under all other Collateral which is not presently subject to any lien or security interest.

71. The Superpriority DIP Claims and the DIP Facility Lien shall be subject to the payment of an amount equal to the sum of the following: (a) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee under 28 U.S.C. § 1930(a) plus interest pursuant to 31 U.S.C. § 3717; (b) to the extent allowed by the Court at any time, and solely to the extent provided for in the Approved Budget submitted by the Debtors pursuant to the DIP Facility Credit Agreement in form and substance satisfactory to the DIP Lender, all accrued and unpaid fees, disbursements, costs and expenses of professionals or professional firms retained by the Debtors and any official committee of creditors incurred at any time after the Petition Date, not to exceed $300,000 in the aggregate, and with such sum automatically reduced by each payment made by the Debtors under an Approved Budget for such fees, disbursements, costs and expenses (collectively, the "Carve-Out"); provided, however, that the Carve-Out shall not include, apply to, or be available for any fees or expenses incurred by any party, including the Debtors, in connection with the initiation or prosecution of any claims, causes of action, adversary proceedings, or other litigation against the DIP Lender or its affiliates, including, without limitation, challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Obligations or the security interests and liens of the DIP Lender in respect thereof, or asserting any claims or causes of action,

including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Lender or its affiliates.

72. As further adequate protection for Debtors' use of the Pre-Petition Lenders' cash collateral, Debtors will agree to use cash collateral only in strict accordance with the terms of the proposed Interim DIP Order, the DIP Facility Credit Agreement and the Approved Budget.

73. Additionally, the Pre-Petition Lenders are granted replacement liens in all of Debtors' collateral to the same extent, validity, and priority that existed as of the Petition Date except that the DIP Lender shall be entitled to its super-priority priming lien as set forth in the DIP Facility Credit Agreement and proposed Interim DIP Order solely for the obligations owed to it under the DIP Facility Credit Agreement.

74. Debtors shall not use cash collateral to pay prepetition interest or principal on any existing indebtedness other than as ordered by the Court.

75. Debtors and I have concluded that use of cash collateral and obtaining the DIP Facility Credit Agreement which the DIP Lender is willing to provide is the only credit, secured or unsecured, available to Debtors. Without such credit, the Debtors would be unable to continue to operate their businesses and serve their customers, and the Debtors' estates would be irreparably harmed and the interests of the Pre-Petition Lenders would be irreparably diminished as the value of their Collateral would be substantially and materially reduced.

76. Pending the final hearing on use of cash collateral and extension of credit, Debtors need authorization on an interim basis to use sufficient cash collateral and to borrow up to $600,000 in funds to avoid immediate and irreparable harm to the bankruptcy estates.

77. Debtors are requesting that they be authorized to immediately use cash collateral to the extent necessary to avoid immediate and irreparable harm to the estate pending an emergency hearing on use of cash collateral.

78. Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief.

>*/s/ James G. M. MacLaughlin*
> JAMES G. M. MACLAUGHLIN
> CHIEF RESTRUCTURING OFFICER