**Exhibit A**

*Execution Version*

_____

**ASSET PURCHASE AGREEMENT**

_____

**BY AND AMONG**

**SMITH MANAGEMENT SERVICES, LLC,**

**FAMILY PHARMACY, INC.,**

**FAMILY PHARMACY OF STRAFFORD, INC.,**

**FAMILY PHARMACY OF MISSOURI, LLC,**

**FAMILY PROPERTY MANAGEMENT, LLC**

**AND**

**HEALTHTAC LOGISTICS, LLC**

**MAY 7, 2018**

# TABLE OF CONTENTS

ARTICLE I – PURCHASE AND SALE OF PURCHASED ASSETS .......................................................... 1

    1.1    Agreement to Sell and Purchase ............................................ 1
    1.2    Deposit ................................................................ 3
    1.3    Purchase Price ......................................................... 3
    1.4    Allocation of the Purchase Price ....................................... 4
    1.5    Assumption of Liabilities .............................................. 4
    1.6    Non-Assignable Items .................................................. 5
    1.7    Assignment and Assumption of Contracts ................................ 5
    1.8    Tax Matters ............................................................ 7

ARTICLE II – CLOSING TIME AND PLACE ................................................................ 8

    2.1    Closing ................................................................ 8
    2.2    Deliveries by Seller ................................................... 8
    2.3    Termination in the Absence of Closing .................................. 9
    2.4    Effect of Termination ................................................ 10
    2.5    Breakup Fee and Expense Reimbursement ................................ 10

ARTICLE III – REPRESENTATIONS AND WARRANTIES OF SELLERS ....................................... 11

    3.1    Corporate Existence and Qualification ................................ 11
    3.2    Authority, Approval and Enforceability ............................... 11
    3.3    Capitalization and Business Records .................................. 12
    3.4    Subsidiaries ......................................................... 12
    3.5    No Defaults or Consents; Authorizations .............................. 12
    3.6    No Proceedings ....................................................... 13
    3.7    Employment Matters ................................................... 13
    3.8    Employee Plans ....................................................... 15
    3.9    Financial Statements; No Undisclosed Liabilities; Funded Indebtedness and Claims ............ 17
    3.10   Absence of Certain Changes ........................................... 17
    3.11   Compliance with Laws ................................................. 19
    3.12   Business Permits ..................................................... 19
    3.13   Litigation ........................................................... 20
    3.14   Real Property ........................................................ 20
    3.15   Material Contracts ................................................... 21
    3.16   Insurance ............................................................ 23
    3.17   Intangible Rights .................................................... 23
    3.18   Equipment and Other Tangible Property ................................ 24
    3.19   Environmental Matters ................................................ 24
    3.20   Banks ................................................................ 25
    3.21   Suppliers ............................................................ 25
    3.22   Transactions With Affiliates ......................................... 25
    3.23   Broker or Finder Fees ................................................ 26
    3.24   Liens ................................................................ 26
    3.25   Inventory ............................................................ 26
    3.26   Accounts Receivable .................................................. 26
    3.26   Accounts Receivable .................................................. 26
    3.27   Tax Matters .......................................................... 27
    3.28   Absence of Unlawful Payments ......................................... 27
    3.29   Most Favored Nation; Take-or-Pay ..................................... 28

| | | |
|---|---|---|
| 3.30 | PCI Compliance | 28 |
| 3.31 | Intentionally Omitted | 28 |
| 3.32 | Healthcare Matters | 28 |
| 3.33 | FDA | 30 |
| 3.34 | Disclosure | 31 |

ARTICLE IV – REPRESENTATIONS AND WARRANTIES OF PURCHASER ...... 31

| | | |
|---|---|---|
| 4.1 | Corporate Existence and Qualification | 31 |
| 4.2 | Authority, Approval and Enforceability | 31 |
| 4.3 | No Default or Consents | 31 |
| 4.4 | No Proceedings | 32 |
| 4.5 | Funds | 32 |
| 4.6 | Brokers | 32 |

ARTICLE V – OBLIGATIONS PRIOR TO OR IN CONNECTION WITH THE CLOSING ...... 32

| | | |
|---|---|---|
| 5.1 | Access to Information and Properties | 32 |
| 5.2 | Conduct of Business and Operations | 32 |
| 5.3 | Notice Regarding Changes | 34 |
| 5.4 | Legal Requirements | 34 |
| 5.5 | Consents and Satisfaction of Conditions | 35 |
| 5.6 | Intentionally Omitted | 35 |
| 5.7 | Employee Matters | 35 |
| 5.8 | WARN | 36 |
| 5.9 | Delivery of Schedules | 36 |
| 5.10 | Title Insurance and Survey; Environmental Assessments | 36 |

ARTICLE VI – CONDITIONS TO SELLERS' AND PURCHASER'S OBLIGATIONS ...... 38

| | | |
|---|---|---|
| 6.1 | Conditions to Obligations of Sellers | 38 |
| 6.2 | Conditions to Obligations of Purchaser | 38 |

CERTAIN OBLIGATIONS AFTER THE CLOSING ...... 39

| | | |
|---|---|---|
| 7.1 | Post-Closing Mailings and Payments | 39 |
| 7.2 | Restrictive Covenants | 40 |
| 7.3 | Rights and Remedies Upon Breach of Restrictive Covenants | 41 |
| 7.4 | Enforceability | 41 |
| 7.5 | Professional Liability Insurance | 42 |
| 7.6 | Use of Sellers' Names | 42 |
| 7.7 | Further Assurances | 42 |

BANKRUPTCY COURT MATTERS; OTHER OBLIGATIONS ...... 42

| | | |
|---|---|---|
| 8.1 | Competing Bids and Other Matters | 42 |
| 8.2 | Sale Order | 43 |
| 8.3 | Bankruptcy Court Filings; Appeals | 44 |

ARTICLE IX – MISCELLANEOUS ...... 44

| | | |
|---|---|---|
| 9.1 | Publicity | 44 |
| 9.2 | Brokers | 45 |
| 9.3 | Costs and Expenses | 45 |
| 9.4 | Notices | 45 |
| 9.5 | Governing Law | 46 |
| 9.6 | Entire Agreement; Amendments and Waivers | 46 |

9.7    Binding Effect and Assignment...................................................................47
9.8    Exhibits and Schedules................................................................................47
9.9    Multiple Counterparts.................................................................................47
9.10   References and Construction.......................................................................47

ARTICLE X – DEFINITIONS .....................................................................................48

10.1   Accounts Receivable ..................................................................................48
10.2   Affiliate ......................................................................................................48
10.3   Alternative Transaction ..............................................................................48
10.4   Auction .......................................................................................................48
10.5   Bidding Procedures ....................................................................................48
10.6   Bidding Procedures Hearing .......................................................................48
10.7   Bidding Procedures Order ..........................................................................48
10.8   Breakup Fee ...............................................................................................48
10.9   Business Day ...............................................................................................49
10.10  Cash ...........................................................................................................49
10.11  Code ..........................................................................................................49
10.12  Claim .........................................................................................................49
10.13  Claim .........................................................................................................49
10.14  Cure Costs .................................................................................................49
10.15  Collateral Agreements ...............................................................................49
10.16  Contracts....................................................................................................49
10.17  Damages ....................................................................................................49
10.18  DIP Facility Obligations .............................................................................49
10.19  DIP Loan Closing Date ...............................................................................49
10.20  DIP Loan Agreement ..................................................................................49
10.21  DIP Order ...................................................................................................49
10.22  Employee Plans ..........................................................................................50
10.23  Environmental Laws ...................................................................................50
10.24  Final Order .................................................................................................50
10.25  Fraud..........................................................................................................50
10.26  Fundamental Representations.....................................................................50
10.27  Funded Indebtedness .................................................................................50
10.28  GAAP .........................................................................................................51
10.29  Governmental Authorities ..........................................................................51
10.30  Hazardous Material ....................................................................................51
10.31  Healthcare Approvals..................................................................................51
10.32  Healthcare Laws ........................................................................................52
10.33  HIPAA ........................................................................................................52
10.34  J M Smith ...................................................................................................52
10.35  Knowledge of Seller ...................................................................................52
10.36  Legal Requirements....................................................................................52
10.37  Liens...........................................................................................................52
10.38  Material Adverse Effect .............................................................................52
10.39  Permits.......................................................................................................52
10.40  Permitted Liens..........................................................................................52
10.41  Person ........................................................................................................53
10.42  Personal Information ..................................................................................53
10.43  Petition Date ..............................................................................................53
10.44  Potential Successor Taxes ..........................................................................53
10.45  Reimbursable Expenses..............................................................................53

10.46    Release ................................................................................................................... 53
10.47    Sale Hearing ......................................................................................................... 53
10.48     Sale Motion .......................................................................................................... 53
10.49    Sale Order............................................................................................................. 53
10.50    Tax.......................................................................................................................... 54
10.51    Tax Return ............................................................................................................ 54

12166182v15

## LIST OF EXHIBITS

**Exhibit A  -  Form of Escrow Agreement**

**Exhibit B  -  Form of Bill of Sale**

**Exhibit C  -  Form of Assignment and Assumption Agreement**

**Exhibit D  -  Form of Operations Transfer Agreement**

**Exhibit E  -  Bidding Procedures**

12166182v15

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (the "Agreement") is made and entered into as of the 7th day of May 2018, by and among (a) Smith Management Services, LLC, a Delaware limited liability company ("Purchaser"); (b) Family Pharmacy, Inc., a Missouri corporation ("FP"); (c) Family Pharmacy of Strafford, Inc., a Missouri corporation ("FP Strafford"); (d) Family Pharmacy of Missouri, LLC, a Missouri limited liability company ("FP Missouri"); (e) Family Property Management, LLC, a Missouri limited liability company ("FP Management"); and (f) HealthTAC Logistics, LLC, a Missouri limited liability company ("FP Logistics") (the entities listed in clauses (b)–(f), the "Sellers" and each of the Sellers, individually, a "Seller"). Certain capitalized terms used in this Agreement are defined in Article X herein and others are defined within the Agreement.

# RECITALS

A.     The Sellers, doing business as "Family Pharmacy," own and operate twenty (20) retail pharmacy locations, two (2) long-term care pharmacy locations and one (1) specialty pharmacy location from which the Sellers market and sell primarily pharmaceuticals at retail and for long-term care facilities and hospice patients (collectively, the "Business").

B.     The Sellers filed voluntary petitions for relief (collectively, the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Western District of Missouri (the "Bankruptcy Court").

C.     The Sellers, as debtors and debtors-in-possession, will continue in the possession of their respective assets and in the management of the Business pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

D.     The Sellers will file the Sale Motion with the Bankruptcy Court, seeking, among other things, the Bankruptcy Court's approval of the Bidding Procedures Order in connection with the sale of all or substantially all of the Sellers' respective assets and the Sale Order with respect to the same.

E.     In connection with the Chapter 11 Case and subject to the terms and conditions contained herein and in the Sale Order, the Sellers shall seller, transfer, and assign to Purchaser, and Purchaser shall acquire and accept from the Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets and shall assume from the Sellers the Assumed Liabilities.

# AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

# ARTICLE I – PURCHASE AND SALE OF PURCHASED ASSETS

1.1     Agreement to Sell and Purchase.

(a)     At the Closing, subject to the terms and conditions of this Agreement and the Sale Order, each Seller shall grant, sell, convey, assign, transfer, and deliver to Purchaser, and Purchaser shall purchase from such Seller, free and clear of all Liens and interests ("interests" to have the same meaning as the word "interests" in Section 363 of the Bankruptcy Code), all right, title, and interest that such Seller possesses and has the right to transfer in and to all assets relating to, used (in whole or in part)

or held for use in or necessary for the ownership, operation or management of the Business (collectively, but excluding the Excluded Assets, the "Purchased Assets"), including the following:

 i. all Accounts Receivable;

 ii. all Inventory;

 iii. all Tangible Company Properties and, subject to Section 5.10, the Owned Real Property;

 iv. all rights and interests of such Seller under those Contracts (the "Assigned Contracts") listed on Schedule 1.1(a)(iv), as such schedule may be modified from time to time by any Supplemental Contract Notice (the "Assigned Contracts Schedule");

 v. all operating data and books and records of such Seller used in the Business, including information, files, records, data, employee files, plans, schematics, drawings, blue prints, contracts and recorded information, patient records, customer, vendor and supplier lists, production records, accounting records, property records, mailing lists, customer pricing information, credit records, correspondence, budgets, documents and records similar to the foregoing;

 vi. all Intangible Rights that are used in the Business, including all goodwill associated therewith;

 vii. all of such Seller's rights under warranties, indemnities and all similar rights against third parties to the extent related to any Purchased Assets;

 viii. all insurance benefits, including rights and proceeds arising from or relating to the Business the Purchased Assets or the Assumed Liabilities, excluding any refunds or credits of prepaid premiums inuring to the benefit of the Seller with respect to its current insurance policies on or after the Closing Date, but not including any life or health insurance benefits payable to or for the benefit of any officer, director employee, independent contractor, or their respective dependents;

 ix. all rights to any actions of any nature available to or being pursued by such Seller to the extent related to the Business, the Purchased Assets or the Assumed Liabilities, whether arising by way of counterclaim or otherwise;

 x. to the extent transferable under applicable law, all Business Permits which are held by such Seller and required for the conduct of the Business as currently conducted or for the ownership and use of the Purchased Assets;

 xi. such Seller's rights to enforce confidentiality, non-competition, non-solicitation, and similar provisions of any employment agreement made between such Seller or any Affiliate thereof and any employee, independent contractor or consultant that renders or rendered services to the Business;

 xii. all prepaid assets, expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees (excluding any such item relating to the payment of Taxes); and

12166182v15

xiii.    such Seller's rights, titles and interests in and to the Business and its goodwill.

(b)    Notwithstanding the foregoing, the Purchased Assets shall not include any of the following (the "Excluded Assets"):

i.    the Purchase Price and rights under this Agreement;

ii.    all Cash of such Seller;

iii.    all Employee Plans of such Seller;

iv.    the corporate seals, articles of incorporation, minute books, stock books, Tax Returns related to income taxes and records, books of account, or other records having to do with the corporate organization of such Seller;

v.    the rights that accrue or will accrue to the Seller under this Agreement;

vi.    all insurance policies of such Seller;

vii.    all Contracts that are not Assigned Contracts (the "Excluded Contracts"), which Excluded Contracts are set forth on Schedule 1.1(b)(vii), as such schedule may be modified from time to time by any Supplemental Contract Notice (the "Excluded Contracts Schedule");

viii.    the membership interests, units, capital stock, partnership interests, or other equity interests of any Seller or any other Person;

ix.    all prepaid assets, expenses, credits, advance payments, claims, security, refunds, rights of recovery, rights of set-off, rights of recoupment, deposits, charges, sums and fees relating to the payment of Taxes; and

x.    title to each parcel of Owned Real Property to which Purchaser refuses to take title in accordance with Section 5.10.

1.2    **Deposit**. No later than five (5) Business Days following the Bankruptcy Court's entry of the Bidding Procedures Order (the "Deposit Due Date"), Purchaser shall deposit $800,000.00 (such amount, together with any interest or earnings thereon, the "Deposit") with the Escrow Agent. The Escrow Agent shall hold and disburse the Deposit pursuant to the terms of this Agreement and an escrow agreement, substantially in the form attached hereto (or to be attached hereto in connection with the making of the Deposit) as Exhibit A (the "Escrow Agreement"). The Escrow Agent, the Sellers and Purchaser shall execute and deliver the Escrow Agreement no later than the Deposit Due Date. The Sellers and Purchaser shall from time to time deliver joint written instructions to the Escrow Agent to carry out the provisions of this Agreement and the Escrow Agreement.

1.3    **Purchase Price.**

(a)    **Calculation of Purchase Price**. Subject to the adjustments, terms and conditions of this Agreement, the aggregate consideration for the Purchased Assets (the "Purchase Price") shall be (a) the Purchaser's assumption of the Assumed Liabilities and (b) the Purchaser's payment of $8,000,000.00 (the "Cash Portion") in accordance with this Agreement.

(b)    **Payment of the Cash Portion of the Purchase Price**. At the Closing, the Cash Portion of the Purchase Price shall be paid on behalf of Purchaser for the account of the Sellers as follows:

i.    The Escrow Agent shall pay the Deposit to Sellers; and

ii.    Purchaser shall pay to Sellers an amount equal to the difference of (x) the Cash Portion of the Purchase Price, minus (y) the Deposit.

The applicable parties shall pay all amounts due to Sellers under this Section by wire transfer of immediately available funds to the account designated by Sellers in writing, such designation to occur no later than two (2) Business Days prior to the Closing Date

1.4    Allocation of the Purchase Price. The Purchase Price, as adjusted hereunder, and all other amounts constituting consideration within the meaning of Section 1060 of the Code, shall be allocated among the Purchased Assets as reasonably determined by Purchaser after consultation with Sellers (the "Allocation"). No party hereto will take a position on any income Tax Return, before any Governmental Entity charged with the collection of any income Tax, or in any judicial proceeding that is in any way inconsistent with the Allocation or the terms of this Section 1.4, and the Sellers and Purchaser shall file Form 8594 with the IRS in a manner consistent with the Allocation. If there is an adjustment to the Purchase Price under Section 1.6(b) or Section 1.7(b), such adjustment will change only the amount of the foregoing allocation to the Purchased Assets, and then (i) to the extent traceable to a particular Purchased Asset, only the Purchase Price allocated to such asset, or (ii) to the extent not traceable to a particular Purchased Asset, such adjustment will be apportioned to goodwill.

1.5    Assumption of Liabilities. At the Closing, Purchaser shall not assume any liabilities or obligations of any of the Sellers whatsoever, fixed or contingent, other than the following: (a) the Purchaser shall assume liabilities and obligations under the Assigned Contracts, but only to the extent such liabilities and obligations (i) relate to periods after the Closing, (ii) relate solely to the Business, excluding in each case any liabilities or obligations of one or more of the Sellers that relate to or arise from (in whole or in part) any event, breach, violation or default that occurred (or, upon the giving of notice or lapse of time or both, would have occurred) prior to the Closing, and Purchaser shall not assume any Assigned Contract which have not been provided or made available to Purchaser prior to the Closing; and (b) Purchaser shall assume all of the DIP Facility Obligations ((a) and (b), collectively, the "Assumed Liabilities"). Subject to the requirements of the Bankruptcy Code and any orders of the Bankruptcy Court, the Sellers, and each Seller, shall retain, promptly pay and discharge in the ordinary course all liabilities and obligations of one or more of the Sellers or the Business other than the Assumed Liabilities. SPECIFICALLY, THIS AGREEMENT EXCLUDES, AND PURCHASER IS NOT ASSUMING, ANY LIABILITIES OF ONE OR MORE OF THE SELLERS OTHER THAN THE ASSUMED LIABILITIES (COLLECTIVELY, THE "EXCLUDED LIABILITIES"). EXCEPT FOR THE ASSUMED LIABILITIES, THE EXCLUDED LIABILITIES INCLUDE, BUT ARE NOT LIMITED TO, EACH SELLER'S ACCOUNTS PAYABLE AND ALL OBLIGATIONS ARISING OUT OF OR RELATED TO THE OPERATION OF THE BUSINESS PRIOR TO THE CLOSING, INCLUDING COSTS, EXPENSES AND OTHER LIABILITIES AND OBLIGATIONS ARISING FROM THE OPERATION OF THE BUSINESS (INCLUDING MEDICAL MALPRACTICE CLAIMS OR OTHER INJURY OR DEATH TO PERSONS, INCLUDING CURRENT OR FORMER PATIENTS); LIABILITY TO CREDITORS OF ONE OR MORE OF THE SELLERS; LIABILITIES FOR CURE COSTS; LIABILITY FOR OVERPAYMENT AND FRAUD UNDER MEDICARE, MEDICAID OR ANY THIRD-PARTY PAYOR AGREEMENT OR OTHER PATIENT-RELATED CONTRACTUAL OBLIGATION; LIABILITIES OR OBLIGATIONS UNDER ANY CONTRACT, REGARDLESS OF WHETHER SUCH CONTRACT IS AN ASSIGNED CONTRACT AND REGARDLESS OF THE

12166182v15

PERIOD TO WHICH SUCH LIABILITY OR OBLIGATION RELATES; COSTS AND EXPENSES IN CONNECTION WITH THE CHAPTER 11 CASE; LIABILITIES AND OBLIGATIONS UNDER ANY COLLECTIVE BARGAINING AGREEMENT, EMPLOYEE PLAN, OR OTHER EMPLOYEE BENEFIT OR INSURANCE PLAN OR AGREEMENT (INCLUDING ANY COMPENSATION OR SEVERANCE PAY LIABILITIES OR OBLIGATIONS); AND LIABILITY FOR ANY AND ALL TAXES. ANY AND ALL ACCOUNTS PAYABLE OR OTHER OBLIGATIONS ACCRUING TO AND EXISTING AS OF THE CLOSING ARE AND SHALL REMAIN THE SOLE OBLIGATION AND RESPONSIBILITY OF THE APPLICABLE SELLER OR SELLERS.

1.6     <u>Non-Assignable Items</u>.

(a)     Nothing in this Agreement shall be construed as an attempt by any Seller to assign to Purchaser pursuant to this Agreement any Contract, Business Permit, Lease, franchise, claim, or asset included in the Purchased Assets (a) that by its terms or under applicable Legal Requirements not assignable without the consent of any other Person or (b) as to which all the remedies for the enforcement thereof available to such Seller would not by contract pass to Purchaser as an incident of the assignments provided for by this Agreement unless (x) such consent or approval shall have been obtained or (y) the Bankruptcy Code, the Sale Order or other applicable Legal Requirements permit the assignment thereof without such consent or the passing of the remedies for the enforcement thereof to Purchaser as an incident of the assignments provided for hereunder (any item described in clause (a) or clause (b) and not excluded by clause (x) or (y), a "<u>Non-Assignable Item</u>").

(b)     To the extent that any consent in respect of a Non-Assignable Item shall not have been obtained on or before the Closing Date, Purchaser may elect to proceed with the Closing with an appropriate reduction to the Purchase Price or, if the failure to obtain such consent, individually for any such Non-Assignable Item or in the aggregate for all such Non-Assignable Items, would in Purchaser's reasonable opinion be materially adverse to the future operations of the Business, Purchaser may terminate this Agreement pursuant to <u>Section 2.3(h)</u>. If Purchaser elects to proceed with the Closing, if requested by Purchaser, such Seller shall use commercially reasonable efforts to obtain any such consent after the Closing Date, and such Seller shall cooperate with Purchaser in any commercially reasonable arrangement to provide that Purchaser shall receive the interest of such Seller in the benefits under such Non-Assignable Item and shall enforce all right of such Seller arising under such Non-Assignable Item for the benefit of Purchaser. Purchaser shall not undertake to pay or satisfy the corresponding Liabilities under the terms of such Non-Assignable Item unless such Non-Assignable Item constitutes an Assumed Liability and Purchaser receives the benefit thereof. Nothing contained in this <u>Section 1.6</u> or elsewhere in this Agreement shall be deemed a waiver by Purchaser of its right to have received on the Closing Date an effective assignment of all of the Purchased Assets or of the covenant of such Seller to obtain all of the consents, nor shall this <u>Section 1.6(b)</u> or any other provision of this Agreement be deemed to constitute an agreement to exclude from the Purchased Assets any Material Contracts as to which a consent may be necessary.

1.7     <u>Assignment and Assumption of Executory Contracts</u>.

(a)     <u>Executory Contracts</u>. <u>Schedule 1.7(a)</u> (the "<u>Executory Contracts Schedule</u>") lists the following: (i) all of the Assigned Contracts and all of the Excluded Contracts that are executory contracts or unexpired leases of the Sellers; (ii) the monetary amounts that Sellers believe are the Cure Costs for such Assigned Contracts and Excluded Contracts; and (iii) any nonmonetary obligations under such Assigned Contracts and Excluded Contracts that Sellers believe would need to be satisfied in order for Sellers to assume such Assigned Contracts and Excluded Contracts and assign them to Purchaser pursuant to this Agreement (assuming for this purpose that all such Contracts constitute Assigned Contracts). No later than five (5) Business Days following the Bankruptcy Court's entry of the Bidding

Procedures Order, the Sellers shall properly serve a copy of the Executory Contracts Schedule on Purchaser and all necessary parties, including all counterparties to the Assigned Contracts.

(b)       Additional Assigned or Excluded Contracts. At any time prior to the date (such date, the "Election Date") that is the later of (x) the Closing Date (whether before or after any Auction) or (y) the date on which the Sellers have fulfilled their respective obligations under the Operations Transfer Agreement, Purchaser may remove any Excluded Contract from the Excluded Contracts Schedule and designate such Contract as an Assigned Contract or remove any Assigned Contract from the Assigned Contracts Schedule and designate such Contract as an Excluded Contract. Purchaser shall make such designation by delivering one or more written notices to any Seller (each a "Supplemental Contract Notice"). Once Purchaser delivers a Supplemental Contract Notice, the Excluded Contracts Schedule, the Assigned Contracts Schedule, and the Executory Contracts Schedule shall be automatically amended consistent with such notice. No Seller shall reject any Contract until earlier of (x) the Election Date and (y) the date on which Purchaser delivers notice to any Seller that Purchaser does not object to the rejection thereof. Notwithstanding anything to the contrary herein, the DIP Facility Obligations will be an Assumed Liability, and Purchaser will satisfy such obligations at the Closing.

(c)       Bankruptcy Court Contract Matters. The Sellers shall take all actions reasonably necessary to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code all of the Assigned Contracts that are listed on the Executory Contracts Schedule (the "Executory Assigned Contracts"), as such schedule may be modified from time to time by any Supplemental Contract Notice. Without limiting the immediately preceding sentence, the Sellers shall notify the counterparties to the Executory Assigned Contracts of their intent to assume such Contracts and assign them to Purchaser and the proposed Cure Costs for each such Contract and seek to have the Bankruptcy Court approve such assumption and assignment of the Executory Assigned Contracts to Purchaser at the Sale Hearing and shall set forth its approval of the same in the Sale Order or, if so requested by Purchaser from time to time, another order. The Sellers shall pay all Cure Costs with respect to the Executory Assigned Contracts, subject to the Cure Cap, and shall do so as soon as practicable after the later of (i) the Bankruptcy Court's final determination of such Cure Costs or (ii) the effectiveness of the assumption and assignment of an Executory Assigned Contract as evidenced by the Sale Order or another Final Order of the Bankruptcy Court. Any Cure Costs which exceed the Cure Cap shall be the responsibility of the Purchaser.  Further and notwithstanding the foregoing, the Cure Costs for any Executory Assigned Contract with an Affiliate of Purchaser shall not be paid from the Cure Cap and shall be Purchaser's sole responsibility. The Sellers and Purchaser acknowledge and agree that the agreements and covenants in this Section 1.7(c) shall survive the Closing. To the extent that the need for Bankruptcy Court approval delays the assumption or rejection of any Contract, Sellers shall undertake all commercially reasonable efforts to gain all necessary approvals, including as required under Section 365(d)(4) of the Bankruptcy Code, with respect to such Contract. The obligations of Sellers under this Section 1.7 shall survive the Closing and are subject to Section 365(d)(4) of the Bankruptcy Code and any extension provided or obtained thereunder.

(d)       Contract-Related Termination. If Sale Order or another Final Order does not approve the assumption and assignment or transfer of one or more of the Executory Assigned Contracts to Purchaser as Purchased Assets, then Purchaser shall have the option to either (i) terminate this Agreement pursuant to Section 2.3(h) or (ii) proceed with Closing with respect to the remaining Purchased Assets with an appropriate reduction in the Purchase Price, and exclude any or all such Assigned Contracts from the Purchased Assets.

12166182v15

1.8    Tax Matters.

(a)    Payment of Taxes.  Each Seller shall be solely responsible for and shall pay, without any cost to Purchaser, any and all Taxes of such Seller arising from the operations of the Business or use of the Purchased Assets prior to the Closing Date (regardless of whether the filing of any Tax Return with respect thereto or payment of any amount in respect thereof is filed, paid or due prior to, on or after the Closing Date). Purchaser shall be solely responsible for and shall pay, without any cost to the Sellers, any and all Taxes arising from the operations of the Business or use of the Purchased Assets after the Closing Date.

(b)    Cooperation.  Except as otherwise provided in this Agreement, the parties hereby agree that each of them shall cooperate with the other(s) in executing or causing to be executed any required document and by making available to the other parties, as promptly as practicable, all work papers, records and notes of any kind at all reasonable times for the purpose of allowing the appropriate party to complete Tax Returns, participate in proceedings, obtain refunds, make any determination required under this Agreement or defend or prosecute Tax claims.

(c)    Transfer Taxes.  The Sellers shall be responsible for all sales, use, transfer, documentary, stamp, recording and similar non-income taxes and fees, levied, imposed or assessed by any Governmental Authority as a result of the sale, transfer, assignment and conveyance of the Purchased Assets to the Purchaser.

(d)    Employment Tax.  Purchaser and Sellers agree that they will follow the standard procedure of Rev. Proc. 2004-53, 2004-34 I.R.B. 320 (08/23/2004) whereby each shall be solely responsible for employment Tax reporting for employees who may be employed by each of them in the calendar year that includes the Closing Date.  Each Seller shall provide Purchaser with such employment Tax information as Purchaser shall reasonably request in connection with Purchaser's employment Tax reporting obligations for the portion of the calendar year following the Closing.

(e)    Potential Successor Taxes.  Each Seller shall give all required notices and make all required filings, on behalf of Purchaser when required, in respect of the transactions contemplated hereby and by the Collateral Agreements, including any notices and filings required to obtain tax good standing letters or tax clearances or certificates with any Governmental Authority with which any Seller is required to file Tax Returns and/or pay Taxes, to the extent such tax good standing letters or tax clearances are available from the applicable Governmental Authorities.  If the Sellers do not provide to Purchaser at the Closing all material tax good standing letters and tax clearances and certificates, then the Purchaser may, in its reasonable discretion, withhold from the Purchase Price the amount of the Potential Successor Taxes, and the Purchaser shall thereafter cause such Taxes to be paid, to the extent of such withholding, on the Sellers' behalf.

## ARTICLE II – CLOSING TIME AND PLACE

2.1     Closing.  Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated herein (the "Closing") shall take place at 10:00 a.m., local time in Springfield, Missouri, no later than the third (3rd) Business Day after the satisfaction or waiver in accordance herewith of the conditions set forth in Article VI or such other date as the parties hereto may otherwise agree in writing (the date of the Closing, the "Closing Date"). The Closing shall take place through an exchange of consideration and documents using overnight courier service, wire transfers, electronic mail or facsimile.

2.2     Deliveries by Seller.  At or prior to the Closing, Sellers shall deliver or cause to be delivered to Purchaser:

(a)     a certificate (the "APA Bring Down Certificate"), duly executed by the Sellers, to the effect that the conditions set forth in Section 6.2(a), Section 6.2(b) and Section 6.2(c) have been satisfied;

(b)     (i) possession of the Purchased Assets and (ii) releases of any Liens (other than Permitted Liens) related thereto, except that no lien release shall be required in respect of any Lien that is duly removed by the Sale Order approving the sale of the Purchased Assets free and clear of all Liens (other than Permitted Liens);

(c)     with respect to each Seller, a copy, certified by an officer or manager of such Seller, of (i) the articles of incorporation and bylaws (or their equivalent) of such Seller if such Seller is a corporation and the articles of formation and the operating agreement (or their equivalent) of such Seller if such Seller is a limited liability company, (ii) the resolutions of the board of directors, board of managers or equivalent governing body or person(s) of such Seller and of the shareholders or members thereof, in each case authorizing the execution, delivery and performance of this Agreement, the other agreements contemplated hereby, and the consummation of all transactions contemplated hereby and thereby, and (iii) an incumbency certificate with respect to the individuals executing documents or instruments on behalf of such Seller.

(d)     with respect to each Seller, a certificate in compliance with Treasury Regulations Section 1.1445-2(c)(3), certifying that the transactions contemplated by this Agreement are exempt from withholding under Section 1445 of the Code and a notice described in Treasury Regulations Section 1.897-2(h)(2);

(e)     with respect to each Seller, a good standing certificate and a certified copy of such Seller's articles of incorporation or articles of formation (or their functional equivalent in Missouri), as applicable, issued by the Secretary of State of Missouri and (for good standing certificates only) of each state identified on Schedule 3.1 in respect of which it is qualified as a foreign company;

(f)     warranty deeds and any other documents or agreements contemplated hereby or reasonably required by Purchaser or the title company insuring title to any of the Owned Real Property, in each case in form and substance reasonably satisfactory to Purchaser, conveying all title to the Owned Real Property free and clear of all Liens other than Permitted Liens;

(g)     such bills of sale, certificates of title and other appropriate instruments of assignment and conveyance, in form and substance reasonably satisfactory to Purchaser dated as of the Closing conveying all title to the Purchased Assets free and clear of all Liens, including a bill of sale in the form attached hereto as Exhibit B, duly executed by the Sellers;

(h)      an assignment and assumption agreement in the form attached hereto as <u>Exhibit C</u>, duly executed by the Sellers, and any other such assignments in form and substance reasonably acceptable to Purchaser of all Intangible Rights and Contracts necessary for the operation of the Business;

(i)      the Operations Transfer Agreement and related documents in the form attached hereto as <u>Exhibit D</u> (the "<u>Operations Transfer Agreement</u>"), duly executed by the Sellers;

(j)      a certified copy of the Sale Order and any other Final Order approving the assumption and assignment of any of the Executory Assigned Contracts not otherwise addressed in the Sale Order;

(k)      all filings, submissions, approvals or authorizations of any of the Sellers to or from any Governmental Authority that are necessary or appropriate in connection with the execution, delivery and performance of this Agreement, the other agreements contemplated hereby, and the consummation of all transactions contemplated hereby and thereby, including those identified on <u>Schedule 2.2(k)</u>; and

(l)      any keys, access codes, security codes, user names, passwords, account information or combinations to locks and other security related to the Purchased Assets.

2.3      <u>Termination in the Absence of Closing</u>. This Agreement may be terminated on or prior to the Closing as follows:

(a)      By the mutual written consent of Purchaser and any Seller;

(b)      by Purchaser if the Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of any Seller is appointed in the Chapter 11 Case, in each case without the consent of Purchaser;

(c)      by Purchaser, if (i) the Bankruptcy Court has not entered the Bidding Procedures Order by the close of business on the date that is thirty (30) days after the DIP Loan Closing Date, (ii) the Bankruptcy Court has not entered the Sale Order by the close of business on the date that is seventy-six (76) days after the DIP Loan Closing Date, (iii) the Bankruptcy Court has not entered the final DIP Order by the close of business on the date that is thirty (30) days after the DIP Loan Closing Date, (iv) after entry of the Bidding Procedures Order, the Sale Order, or the DIP Order, any such order fails to be in full force and effect or has been stayed, reversed, modified or amended without the prior written consent of Purchaser, (v) the Auction has not been completed by the close of business on the date that is seventy-six (76) days after the DIP Loan Closing Date or (vi) the Closing has not occurred within ninety (90) days of the DIP Loan Closing Date (such date, the "<u>Termination Date</u>");

(d)      by Purchaser if any Event of Default occurs and is continuing under the DIP Loan Agreement;

(e)      By Purchaser (if it is not in breach of its representations, warranties, covenants or agreements under this Agreement so as to cause any of the conditions set forth in <u>Section 6.1</u> not to be satisfied), upon written notice to any Seller if there has been a violation, breach or inaccuracy of any representation, warranty, covenant or agreement of one or more of the Sellers contained in this Agreement which violation, breach or inaccuracy would cause any of the conditions set forth in <u>Section 6.2</u> not to be satisfied, and such violation, breach or inaccuracy has not been waived by Purchaser or

cured by the applicable Sellers within ten (10) Business Days after receipt by any Seller of written notice from Purchaser or is not reasonably capable of being cured prior to the Termination Date;

(f)    By Sellers (if no Seller is in breach of the representations, warranties, covenants or agreements of one or more of the Sellers under this Agreement so as to cause any of the conditions set forth in Section 6.2 not to be satisfied), upon written notice to Purchaser if there has been a violation, breach or inaccuracy of any representation, warranty, covenant or agreement of Purchaser contained in this Agreement which violation, breach or inaccuracy would cause any of the conditions set forth in Section 6.1 not to be satisfied, and such violation, breach or inaccuracy has not been waived by a Seller or cured by Purchaser within ten (10) Business Days after receipt by Purchaser of written notice from a Seller or is not reasonably capable of being cured prior to the Termination Date;

(g)    by any Seller or Purchaser if (i) the Auction has occurred and Purchaser was not the Prevailing Bidder and has not agreed to serve as the Back-up Bidder in accordance with the terms hereof or (ii) the Bankruptcy Court otherwise approves an Alternative Transaction;

(h)    By Purchaser if (i) permitted by under Section 1.6(b), Section 1.7(d), Section 5.9(c), Section 5.10(a) or Section 5.10(b) of this Agreement or (ii) there has occurred a Material Adverse Effect; and

(i)    By Purchaser or any Seller if a court of competent jurisdiction or other Governmental Authority shall have issued an order or taken any other action permanently restraining, enjoining or otherwise prohibiting the transactions contemplated under this Agreement and such order or action shall have become final and nonappealable.

2.4    Effect of Termination. If this Agreement is duly terminated in accordance with Section 2.3:

(a)    the Escrow Agent shall, no later than three (3) Business Days after such termination, refund the Deposit, together with any interest or earnings thereon, to Purchaser (in immediately available funds to the account designated thereby), provided that if this Agreement is duly terminated pursuant to Section 2.3(f), the Escrow Agent shall pay the Deposit, together with any interest or earnings thereon, to the Sellers (in immediately available funds to the account designated thereby), such payment to constitute the sole and exclusive remedy of the Sellers relating to such termination or the violation, breach or inaccuracy of any representation, warranty, covenant or agreement of Purchaser giving rise thereto;

(b)    this Agreement shall become void and of no further effect, provided; however, that (i) this Section 2.4, Section 2.5, Section 9.1 through Section 9.10 and any other provision that expressly indicates that it will survive such termination, and any rights or obligations under such provisions, shall survive any such termination; and (ii) and except as otherwise provided herein, no party shall be relieved of any liability for any breach of the provisions of this Agreement or any Collateral Agreement prior to the termination of this Agreement; and

(c)    the Escrow Agreement shall not be terminated solely by virtue thereof.

2.5    Breakup Fee and Expense Reimbursement.

(a)    Sellers shall pay to Purchaser, by wire transfer of immediately available funds to a bank account designated by Purchaser:

i.      the Breakup Fee plus the Reimbursable Expenses if this Agreement is duly terminated pursuant to Section 2.3(g) or the Sellers otherwise close an Alternative Transaction; and

ii.      the Reimbursable Expenses (but not the Breakup Fee) if this Agreement is duly terminated by Purchaser or Seller pursuant to Section 2.3(b), (c), (d), (e), (h) or (i).

The Sellers shall pay the Reimbursable Expenses and, if applicable, the Breakup Fee no later than three (3) Business Days following such termination (except that if the Breakup Fee and Reimbursable Expenses are due under Section 2.5(a)(i), such amount shall be payable as set forth in Section 2.5(c)(iv)), and such payment shall be made free and clear of all Liens, Claims, interests, and encumbrances.

(b)      Sellers shall seek Bankruptcy Court approval of the allowance of the Breakup Fee and Reimbursable Expenses in favor of Purchaser and the payment of such amounts to Purchaser under the terms and conditions set forth in this Agreement through the Sale Motion.

(c)      The parties hereto acknowledge and agree that (i) the payment of the Breakup Fee and Reimbursable Expenses is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of Sellers' obligations to make these payments in the circumstances described herein, Purchaser would not have entered into this Agreement, (iii) time is of the essence with respect to the payment of the Breakup Fee and Reimbursable Expenses, (iv) Sellers shall pay the Breakup Fee and the Reimbursable Expenses from the proceeds of the Alternative Transaction (to the extent one occurs), and (v) the Breakup Fee and Reimbursable Expenses shall each constitute allowed administrative expense claims of each of the Sellers' respective bankruptcy estates under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code.  For avoidance of doubt, the Breakup Fee and Reimbursable Expenses shall constitute joint and several obligations of each of the Sellers' respective bankruptcy estates.

### ARTICLE III – REPRESENTATIONS AND WARRANTIES OF SELLERS

As a material inducement to Purchaser entering into this Agreement, each Seller hereby makes the representations and warranties set forth in Sections 3.1 to Section 3.34 to Purchaser and agrees as follows:

3.1      Corporate Existence and Qualification.

(a)      Such Seller is a corporation or a limited liability company, as the case may be, duly organized, validly existing and in good standing under the laws of the State of Missouri, and has the corporate power to own, manage, lease and hold its properties and to carry on its business as and where such properties are presently located and such business is presently conducted.

(b)      Such Seller is qualified as a foreign company and is in good standing in each jurisdiction listed on Schedule 3.1.  Neither the character of the properties of such Seller nor the nature of its business requires such Seller to be qualified to do business as a foreign company in any jurisdiction outside those identified in Schedule 3.1 hereto in which it is so qualified, except where the failure to be so qualified would not, individually or in the aggregate, have a Material Adverse Effect.

3.2      Authority, Approval and Enforceability.  Subject to and conditioned solely upon the approval of the Bankruptcy Court, this Agreement and the Collateral Agreements to which such Seller is a party have been (or upon execution and delivery will be) duly executed and delivered by such Seller. Such Seller has all requisite corporate or limited liability company (as the case may be) power and capacity to execute and deliver this Agreement and all Collateral Agreements executed and delivered or to be executed and delivered in connection with the transactions provided for hereby, to consummate the

12166182v15

transactions contemplated hereby and by the Collateral Agreements, and to perform its obligations hereunder and under the Collateral Agreements.  The execution, delivery and performance of this Agreement and the Collateral Agreements and the consummation by such Seller of the transactions contemplated hereby and thereby has been duly and validly authorized and approved by all necessary corporate or limited liability company action, as the case may be, on the part of such Seller.  No other corporate or limited liability company, as the case may be, proceedings on the part of such Seller are necessary to authorize this Agreement or the Collateral Agreements, or to consummate the transactions contemplated by this Agreement or the Collateral Agreements.  This Agreement and each Collateral Agreement to which such Seller is a party constitutes, or upon execution and delivery will constitute, the legal, valid and binding obligation of such Seller enforceable in accordance with its terms, except as such enforcement may be limited by general equitable principles or by applicable bankruptcy, insolvency, moratorium or similar laws and judicial decisions from time to time in effect, which affect creditors' rights generally.

3.3    <u>Capitalization and Business Records</u>.  Schedule 3.3(a) sets forth (i) the authorized and issued capital stock of each Seller that is a corporation and issued and outstanding membership interest, units or other equity interests in each Seller that is a limited liability company, and (ii) each owner of any capital stock, membership interest, units or other equity interest of such Seller or any security interest in any of the foregoing.

3.4    <u>Subsidiaries</u>.  No Seller owns, directly or indirectly, any securities of or other equity-related interests in any other corporation, partnership, joint venture or other Person, except FP owns all of the issued and outstanding capital stock of FP Strafford.

3.5    <u>No Defaults or Consents; Authorizations</u>.  Except as otherwise set forth in Schedule 3.5 hereto or excused by the Bankruptcy Code or a consequence of the Bankruptcy Code, neither the execution and delivery of this Agreement nor the carrying out of any of the transactions contemplated hereby will:

(a)    violate or conflict with any of the terms, conditions or provisions of the charter, articles of formation, bylaws, operating agreement, or similar organizational or operating documents, of any Seller;

(b)    violate any Legal Requirements applicable to such Seller;

(c)    violate, conflict with, result in a material breach of, constitute a default under (whether with or without notice or the lapse of time or both), or accelerate or permit the acceleration of the performance required by, or give any other Person the right to terminate or exercise any remedial right under, any Lease, Material Contract or Permit binding upon or applicable to the Seller;

(d)    contravene or conflict with in any material respect or give any Governmental Authority or any other Person the right to challenge the transactions contemplated by this Agreement, or to exercise any remedy or obtain any relief under any Legal Requirement;

(e)    contravene, conflict with or violate in any material respect or result in the loss of any material benefit to which such Seller is entitled under, or give any Governmental Authority the right to revoke, suspend, cancel, terminate or modify any Permit held by such Seller or that otherwise relates to the business of or any assets owned or used by the Seller;

(f)    result in the creation of any Lien (other than a Permitted Lien) on any material properties of such Seller; or

12166182v15

(g)    require such Seller to obtain or make any waiver, consent, action, approval or authorization of, or registration, declaration, notice or filing with, any private non-governmental third party or any Governmental Authority (other than the Bankruptcy Court's issuance of the Sale Order and filings and communications with the Bankruptcy Court in the Chapter 11 Case), including the National Supplier Clearinghouse, any state board of pharmacy, the Centers for Medicare and Medicaid Services ("CMS"), any state Medicaid program, and federal or state healthcare programs or any Person offering a Prescription Drug Plan or a Medicare Advantage Plan or any managed care plan providing prescription drug benefits through Medicare or Medicaid.

3.6    <u>No Proceedings</u>.  Except for the Chapter 11 Case, no suit, action or other proceeding is pending or, to the Knowledge of the Sellers, threatened before any Governmental Authority seeking to restrain the Seller, affect the operation of the Business by the Seller prohibit the Seller from entry into this Agreement or any Collateral Agreement or prohibit the Closing, or seeking Damages against the Seller as a result of the consummation of this Agreement or the transactions contemplated by this Agreement or otherwise.

3.7    <u>Employment Matters</u>.

(a)    Intentionally omitted.

(b)    <u>Schedule 3.7(b)</u> contains a true and complete list, by business (if applicable), reflecting for each individual employee of each of such Seller (including each employee on leave of absence or other layoff or absentee status) his or her: name, department and employer, current annual base salary (if exempt under the Fair Labor Standards Act) or hourly wage compensation (if not exempt under the Fair Labor Standards Act), and total compensation for the current year to date through April 22, 2018 (including overtime pay, bonus, and car allowance, as applicable), job title, date of hire, length of service, active or on leave of absence/absentee status, employee benefit coverages selected and other benefits provided, short-term disability status.  Except as set forth in <u>Schedule 3.7(b)</u>, the employment of each such employee is "at will."  <u>Schedule 3.7(b)</u> sets forth a list of all independent contractors or consultants of such Seller as of the date hereof that are individuals, which list includes such individual's name, the services provided and the rate of compensation paid thereto.

(c)    None of the Sellers nor any of the Sellers' respective employees are a party to or subject to any collective bargaining agreement or any other contract, written or oral, with any trade or labor union, employees' association or similar organization. There have been no work stoppages, slowdowns, strikes or labor disputes, and there are currently no such work stoppages, slowdowns, strikes or labor disputes pending or, to the Knowledge of the Sellers, threatened. To the Knowledge of the Sellers, there are not currently, nor have there been, any attempts at union organization of the employees of any Seller.  To the Knowledge of the Sellers, (i) the relationship between each Seller and its employees is good and (ii) none of the fifteen highest paid employees of such Seller has threatened to or indicated intentions to resign his or her employment.

(d)    Except as set forth on <u>Schedule 3.7(d)</u>, there are no pending claims or, to the Knowledge of the Sellers, threatened claims against any of the Seller by any existing or former employee before the U.S. Equal Employment Opportunity Commission or any federal, foreign, state or local court or agency concerning alleged employment discrimination or any other matters relating to the employment of labor.

(e)    Such Seller is in compliance in all material respects with applicable workers' compensation laws and has paid in full all amounts owing pursuant thereto and there are no outstanding or pending assessments, levies or penalties thereunder.

(f)      Schedule 3.7(f) hereto contains a true and complete listing, by location, of each individual paid by such Seller as an independent contractor, rather than as an employee, and who was paid in excess of $20,000 in any year during the period from January 1, 2018, through the date of this Agreement ("Independent Contractors").  No Seller has completed IRS Form SS-8 with respect to any Independent Contractor, and no Independent Contractor has completed IRS Form SS-8 with respect to such Seller.  Such Seller has no workers treated as employees on its payroll that performs the same or similar functions as any Independent Contractor.  Such Seller maintains good commercial relations with all of its Independent Contractors and since January 1, 2018, no Independent Contractor has canceled, terminated or made any threat to such Seller to cancel or otherwise terminate his or her relationship with Seller.

(g)      Such Seller is in compliance in all material respects with all applicable Legal Requirements relating to the employment of labor.  Such Seller has classified all individuals who perform services for it correctly, in accordance with the terms of each Employee Plan and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), the Code, the Fair Labor Standards Act and all other applicable Legal Requirements, as employees, independent contractors or leased employees, as the case may be, and has not received notice to the contrary from any Person or Governmental Authority.

(h)      Such Seller has only employed individuals authorized to work in the United States.  Without limiting the generality of Section 3.7(g) above, except as provided in Schedule 3.7(h) hereof, such Seller has complied in all material respects with all provisions of the Immigration Reform and Control Act of 1986, as amended, and all regulations promulgated thereunder.  Such Seller maintains current files containing all Labor Condition Applications and related public access documentation which it must present upon request by the U.S. Department of Labor or the general public, including but not limited to all documentation noted in 20 CFR §655.760, and such Seller has made such public files available to Purchaser. Such Seller maintains and has maintained its continuing obligations pursuant to those same applications.  Such Seller maintains and has given Purchaser access to all data necessary for the assembly of non-public access documentation that it must present upon request to the U.S. Department of Labor.  Such Seller maintains copies of all applications for permanent employment certification, including all required supporting documentation, that were filed by it with the U.S. Department of Labor since September 30, 2014.  Such Seller also maintains copies of all U.S. Department of Labor audit requests related to such applications, as well as copies of its responses to such audit requests.  Such Seller has made such applications, supporting documentation, audit requests, and audit responses available to Purchaser.  Such Seller has not received written notice of any inspection, investigation, proceeding, and/or enforcement action relating to its alleged noncompliance with or violation of the Immigration Reform and Control Act of 1986, as amended ("IRCA"), nor such the Seller been warned, fined, or otherwise penalized by reason of any failure to comply with IRCA or for any willful violation of any other Legal Requirement.  Such Seller has performed reasonable due diligence in response to any and all "no-match letters" which it has received from the U.S. Social Security Administration ("SSA").  Such Seller has made available to Purchaser any and all "no-match letters" which it has received from the SSA and copies of any and all documentation evidencing that it performed reasonable due diligence in response to its receipt of any and all such "no-match letters."

(i)      Schedule 3.7(i) contains

(i)      a true and complete list of all employees of such Seller working under DHS authorization in, or for whom such Seller is currently seeking to obtain, E, F, H, J, L, M, O, P, or TN nonimmigrant visa status, including specific reference to each such employee's nonimmigrant classification, the exact date (month/day/year) each such employee's current nonimmigrant status expires (if applicable), and any steps taken by

such Seller to extend, amend, or change each such employee's current nonimmigrant status;

(ii)    a true and complete list of all employees employed by such Seller as of the date of this Agreement on whose behalf such Seller has filed a labor certification application or an employment-based immigrant visa petition for U.S. permanent residence, which employees have not been granted U.S. permanent residence; and

(iii)    a true and complete list of all other employees employed by such Seller as of the date of this Agreement which employees such Seller has agreed, whether verbally or in writing, to sponsor for U.S. permanent residence, or on whose behalf such Seller is presently preparing to file a labor certification application or an employment-based immigrant visa petition for U.S. permanent residence.

3.8    <u>Employee Plans</u>.

(a)    All Employee Plans are listed in <u>Schedule 3.8(a)</u>, and such Seller has made available to Purchaser true, complete and up-to-date copies of all current plan documents and all amendments thereto together with, as applicable, the most current summary plan descriptions and other descriptions of the Employee Plans provided to past or present participants therein, and the financial statements, if any, for the Employee Plans; all material Contracts relating to Employee Plans, including insurance Contracts, investment management Contracts, subscription and participation agreements, record keeping agreements and other services agreements; and such other Employee Plan related documents and materials as requested by Purchaser.

(b)    Neither such Seller, nor any ERISA Affiliate, has ever sponsored or participated in a "multiple employer welfare arrangement" (as such term is defined Section 3(40) of ERISA), any "nonqualified deferred compensation plan" (within the meaning of Code Section 409A(d)(1) and the regulations issued thereunder) or any qualified defined benefit pension plan (including, without limitation, (i) a "single-employer plan" (as such term is defined in Section 4001(a)(15) of ERISA) subject to Section 412 of the Code or Section 302 of Title I of ERISA or Title IV of ERISA, (ii) a "multiple employer plan" (meaning a plan sponsored by more than one employer within the meaning of ERISA Section 4063 or 4064 or Section 413(c) of the Code), or (iii) a "multiemployer plan" (as such term is defined in Sections 3(37) or 4001(a)(3) of ERISA)). For purposes of this Agreement, the term "<u>ERISA Affiliate</u>" means any Person that, together with such Seller at any given time, would be deemed a "single employer" within the meaning of Section 414(b), (c), (m) or (o) of the Code. To the Knowledge of the Sellers, there are no circumstances under which any of the Sellers could incur any liability (whether fixed or contingent) under Title IV of ERISA or Section 412 of the Code. Except as set forth on <u>Schedule 3.8(b)</u>, none of the Employee Plans provides for retiree benefits (including health and welfare benefits, other than benefits that are required to be provided pursuant to the applicable requirements of Section 4980B of the Code and Section 601 <u>et seq.</u> of ERISA (such statutory provisions are referred to herein collectively as "<u>COBRA</u>")) or for pension benefits to retired or terminated employees or directors or to the beneficiaries or dependents of retired employees or directors.

(c)    All of the Employee Plans are duly registered where required by applicable Legal Requirements and are in good standing thereunder (including registration with the relevant Tax authorities where such registration is required to qualify for Tax exemption or other beneficial Tax status), and each Employee Plan, and all related trusts, insurance contracts and funds have been maintained, funded and administered in accordance with the terms of such Employee Plan and comply, and at all times have complied, both in form and in operation, with all applicable Legal Requirements (including, but not limited to, the Code and ERISA).

(d)    No "party in interest" (as defined in Section 3(14) of ERISA) or "disqualified person" (as defined in Section 4975(e)(2) of the Code) with respect to any Employee Plan has engaged in a "prohibited transaction" (as such term is defined in Section 406 of ERISA and Section 4975 of the Code), or any breach of fiduciary duty or responsibility with respect to any Employee Plan subject to ERISA, that reasonably could be expected to subject any of the Sellers or any of the Sellers' respective employees to (i) any Tax or penalty on prohibited transactions imposed by Section 4975 of the Code, (ii) any liability under Section 502(i) or (l) of ERISA, or (iii) any other Tax penalty or liability.

(e)    No Employee Plan is subject to any pending action, investigation, examination, claim (including claims for Taxes, but excluding routine claims for benefits) or any other proceeding initiated by any Person, and to the Knowledge of the Sellers there exists no state of facts that could reasonably be expected to give rise to any such action, investigation, examination, claim or other proceeding.

(f)    No insurance policy or any other agreement affecting any Employee Plan requires or permits a retroactive increase in contributions, premiums or other payments due under such insurance policy or agreement. The level of insurance reserves under each insured Employee Plan is reasonable and sufficient to provide for all incurred but unreported claims.  No contributions or payments are due or required to be paid by any of the Sellers with respect to any of the Employee Plans, except for payments due or required to be paid in the ordinary course of business, consistent with past practice.  All contributions required to be made to each Employee Plan under the terms of each Employee Plan, ERISA, the Code, or any other applicable Legal Requirements have been timely made.  Other than as set forth on Schedule 3.8(f), each Employee Plan that is a "welfare plan," as defined in Section 3(1) of ERISA, whether or not subject to ERISA, is fully insured.

(g)    Each Employee Plan that is a group health plan has complied in all respects in form, operation and administration with the employer shared responsibility mandate (the "ACA employer mandate"), to the extent applicable, under Code Section 4980H (including with respect to related reporting and disclosure requirements under Code Sections 6055 and 6056), and no Seller is, and no Seller will be, subject to any "assessable payments" (within the meaning of Code Section 4980H) for any month beginning prior to the Closing Date, or any penalties or excise taxes under Code 4980D or any other provision of the Affordable Care Act.  No Seller uses a look-back measurement period to determine full-time employee status for any category of employee for purposes of the ACA employer mandate.  Such Seller has at all times complied with COBRA.  Schedule 3.8(g) lists the name of each current and former employee of such Seller, or "qualified beneficiary" (as defined in COBRA), who has experienced a "qualifying event" (as defined in COBRA) with respect to an Employee Plan, who is eligible for "continuation coverage" (as defined in COBRA) and whose maximum period for continuation coverage required by COBRA has not expired, which Schedule includes the date and type of each qualifying event, whether the individual has already elected continuation coverage and, for any individual who has not yet elected continuation coverage, the date on which such individual was notified of his or her rights to elect continuation coverage.

(h)    Such Seller has not undertaken to maintain any Employee Plan for any period of time, and subject to applicable Legal Requirements, no provision of any Employee Plan or of any agreement, and no act or omission of such Seller, in any way limits, impairs, modifies or otherwise affects its right to unilaterally amend or terminate any Employee Plan, and no commitments to improve or otherwise amend any Employee Plan have been made.  Except as set forth on Schedule 3.8(h), the execution and delivery of this Agreement and the consummation of the transactions contemplated hereby (either alone or upon the occurrence of any additional or subsequent events) will not result in any liability of such Seller for (i) any payment (including severance or otherwise) becoming due to any current or former employees or independent contractors, or their dependents or beneficiaries, under any Employee

16

Plan or otherwise; (ii) an increase in any benefits payable under any Employee Plan; or (iii) any acceleration of the time of payment or vesting of any such benefit.  Such Seller has not made any verbal commitments to any current or former employees or independent contractors with respect to compensation, benefits, promotion, retention, termination, severance, change in control or similar matters in connection with the transactions contemplated hereby or otherwise, except as set forth on Schedule 3.8(h).

(i)     All employee data necessary to administer each Employee Plan in accordance with its terms and conditions and all Legal Requirements is in possession of one or more of the Sellers, and such data is complete, correct, and in a form that is sufficient for the proper administration of each Employee Plan.

3.9     Financial Statements; No Undisclosed Liabilities; Funded Indebtedness and Claims.

(a)     To the Knowledge of the Sellers, the Sellers have delivered to Purchaser true and complete copies of the following (collectively the "Financial Statements"): (i) financial statements of the Sellers as of and for the years ended December 31, 2016 and 2017 and (ii) financial statements of the Sellers as of and for the two months ended February 28, 2018 (the "Balance Sheet Date"), and a copy of the Financial Statements is attached hereto as Schedule 3.9(a).  The Financial Statements present fairly in all material respects the financial condition of the Sellers, and results of operations and cash flows for the dates or periods indicated thereon, in accordance with GAAP applied on a consistent basis throughout the periods indicated, except to the extent of inaccuracies in the recording of  write offs of Accounts Receivable from the amount initially recorded in such respect (the "AR Adjustment"). The Financial Statements, including the footnotes thereto, have been prepared from the books and records of the Seller and have been prepared in accordance with GAAP, consistently applied, except with respect to the AR Adjustment.

(b)     To the Knowledge of the Sellers, no Seller has any liabilities or obligations (whether accrued, absolute, contingent, known, unknown or otherwise, and whether or not of a nature required to be reflected or reserved against in a balance sheet in accordance with GAAP), except for (i) the liabilities reflected in the Financial Statements, (ii) Funded Indebtedness, trade payables, accrued expenses and other liabilities incurred by such Seller since the Balance Sheet Date in the ordinary course of business, (iii) executory contract obligations under Contracts arising in the ordinary course of business consistent with past practice which are not required to be reflected or reserved against in a balance sheet in accordance with GAAP and (iv) obligations under this Agreement and the Collateral Agreements.

(c)     To the Knowledge of the Sellers, Schedule 3.9(c) sets forth a true, correct and complete list of: (i) each lender or provider of Funded Indebtedness to any of the Sellers as of the date hereof (each "Lender"), including The Bank of Missouri and Cardinal Health; (ii) with respect to each Lender, the aggregate principal amount of indebtedness owed to such Lender, the accrued and unpaid interest owed to such Lender and any other amounts owed to such Lender; (iii) each other Person having any Claim against any of the Sellers, including all other creditors of any of the Sellers (including trade creditors) (each "Claim Holder"); and (iv) with respect to each Claim Holder, a description of the nature of the Claim and the amount of such Claim

3.10     Absence of Certain Changes.

(a)     Since January 1, 2018, there has not been any event, circumstance or change that had or could reasonably be expected to have a Material Adverse Effect.

(b)      Except as otherwise set forth in Schedule 3.10(b) hereto, since January 1, 2018, no Seller has done any of the following:

i.      merged into or with or consolidated with, or acquired the business or assets of, any Person;

ii.      purchased any securities of any Person;

iii.      created, incurred, assumed, guaranteed or otherwise become liable or obligated with respect to any Funded Indebtedness (excluding in each case Funded Indebtedness with respect to which J M Smith is the Lender), or made any loan or advance to, or any investment in, any Person, except in each case in the ordinary course of business;

iv.      made or changed any Tax election, changed any annual Tax accounting period, adopted or changed any method of Tax accounting, entered into any closing agreement, settled any Tax claim or assessment, or consented to any extension or waiver of the limitations period applicable to any Tax claim or assessment;

v.      sold, transferred, leased, mortgaged, encumbered or otherwise disposed of, or agreed to sell, transfer, lease, mortgage, encumber or otherwise dispose of, any material properties except (A) in the ordinary course of business or pursuant to this Agreement, or (B) pursuant to any Contract listed in Schedule 3.15(a);

vi.      settled any material claim or litigation or any claim or litigation in which greater than $50,000 was at issue, or filed any motions, orders, briefs or settlement agreements in any material proceeding before any Governmental Authority or any arbitrator;

vii.      maintained its books of account other than in the usual, regular and ordinary manner on a basis consistent with prior periods or made any change in any of its accounting methods or practices;

viii.      adopted or amended any Employee Plan, or granted any increase in the compensation payable or to become payable to any employee (including, without limitation, any such increase pursuant to any bonus, profit-sharing or other plan, program, agreement, arrangement, policy or practice), other than merit and annual review increases to non-officer employees in the ordinary course of business consistent with past practice;

ix.      suffered any extraordinary losses or waived any rights of value in excess of $50,000;

x.      declared, set aside or paid any dividends, or made any distributions or other payments in respect of its equity securities, or repurchased, redeemed or otherwise acquired any such securities;

xi.      amended, as applicable, its articles or certificate of incorporation or formation, bylaws, operating agreement or other governing instruments;

18

xii.    issued any equity securities, or granted, or entered into any agreement to grant, any options, convertible rights, warrants, calls or agreements relating to its equity securities;

xiii.    repurchased, redeemed or otherwise acquired any of its equity securities; or

xiv.    committed to do any of the foregoing.

(c)    Since January 1, 2018, such Seller has operated in all material respects in the ordinary course of business, consistent with past practices, and have not intentionally taken steps to artificially increase or decrease the working capital of the Sellers on a consolidated basis or such Seller on a consolidating basis, except for the withdrawal of cash and cash equivalents in the bank accounts of such Seller to pay and reduce Funded Indebtedness.

3.11    <u>Compliance with Laws</u>.  Except as otherwise set forth in Schedule 3.11 hereto, such Seller is and has been in compliance in all material respects with any and all Legal Requirements applicable to it.  Except as otherwise set forth in Schedule 3.11 hereto, and without limiting the generality of the foregoing:

(a)    such Seller has not received or entered into any citations, complaints, consent orders, or other similar enforcement orders, or received any written, or to the Knowledge of the Sellers, oral, notice from any Governmental Authority or any other written, or to the Knowledge of the Sellers, oral, notice that indicates non-compliance with any material Legal Requirements, and

(b)    such Seller is not in default under, and no condition exists that with or without notice or lapse of time or both would constitute a default under, or breach or violation of, any material Legal Requirement or Permit applicable to such Seller.

3.12    <u>Business Permits</u>.  Except as set forth in Schedule 3.12, such Seller currently has and has had at all times all material approvals, consents, authorizations, registrations, waivers, privileges, exemptions, qualifications, quotas, certificates, filings, franchises, licenses, notices, permits and rights necessary for the lawful conduct of its business (including specifically but without limitation the Business), the lawful participation in federal and/or state healthcare programs (including but not limited to, as applicable, the Medicare and any applicable state Medicaid programs), the lawful filing of claims for reimbursement for items or services rendered to patients with federal or state healthcare program benefits, and the lawful ownership of properties and assets or the operation of its business, as conducted on the date hereof (collectively, "Business Permits"), and has continuously maintained such Business Permits in effect to the extent necessary for the lawful conduct of its business and the lawful ownership of it properties and assets as conducted in the past.  All such Business Permits are listed on Schedule 3.12 and are in full force and effect, and there has occurred no default under or breach or violation of any Business Permit by such Seller, except as would not, individually or in the aggregate, reasonably be expected to be material to the operation of the business of such Seller.  Except as set forth on Schedule 3.12, the Seller has not received any notice or other communication from any Governmental Authority or any other person regarding (i) any actual, alleged potential violation of, or failure to comply with, any Business Permit, or (ii) any actual, proposed or potential revocation, suspension, cancelation, termination or modification of any Business Permit.  Such Seller has provided Purchaser with correct and complete copies of the Business Permits.  All applications required to have been filed for the renewal or reissuance of the Business Permits have been duly filed on a timely basis with the appropriate Governmental Authorities, and other filings required to have been made with respect to such Business Permits have been duly made on a timely basis with the appropriate Governmental Authorities.

19

3.13    <u>Litigation</u>.    Schedule 3.13 sets forth a complete and accurate list of all actions, administrative charges, proceedings or, to the Knowledge of the Sellers, investigations involving such Seller, the assets of such Seller, any of the Real Property or the Business before any court, tribunal, alternative dispute resolution forum or governmental body that are currently pending or were outstanding at any time since January 1, 2015.  Except for the Chapter 11 Case or as set forth on Schedule 3.13, there is no action, administrative charge, proceeding or, to the Knowledge of the Sellers, investigation pending or threatened against or involving such Seller, the assets of such Seller, any of the Real Property or the Business. Except for the Chapter 11 Case or as set forth on Schedule 3.13, such Seller is not subject to any judgment, order or decree entered in any lawsuit or other type of proceeding relating to such Seller, the assets of such Seller or the operation of the Business.

3.14    <u>Real Property</u>.

(a)    Such Seller does not own any real property, except as set forth on <u>Schedule 3.14</u> (all real property listed or required to be listed on such schedule, the "<u>Owned Real Property</u>"). <u>Schedule 3.14</u> lists the address of each parcel of Owned Real Property and identifies the owner thereof and the present use thereof.

(b)    Sellers have made available to Purchaser copies of all title insurance policies, opinions, abstracts, surveys and environmental site assessments in the possession or control any of them or any of their respective Affiliates.  With respect to Owned Real Property:

i.    The real property owned by FP and the real property owned by FP Management constitutes all of the Owned Real Property; each such Person has good and marketable fee simple title to all of the Owned Real Property owned thereby; and no improvements on any of the Owned Real Property encroach on any set backs or other Person's property;

ii.    Neither FP nor FP Management has, directly or indirectly, leased or otherwise granted to any Person other than another Seller the right to currently or in the future use or occupy the Owned Real Property or any portion thereof, except as set forth on <u>Schedule 3.14</u>; and

iii.    there are no outstanding options, rights of first offer or rights of first refusal to purchase any the Owned Real Property or any portion thereof or interest therein.   Neither FP nor FP Management has, directly or indirectly, has pledged, mortgaged or otherwise granted a Lien on the any of the Owned Real Property except as set forth on <u>Schedule 3.14</u>.

(c)    No Seller has received any written notice of (i) material violations of building codes, zoning ordinances or other Legal Requirements affecting any of the Owned Real Property, (ii) existing, pending or threatened condemnation proceedings affecting any of the Real Property, (iii) existing, pending or threatened zoning, building code or other moratorium proceedings, or similar matters which could adversely affect the ability to operate or use any of the Real Property as currently operated or used or (iv) material violations of any recorded covenants or restrictions affecting any of the Owned Real Property (the matters described in clauses (i)–(iv), the "<u>Adverse Real Property Matters</u>"). To the Knowledge of the Sellers, there are no Adverse Real Property Matters.

(d)    <u>Schedule 3.14(d)</u> hereto sets forth a list of all leases or similar agreements relating to such Seller's use or occupancy of real property owned by a third party (including an Affiliate of such Seller) ("<u>Leases</u>"), true and correct copies of which have previously been furnished to Purchaser,

20

in each case setting forth (i) the lessor and lessee thereof, (ii) the street address of each property covered thereby and (iii) any security deposit held under such lease or arrangement (the "Leased Premises" and, together with the Owned Real Property, the "Real Property").

(e)    (i) The portions of the buildings and other improvements located at any of the Real Property are in good repair and condition, normal wear and tear excepted, and are sufficient to satisfy the normal business activities of the Business and the Sellers as conducted thereon; (ii) all of the Real Property has access to public roads sufficient to satisfy the current transportation requirements of the business presently conducted at such parcel; (iii) no Seller has received notice of (A) any condemnation, eminent domain or similar proceeding affecting any of the Real Property, (B) any special assessment or pending improvement liens to be made by any Governmental Authority which could reasonably be expected to materially and adversely affect any of the Real Property, or (C) any violations of building codes and/or zoning ordinances or other governmental regulations with respect to any of the Real Property; (iv) except for Affiliates of Purchaser, no third party has any purchase contract or option rights to acquire any portion of the Real Property; and (v) no portion of the Real Property is encumbered by Liens other than Permitted Liens.

(f)    Each of the Leases is in full force and effect.  The tenant under each Lease has performed and observed in all material respects all covenants, conditions and agreements required to be performed or observed by it in respect of any of the Leased Premises, and no notice of a breach has been received by it.  With respect to each Lease, no waiver or postponement of the tenant's obligations has been granted by the landlord, there exists no event of default or event, occurrence, condition or act (including the transactions contemplated by this Agreement or the Collateral Agreements, after giving effect to the Bankruptcy Code provisions applicable in the Chapter 11 Case) which, with the giving of notice, the lapse of time or the happening of any other event or condition, would become a default under each such Lease, and to the Knowledge of the Sellers, all of the covenants to be performed by any other party under each such Lease have been performed.  No Seller has received or given any notice of any default or event that with notice or lapse of time, or both, would constitute a default by such Seller under any of the Leases and, to the Knowledge of the Sellers, no other party is in default thereof, and no Party to any Lease has exercised any termination rights with respect thereto.  No Seller has subleased, assigned or otherwise granted to any Person the right to use or occupy such Leased Premises or any portion thereof.

3.15    Material Contracts.

(a)    Except as otherwise set forth in Schedule 3.15 hereto, no Seller is a party to or bound by any of the following (collectively, "Material Contracts" and each, individually, a "Material Contract"):

i.    except for ordinary course purchase orders or similar documentation with respect to individual purchases, any Contract with any customer or supplier of products;

ii.    any Contract for capital expenditures by such Seller in excess of $3,000;

iii.    any lease or license with respect to any real or personal property, whether as lessor, lessee, licensor or licensee, that involves annual payments of more than $3,000 or involves the right to use software or equipment;

iv.    any Contract relating to the borrowing of money, including all Contracts evidencing Funded Indebtedness, or the deferred payment of the purchase price of any properties, or which creates a Lien on the capital stock, membership interests, units or other equity interest of such or any property or asset of such Seller;

21

v.      any shareholder, partnership, joint venture, limited liability company operating agreement or similar governance Contract;

vi.     any Contract containing covenants that in any way purport to limit the freedom of such Seller to engage in any line of business or to compete with any Person or in any geographic area;

vii.    any Contract with any Affiliate (including another Seller) relating to the provision of funds, real property, goods or services by or to such Seller;

viii.   any Contract granting to any Person a first refusal, first offer or similar preferential right to purchase or acquire any right, asset or property of such Seller;

ix.     any Contract involving the acquisition by such Seller or Lynn A. Morris ("Principal") of any business enterprise, or the capital stock, membership interests, units or other equity interest thereof, within the past five (5) years, whether via stock or asset purchase or otherwise, including any Contracts relating to the acquisition of capital stock of FP Strafford and units or membership interests of FP Management, FP Missouri and FP Logistics;

x.      any Contract for the sale of any assets that in the aggregate has a net value of greater than $3,000;

xi.     any Contract that involves aggregate annual payments or expenditures by or to such Seller in excess of $3,000;

xii.    any Contract which constitutes a license under which such Seller is subject to receive, or obligated to pay, as the case may be, fees (including support and maintenance fees) of more than $3,000 per annum following Closing (excluding shrink wrap, click wrap, click through or similar licenses with respect to off-the-shelf or generally available computer software);

xiii.   any Contracts that are employment, consulting or non-competition agreements with any employee, officer or consultant;

xiv.    any Contract containing a power-of-attorney granted by such Seller;

xv.     any Contract involving the settlement, release, compromise or waiver of any material rights, claims, obligations, duties or liability;

xvi.    any Contract under which such Seller has loaned to, made an investment in or guaranteed the obligations of any Person;

xvii.   any Contract containing any obligation of confidentiality or nondisclosure between such Seller and any other Person for the benefit of such Seller or any other Person; or

xviii.  any Contract constituting any amendment or modification of any of the foregoing.

(b)     Such Seller has made or will make available to Purchaser true, correct and complete copies of the written Material Contracts, including any and all amendments thereto, and summaries of all of the material terms of all oral Material Contracts.  The Material Contracts are valid, legally binding and enforceable against such Seller and, to the Knowledge of the Sellers, the other parties thereto, except as such enforcement may be limited by general equitable principles or by applicable bankruptcy, insolvency, moratorium or similar laws and judicial decisions from time to time in effect, which affect creditors' rights generally.  Except as set forth on Schedule 3.15(b), neither such Seller nor, to the Knowledge of the Sellers, any other party to any of the Material Contracts are in breach of, or in default under, any of the Material Contracts; and no event has occurred or failed to occur which (i) with the giving of notice or lapse of time, or both, would constitute a default by such Seller or, to the Knowledge of the Sellers, any other party to any of the Material Contracts thereunder or (ii) gives any other party to any of the Material Contracts the right to terminate such Material Contract or take other adverse remedial action with respect thereto.  Except as set forth on Schedule 3.15(b), there are no negotiations pending nor, to the Knowledge of the Sellers, threatened or requested with respect to, nor any outstanding rights to renegotiate, any Material Contracts.

3.16    Insurance.

(a)     Schedule 3.16 contains a true, correct and complete list of all insurance policies currently carried by or for the benefit of such Seller with respect to the Business (the "Business Policies"), specifying the insurer, the amount of and nature of coverage (including whether written on a claims made or occurrence basis), the risk insured against, the deductible amount (if any) and the date through which coverage will continue by virtue of premiums already paid.  Except as set forth in Schedule 3.16, such Seller has no claim pending against any of its insurance carriers under any of such policies.

(b)     All Business Policies (i) are valid, outstanding and enforceable, (ii) taken together, provide adequate insurance coverage for the Business and the operations of such Seller for all risks to which such Seller is normally exposed, and (iii) are sufficient for compliance with all Legal Requirements and all of such Seller's Contracts.

(c)     Such Seller has not received any refusal of coverage or any notice that a defense will be afforded with reservation of rights or any notice of cancellation or any other indication that any Business Policy is no longer in full force or effect or that the issuer of any policy of insurance is not willing or able to perform its obligations thereunder.

3.17    Intangible Rights.  Schedule 3.17 hereto sets forth a list and description of all material foreign and domestic patents, trademarks, service marks, trade names, brands and copyrights, information, know-how, trade secrets, software, formulae, methods, processes, internet domain names and other intangible rights ("Intangible Rights") that are registered or for which an application is pending or that are owned, licensed, used or controlled by such Seller.  Except as otherwise set forth in Schedule 3.17 hereto:

(a)     no royalties, license or other fees are payable by such Seller to any Person by reason of the ownership or use of any of the Intangible Rights, other than any "shrink wrap" or other standard end user license for commercial off-the-shelf software that would not reasonably be expected to require aggregate annual license fees greater than $3,000;

(b)     there are no claims pending or, to the Knowledge of the Seller, threatened against such Seller asserting the invalidity, abuse, misuse or unenforceability of any of the Intangible Rights;

23

(c)     such Seller has not made any claim of any violation or infringement by others of any of its Intangible Rights or interests therein and, to the Knowledge of the Sellers, no grounds for any such claims exist;

(d)     such Seller has not received any notice that it is in conflict with or infringing upon the asserted intellectual property rights of others in connection with the Intangible Rights, and, to the Knowledge of the Sellers, neither the use of the Intangible Rights nor the operation of such Seller's businesses or the Business is infringing in any material respect upon any intellectual property rights of others; and

(e)     to the Knowledge of the Sellers, (i) no Person is materially infringing or violating any of the Intangible Rights owned by any of the Sellers, and (ii) the marketing, distribution and sale of products currently sold by such Seller, as applicable, does not infringe or violate in any material respect the proprietary rights of any third party.

3.18    Equipment and Other Tangible Property.

(a)     Schedule 3.18 sets forth a true and correct copy of Sellers' fixed asset listing. Sellers' policy was to list assets with an original acquisition cost of $250.00 which threshold was increased to $1,000.00 in 2017, and assets that were fully depreciated have been removed from the fixed asset listing.  The fixed asset list includes a listing of each Seller's furniture, fixtures, equipment, machinery, appliances, computer hardware, tools, vehicles or supplies, as well as leasehold improvements, fixtures, any construction in progress and any other tangible property included in the Real Property (collectively, the "Tangible Company Properties").  The Tangible Company Properties include all such material items owned (or, as noted thereon, leased) and used or held for use by the Sellers in the operation of the Business.  The Tangible Company Property is owned by one or more of the Sellers free and clear of all Liens except as otherwise set forth on Schedule 3.18.  The Tangible Company Properties are in good operating condition and repair and are fit for use in the ordinary course of business as historically conducted by the Sellers, normal wear and tear excepted, and except for such Tangible Company Properties as shall have been taken out of service on a temporary basis for repairs or replacement consistent with the Sellers' prior practices and normal industry standards. To the Knowledge of the Sellers, the Tangible Company Properties are free of any structural or engineering defects, and there has not been any significant interruption of the Business due to inadequate maintenance or obsolescence of the Tangible Company Properties.

(b)     The Purchased Assets constitute all of the material assets required for the continued operation of the Business, as it is currently operated and as it has been conducted in the twelve (12) month period prior to the date hereof, in the ordinary course of business, by the Sellers, and there are no assets other than the Leased Premises (excluding Leased Premises that are Owned Real Property leased by one Seller to another Seller) and certain leased equipment subject to a Material Contract used in the operation of the Business that are owned by any Person other than the Sellers.

3.19    Environmental Matters.

(a)     Except as otherwise set forth in Schedule 3.19(a) hereto, there have not been, and there are not currently any claims, notices, complaints, directives, judgments, verdicts, demands, suits, liabilities, requests for information, litigation, administrative proceedings, or, to the Knowledge of the Sellers, governmental investigations, relating to any Hazardous Materials or to compliance with, or liability under Environmental Laws (collectively, "Environmental Claims") pending or, to the Knowledge of the Sellers, threatened against such Seller, nor, to the Knowledge of the Sellers, is there a reasonable basis to expect that an Environmental Claim may be made against such Seller.  None of the Sellers, any

24

prior owner or current or prior occupant of the Owned Real Property, to the Knowledge of the Sellers, any owner of the Leased Premises or any predecessor owner or occupant of the Leased Premises has caused or permitted any Hazardous Material to be used, generated, reclaimed, transported, Released, treated, stored or disposed of in a manner which could reasonably be expected to form the basis for an Environmental Claim against any of the Sellers.  No Seller has assumed any liability of any Person for cleanup, compliance or required capital expenditures in connection with any Environmental Claim or any under any Environmental Law.  To the Knowledge of the Sellers, there is no condition, event or circumstance relating to Hazardous Materials or Environmental Laws that might prevent or impede, after the Closing Date, the ownership, lease, operation or use of the Real Property, the Business or assets of any of the Seller as currently carried out.

(b)     Except as otherwise set forth on <u>Schedule 3.19(b)</u> hereto, such Seller has complied, and currently complies in with all applicable Environmental Laws, including obtaining, complying with and maintaining in effect all Permits required by applicable Environmental Laws.

(c)     There are no underground storage tanks on any of the Owned Real Property and, to the Knowledge of the Sellers, there are no underground storage tanks on any of the Leased Premises.

(d)     Such Seller has provided to Purchaser: (i) any and all environmental reports, studies, audits, records, sampling data, site assessments, risk assessments and other similar documents with respect to the Business or any currently or formerly owned, operated or leased real property which are in the possession or control of such Seller related to compliance with Environmental Laws, Environmental Claims or the Release of Hazardous Materials; and (ii) any and all material documents concerning planned or anticipated capital expenditures required to reduce, offset, limit or otherwise control pollution and/or emissions, manage waste or otherwise ensure compliance with current or future Environmental Laws (including, without limitation, costs of remediation, pollution control equipment and operational changes).

3.20    <u>Banks</u>.  Schedule 3.20 hereto sets forth (a) the name of each bank, trust company or other financial institution with which such Seller has an account, credit line or safe deposit box, specifying the account numbers, (b) the names of all Persons authorized to draw thereon or to have access to any safe deposit box, and (c) the purpose of each such account, credit line or safe deposit box.

3.21    <u>Suppliers.</u>

(a)     <u>Intentionally Omitted</u>.

(b)     <u>Schedule 3.21(b)</u> sets forth the twenty-five largest (based on total purchases) suppliers of the Sellers during the 12 months ended on December 31, 2017, together with the dollar amount of goods purchased by the Sellers from each such supplier during each such period.  Except as otherwise set forth in <u>Schedule 3.21(b)</u> hereto, the Sellers maintain good relations with all suppliers listed or required to be listed in <u>Schedule 3.21(b)</u>, and no such party has canceled, terminated or made any threat to any of the Sellers to cancel or otherwise terminate its relationship with any of the Sellers, or to materially amend or change its relationship therewith (including, without limitation, to materially decrease its sale of products to any of the Sellers).

3.22    <u>Transactions With Affiliates</u>.  Except (a) as otherwise set forth in <u>Schedule 3.22</u> hereto, (b) for payment of compensation to employees in the ordinary course of business consistent with past practices and (c) for participation in Employee Plans by employees, since January 1, 2018, no Seller has purchased, acquired or leased any property or services from, or sold, transferred or leased any property to, or loaned or advanced any money to, or borrowed any money from, or entered into or been subject to any

management, consulting or similar agreement with, or engaged in any other transaction with, any stockholder, member, manager or officer, director or employee of such Seller or any Affiliate thereof (including another Seller or Principal) or family member of any of the foregoing (collectively, a "Related Party"). No such loans to or from, and no such agreement or lease, with any Related Party currently exists or is in effect or outstanding.

3.23    Broker or Finder Fees.  Except as otherwise set forth in Schedule 3.23 hereto, no broker, finder or similar intermediary has acted for or on behalf of any of the Sellers, or any of the Sellers' respective Affiliates, in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement with any such Person.

3.24    Liens.  The assets of such Seller are not subject to any Liens other than Permitted Liens and Liens set forth on Schedule 3.24.  This Section 3.24 does not relate to Intangible Rights, such items being the subject of Section 3.17.

3.25    Inventory.  Each Seller's inventory of products for sale in the operation of the Business ("Inventory") consists only of Inventory that is Saleable and that is owned by such Seller or any other Seller.  For purposes hereof, Inventory is "Saleable" only if it (including its packaging) is in the physical condition to be sold to customers in the ordinary course of the Business consistent with past practices and in accordance with applicable government regulations; provided, however, that "Saleable" Inventory does not include: (i) any item whose supplier notifies such Seller prior to the Closing Date that such item may not be distributed following the Closing Date; (ii) any items that are, pursuant to government standards, including, without limitation, FDA standards, out-of-date; (iii) any item that has a materially defective or damaged label, package or case; or (iv) any special order item that is not designated for a specific sale, to the extent not otherwise Saleable.  Sellers record Inventory on their books and records at the lower of cost or market as follows:  non-prescription drug inventory is recorded at cost subject to an annual physical inventory and adjustment to market price and prescription drug inventory is carried at cost subject to quarterly adjustments to market with an annual physical inventory and adjustment for shrink and market prices.  As of the Closing, there will be on hand Saleable Inventory in amounts substantially consistent with such Seller's ordinary business practices and at levels substantially consistent with the operation of the Business prior to the Closing.  The Inventory (other than goods in transit in the ordinary course) of the Seller is located on the premises of the Seller.  Except as provided in Schedule 3.25, the Seller is not in possession of any goods not owned by the Seller or another Seller. Sellers identify certain Inventory on its books and records which is not Saleable (e.g. outdated, damaged, partial lots, etc.) which may be subject to return which information has been disclosed to Purchaser.

3.26    Accounts Receivable.  To the Knowledge of the Sellers, the Accounts Receivable of the Sellers reflected on the interim balance sheet included in the Financial Statements and all of the Seller's Accounts Receivable arising since the Balance Sheet Date (i) arose from bona fide transactions, (ii) the goods involved have been sold and shipped to or on behalf of the account obligors, (iii) no filings (with Governmental Authorities, insurers or others) are required to be made, (iv) no further goods are required to be provided and no further services are required to be rendered in order to complete the sales reflected by such Accounts Receivable, (v) except to the extent impacted by the AR Adjustment, for Accounts Receivables that have not been collected, are collectible, and (vi) except to the extent impacted by the AR Adjustment, are not subject to any dispute, defense, counterclaims or setoffs.  Except for a Permitted Lien, no Account Receivable has been assigned or pledged to any Person. Subject to the A/R Adjustment, Schedule 3.26 sets forth a true, correct and complete list of the Accounts Receivable of any of the Sellers as of the date hereof.

3.27    <u>Tax Matters</u>.

(a)    Such Seller has filed or caused to be filed, or shall file or cause to be filed, all Tax Returns that are required to be filed on or prior to the Closing Date, in each case, after taking into account any applicable extensions.   All Taxes due and owing by such Seller (whether or not shown on any Tax Return) have been, or will be, timely paid.

(b)    Such Seller is not currently the subject of an audit or other examination relating to the payment of or failure to pay any material amount of Taxes of such Seller by the taxing authorities of any Governmental Authorities nor has such Seller received any written notices from any such taxing authority that such an audit or examination is pending. All deficiencies asserted, or assessments made, against such Seller as a result of any examinations by any taxing authority have been fully paid.

(c)    No claim has been made in writing by any taxing authority in any jurisdiction where such Seller does not file Tax Returns that it is, or may be, subject to Tax by that jurisdiction.

(d)    Such Seller (i) has not entered into a written agreement or waiver extending any statute of limitations relating to the payment or collection of Taxes of such Seller that has not expired or (ii) is not presently contesting any Tax liability of such Seller before any Governmental Authorities.

(e)    All United States federal and other Taxes due and payable by such Seller prior to the Closing have been paid prior to the Closing or are properly and fully accrued on its books and records as of the Closing Date in accordance with GAAP, and such Seller has properly withheld and paid prior to the Closing all United States federal and other Taxes required to have been withheld and paid prior to the Closing in connection with amounts paid or owing to any employee, independent contractor or other third party.

(f)    Such Seller has delivered to Purchaser copies of all federal, state, local and foreign income, franchise and similar Tax Returns, examination reports, and statements of deficiencies assessed against, or agreed to by, such Seller for all Tax periods ending on or after December 31, 2016.

(g)    No Seller is not a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code.

(h)    No private letter rulings, technical advice memoranda or similar agreement or rulings have been requested, entered into or issued by any taxing authority with respect to such Seller.

(i)    Such Seller is not a party to, or bound by, any Tax indemnity, Tax sharing or Tax allocation agreement.

(j)    There are no Liens for Taxes (other than for current Taxes not yet due and payable) upon the assets of such Seller.

(k)    Such Seller has no liability for Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any corresponding provision of state, local or foreign law), as transferee or successor, by contract or otherwise.

3.28    <u>Absence of Unlawful Payments</u>. To Sellers' Knowledge, no officer, director, employee, or agent of such Seller has: (a) used funds of such Seller to offer or make any political contribution or gift relating to any political activity that would be unlawful under any applicable Legal Requirements; (b) paid, offered to pay, promised to pay or authorized the payment of money or anything of value to any

27

governmental official or employee that would be unlawful under any applicable Legal Requirements, (c) established or maintained any unrecorded fund or account of any nature that would be unlawful under any applicable Legal Requirements; or (d) made any payoff, influence payment, bribe, rebate, kickback or payment to any person that would be unlawful under any applicable Legal Requirements.  Such Seller is operating and has operated in compliance with the U.S. Foreign Corrupt Practices Act and any Legal Requirements regarding bribery.

3.29    <u>Most Favored Nation; Take-or-Pay</u>.  Other than as set forth on <u>Schedule 3.29</u>, such Seller is not a party to any agreement or arrangement (a) with any customer of the Business which provides that such customer shall be sold products or services at the lowest price the Seller charges its customers for any such products or services or any Contract with any Person which contains any other "most favored nation" or similar clause or (b) with any supplier of the Business under which the Seller has directly or indirectly guaranteed any obligations of any Person including any take-or-pay agreement.

3.30    <u>PCI Compliance</u>.  Such Seller has complied in all material respects with all applicable Legal Requirements regarding the collection, retention, use and protection of Personal Information.  Such Seller has a privacy policy regarding the collection, use, disclosure and transfer of Personal Information in connection with the operation of the Business and is in compliance in all material respects with such privacy policy, a true and correct copy of which policy has been delivered to Purchaser.  No Person has delivered to such Seller any written claim or, to the Knowledge of the Sellers, commenced any investigation, inquiry or action relating to such Seller's information privacy or data security practices.  Such Seller has established and implemented commercially reasonable policies, programs and procedures to protect the confidentiality, integrity and security of Personal Information in its possession, custody or control against unauthorized access, use, modification, disclosure or other misuse.  To the Knowledge of the Sellers, such Seller has not experienced any loss, damage, or unauthorized access, disclosure, use or breach of security of any Personal Information in their possession, custody or control, or otherwise held or processed on its behalf.

3.31    <u>Intentionally Omitted</u>.

3.32    <u>Healthcare Matters</u>.

(a)    Except as set forth in <u>Schedule 3.32(a)</u>: (i) such Seller and the Business is and has been operated and conducted in compliance in all material respects with all Healthcare Laws, and (ii) neither such Seller nor the Business has received any written notice from any Governmental Authority regarding any material violation of any Healthcare Law.  Such Seller maintains a healthcare compliance program consistent with the criteria established by the Office of the Inspector General of the Federal Department of Health and Human Services, and such Seller is operated in compliance in all material respects with such compliance program. Such Seller has provided to Purchaser a copy of its current compliance program materials including all program descriptions, compliance officer and compliance committee designations and job descriptions, training and education materials, auditing and monitoring protocols and disciplinary policies.

(b)    Except as set forth in <u>Schedule 3.32(b)</u>:  (i) such Seller possesses all Business Permits required by applicable Healthcare Laws to operate the Business; (ii) such Seller is and has been in compliance in all material respects with such Business Permits, and all of such Business Permits are valid and in full force and effect; (iii) there is no action or investigation by or before any Governmental Authority pending or, to the Knowledge of the Sellers, threatened against such Seller or the Business to revoke, suspend, or otherwise limit any such Business Permit; (iv) such Seller has not received any written notice from any Governmental Authority regarding any violation of any such Business Permit or any revocation, withdrawal, suspension, cancellation, restriction or termination of any such Business

Permit; (v) such Seller has filed all material reports and maintained and retained all material records required by applicable Healthcare Laws pertaining to all of their respective material Business Permits and (vi) such Seller has provided to Purchaser correct and complete copies of each such Business Permit, including all amendments and modifications thereto.

(c)      Except as set forth in Schedule 3.32(c): (i) all billing practices (including billing, coding, filing, and claims practices) of such Seller are and have been in material compliance with all applicable Healthcare Laws; (ii) there is no pending or, to the Knowledge of the Sellers, threatened recoupment, denial of payment, suspension of payment, overpayment, or penalty action or proceeding against such Seller under any federal or state health care program or any Healthcare Law or any other third party payor program and to, the Knowledge of the Sellers, there is no basis therefor; and (iii) such Seller has timely paid or caused to be paid all known and undisputed refunds, overpayments or adjustments, including any Medicare or Medicaid liability, which have become due.

(d)      Schedule 3.32(d) sets forth a true and complete list of all federal and/or state health care programs (each and collectively, a "Government Program") and any material private third-party health care programs or insurance plans (each and collectively, a "Private Program") in which such Seller participates.  No event has occurred which, with the giving of notice, the passage of time, or both would constitute grounds to terminate, modify, or not renew the participation of such Seller in any such Government Program or Private Program.   All claims submitted by such Seller to any Government Program have been prepared in all material respects in accordance with and in compliance with applicable Healthcare Laws and have been certified by an officer, administrator or other authorized person of such Seller as true, correct and complete statements.  Such Seller has not received written notice of any dispute from any Governmental Authority or Government Program regarding any such claims, other than with respect to adjustments in the ordinary course of business.  Such Seller has not received written notice of audits or violations with respect to any claims, and, to the Knowledge of the Sellers, no such audits or violations are threatened.  There are no facts or circumstances which could reasonably be expected to give rise to any material disallowance under such claims.  Except as set forth in Schedule 3.32(d), such Seller is now and has been in full compliance with all applicable conditions of participation and all applicable conditions of payment for all Government Programs in which it participates or participated. Without limiting the generality of the foregoing, such Seller is now and has been in full compliance with the "Supplier Standards" at 42 C.F.R. 424.57(c).

(e)      Neither such Seller nor any of its current or former directors, officers, employees, contractors or agents has been or is currently suspended, excluded or debarred from contracting with the United States federal or any state government or from participating in any Federal Health Care Program (as defined in 42 USC § 1320a-7b(f)) or is subject to an investigation or proceeding by any Governmental Authority that has resulted in or could reasonably be expected to result in such suspension, exclusion, or debarment; nor has such Seller or any of its current or former directors, officers, employees, agents or, to the Knowledge of the Sellers, any of its current or former contractors, received notice of any impending or potential exclusion or listing.  Such Seller has not been subject to sanction pursuant to 15 U.S.C. §41 et seq. or 42 U.S.C. §1320a-7a or 1320a-8, or been charged with or convicted of a crime described at 42 U.S.C. §1320a-7b, and no such sanction or proceeding is pending or, to the Knowledge of the Sellers, threatened.

(f)      Neither such Seller nor any of such Seller's current or former directors, officers, employees, agents or, to the Knowledge of the Sellers, any such Seller's contractors, have solicited, received, paid or offered to pay any illegal remuneration, directly or indirectly, overtly or covertly, in cash or in kind, for any referral or generation of business in violation of any applicable Healthcare Law.

(g)     Except as set forth in Schedule 3.32(g), such Seller is not: (i) a party to a Corporate Integrity Agreement with the Office of the Inspector General of the Department of Health and Human Services, (ii) the subject of any investigation, program integrity review or audit conducted by any federal, state or local Governmental Authority, (iii) a defendant or named party in any unsealed *qui tam*/False Claims Act litigation or (iv) a party to a consent decree, judgment, order or settlement with any Governmental Authority that (A) requires the payment of money by such Seller to any Governmental Authority or third party, (B) requires any recoupment of money from such Seller by any Governmental Authority or third party or (C) prohibits any activity currently conducted by such Seller, (1) subject to any actual or potential settlement agreement, corporate integrity agreement or certification of compliance agreement with any Governmental Authority or (2) subject to any mandatory or discretionary exclusion or suspension from federal or state health care program participation.

(h)     Except as set forth in Schedule 3.32(h), such Seller has not: (i) had any security or data breaches compromising or otherwise involving "Protected Health Information" (as such term is defined in HIPAA); (ii) received any written claim or notice, alleging or referencing the investigation of any breach or the improper use, disclosure or access to any Protected Health Information in its possession, custody or control; or (iii) received any written communication from any Governmental Authority alleging that such Seller is not in compliance in all material respects with HIPAA that has not been resolved, and no event has occurred that required such Seller to provide notification to any Governmental Authority under any state privacy and/or breach notification law. Such Seller has established and implemented such policies, programs, procedures, contracts and systems as are necessary to comply with HIPAA as in effect as of the date hereof. Such Seller is in compliance and have complied in all material respects with its policies and procedures governing the maintenance, use, disclosure, privacy and security of, and standard transactions related to, Protected Health Information. Such Seller has entered into "Business Associate Agreements" (as that term is defined in HIPAA) as required under HIPAA.

(i)     Such Seller has (i) verified that all employees and independent contractors, including pharmacists and pharmacy technicians, providing professional services for or on behalf of such Seller have valid and current licenses, permits and credentials and (ii) conducted criminal background checks on all such employees providing professional services and required criminal background checks to be conducted on all independent contractors to the extent required by and in accordance with all Healthcare Laws.

3.33    FDA.

(a)     Such Seller does not engage in and has never engaged in any activities that would meet the definition of "manufacture" found at 21 C.F.R. § 207.1.

(b)     Except as would not reasonably be expected to result in a material liability to such Seller: (i) each product that is sold by such Seller, while in the care, custody and control of such Seller is and always has been, as applicable, stored and distributed, and distribution records maintained, in a manner to ensure that the product does not become adulterated or misbranded, as those terms are defined in the FD&C Act; (ii) such Seller has not undertaken or been requested by FDA or any other Governmental Authority to undertake a recall, field correction or removal of any product that was the result of mishandling, or any type of adulteration or misbranding, that was caused by such Seller or any other Person; (iii) with respect to the third-party products sold by such Seller, such Seller is in compliance with all Legal Requirements.

(c)     Such Seller and the Business are and have been in compliance with all Legal Requirements related to the compounding of drugs, including complying with Section 503A of the Federal Food, Drug, and Cosmetic Act (21 U.S.C. § 353a) (the "FD&C Act"), and to the extent

applicable, Section 503B of the FD&C Act and all regulations promulgated by the United States Food and Drug Administration ("FDA") under these statutory provisions.

(d)    Such Seller has not received any written notice or communication from the FDA alleging any material non-compliance with any Legal Requirements.  Such Seller has not entered into any consent decree or other Order pursuant to any Legal Requirements. No Seller nor the Business is now subject (nor has been subject since September 30, 2014) to any civil, criminal, or administrative action, suit, claim, complaint, hearing, demand letter, warning letter, untitled letter, proceeding, inspection, finding, recall, investigation, penalty assessment, audit or other compliance or enforcement, regulatory or administrative proceedings by the FDA or a State Board of Pharmacy, and no review or investigation has, to the Knowledge of the Sellers, been threatened, against such Seller or the Business for failure to comply with the FD&C Act or any FDA regulation, or any provision of state law governing the regulation of the business of such Seller.

3.34    Disclosure.  No representation, warranty or statement of such Seller set forth in this Agreement (including the Schedules and Exhibits hereto) or any Collateral Agreement contains any untrue statement of a material fact or omits to state a material fact necessary to make the statements made herein or therein, in light of the circumstances under which they were made, not misleading.

### ARTICLE IV – REPRESENTATIONS AND WARRANTIES OF PURCHASER

As a material inducement to Sellers entering into this Agreement, Purchaser hereby represents and warrants to Sellers that:

4.1    Corporate Existence and Qualification.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Purchaser has the power to own, manage, lease and hold its properties and to carry on its business as and where such properties are presently located and such business is presently conducted.

4.2    Authority, Approval and Enforceability.  This Agreement and the Collateral Agreements to which Purchaser is a party have been (or upon execution and delivery will be) duly executed and delivered by Purchaser. Purchaser has all requisite limited liability company power and capacity to execute and deliver this Agreement and all Collateral Agreements executed and delivered or to be executed and delivered by Purchaser in connection with the transactions provided for by this Agreement, to consummate the transactions contemplated hereby and by the Collateral Agreements and to perform its respective obligations hereunder and under the Collateral Agreements.  The execution, delivery and performance of this Agreement and the Collateral Agreements and the consummation by Purchaser of the transactions contemplated hereby and thereby have been duly and validly authorized and approved by all necessary limited liability company action on the part of Purchaser.  This Agreement and each Collateral Agreement to which Purchaser is a party constitutes, or upon execution and delivery will constitute, the legal, valid and binding obligation of Purchaser, enforceable in accordance with their respective terms, except as such enforcement may be limited by general equitable principles or by applicable bankruptcy, insolvency, moratorium or similar laws and judicial decisions from time to time in effect which affect creditors' rights generally.

4.3    No Default or Consents.  Neither the execution and delivery of this Agreement nor the carrying out of the transactions contemplated hereby will:

(a)    violate or conflict with any of the terms, conditions or provisions of Purchaser's organizational or operating documents;

31

(b)      violate any Legal Requirements applicable to Purchaser; or

(c)      result in a violation or breach of, constitute a default under or result in the acceleration of any agreement to which Purchaser is a party.

4.4      <u>No Proceedings</u>.  Except for the Chapter 11 Case, no suit, action, investigation or other proceeding is pending or, to Purchaser's knowledge, threatened before any Governmental Authority or in any legal proceeding seeking to restrain Purchaser, or prohibit its entry into this Agreement or prohibit the Closing, or that may otherwise delay the Closing, or seeking Damages against Purchaser or any of its properties as a result of the consummation of this Agreement.

4.5      <u>Funds</u>.  Purchaser has sufficient cash on hand or available for Purchaser to consummate the purchase and the other transactions contemplated by this Agreement and to pay in full the Purchase Price and all related fees and expenses incurred by Purchaser and its Affiliates as provided in this Agreement.

4.6      <u>Brokers</u>.  No broker, finder or similar intermediary has acted for or on behalf of Purchaser or any of its Affiliates in connection with this Agreement or the transactions contemplated hereby, and no broker, finder, agent or similar intermediary is entitled to any broker's, finder's or similar fee or other commission in connection therewith based on any agreement with Purchaser or any Affiliate thereof.

## ARTICLE V – OBLIGATIONS PRIOR TO OR IN CONNECTION WITH THE CLOSING

From the date of this Agreement through the Closing Date or date of earlier termination of this Agreement in accordance with its terms:

5.1      <u>Access to Information and Properties</u>.  Each Seller shall make available to Purchaser, its Affiliates and their respective representatives for examination and reproduction all materials, documents and data of every kind and character relating to the Business or any of the Purchased Assets in possession or control of, or subject to reasonable access by, such Seller or any Affiliate thereof, including, without limitation, all files, records, data and information relating to its properties (whether stored in paper, magnetic or other storage media) and all Contracts, assignments, certificates, orders and amendments thereto.  In addition, upon reasonable prior notice, Sellers shall make reasonably available to Purchaser the officers and representatives of the Sellers to respond to questions of Purchaser. Without limiting the preceding two sentences, each Seller shall cooperate with Purchaser as may reasonably be requested by Purchaser or any of its representatives for purposes of (a) enabling an independent accounting firm selected by Purchaser to conduct an audit of the Business, including access to Seller's accountants and auditors' working papers pertaining to the Business or the Purchased Assets; (b) undertaking any study of the condition or value of the Purchased Assets; and (c) undertaking any study relating to compliance by one or more of the Sellers or the Business with applicable Legal Requirements, including obtaining any environmental assessment. The access, and related rights to investigate and examine, granted hereunder shall not constitute nor be construed as a waiver of any applicable legal privilege of any of the Sellers, including the attorney-client and work product privileges.

5.2      <u>Conduct of Business and Operations</u>.

(a)      <u>Ordinary Course</u>. Subject to any limitation imposed by the Bankruptcy Court or applicable Legal Requirements, each Seller covenants and agrees that, unless Purchaser shall otherwise consent in writing and except as otherwise set forth herein, between the date hereof and the Closing, such Seller shall use commercially reasonable efforts to conduct the Business in, and such Seller shall use

commercially reasonable efforts not to take any action except in, the ordinary course of the Business and in a manner consistent with past practice, and such Seller shall use its commercially reasonable efforts to preserve intact the business organization of such Seller and the Business, to keep available the services of the present officers, employees and consultants of such Seller, to preserve the present relationships of such Seller with customers, suppliers and other Persons with whom Seller has significant business relations, and to comply in all material respects with all applicable Legal Requirements.

(b)    Certain Actions. By way of amplification and not limitation, except as expressly provided for in this Agreement (and subject to any limitation imposed by the Bankruptcy Court or applicable Legal Requirements), no Seller may, between the date hereof and the Closing, directly or indirectly, do any of the following without the prior written consent of Purchaser:

(i)    (A) merge or consolidate with or into another company; (B) except in the ordinary course of the Business and in a manner consistent with past practice, sell, pledge, dispose of, or encumber or authorize or propose the sale, pledge, disposition or encumbrance of any assets leased, used or held for use by the Business; (C) enter into any contract or agreement with an aggregate value in excess of $3,000, except in the ordinary course of the Business; (D) authorize any capital expenditures in the aggregate in excess of $1,000; or (E) enter into or amend any contract, agreement, commitment or arrangement with respect to any of the matters set forth in this Section 5.2(b)(i);

(ii)    take any action other than in the ordinary course of the Business and in a manner consistent with past practice (none of which actions shall be unreasonable) with respect to increasing or decreasing compensation (including bonuses) of any employee or director or with respect to the grant of any severance, termination or change-in-control pay or with respect to any increase of benefits payable under its severance or termination pay policies in effect in the last year;

(iii)    make any material payments, except in the ordinary course of the Business and in amounts and in a manner consistent with past practice, under any Employee Plan or otherwise to any employee of such Seller or any other Person, enter into, adopt or amend any Employee Plan or any employment or consulting agreement, or grant or establish any new awards under any such Employee Plan or agreement;

(iv)    take any action except in the ordinary course of the Business and in a manner consistent with past practice with respect to, or make any material change in, its methods of management, purchasing, distribution, marketing, accounting, collections or operating (including practices relating (A) to payment of trade accounts, (B) to other payments or collection of Accounts Receivable or (C) to diminishing quantities of Inventory on hand);

(v)    do any act or omit to do any act which would cause a material breach of any Contract, commitment or obligation of the Business or such Seller;

(vi)    dissolve, declare or pay any dividend or make any similar distribution to the holder of any equity interests of such Seller or make any payment on account of the purchase, redemption, retirement or acquisition of any such equity interest;

(vii)    make or guarantee any loan or enter into any transaction with or distribute any assets or property to any of its officers or other employees, directors,

stockholders or Affiliates (except for base salary paid to employees in the ordinary course of the Business);

(viii)    (A) take any action that jeopardizes the validity of or results in the revocation, surrender or forfeiture of, any of the Permits necessary for the continued operation of the Business, (B) fail to use commercially reasonable efforts to prosecute with due diligence any pending applications with respect to the Permits, including any renewals thereof, (C) with respect to the Permits, fail to make all filings and reports and pay all fees necessary or reasonably appropriate for the continued operation of the Business of such Seller, as and when such filings, reports or payments are necessary or appropriate or (D) fail to initiate appropriate steps to renew any Permits held by such Seller that are scheduled to terminate prior to or within sixty (60) days after the Closing or to prosecute any pending applications for any Permit;

(ix)    cancel or compromise any material debt or Claim or waive or release any material right; or

(x)    enter into any Contract to take or fail to take any action other than in compliance with this terms of this Section 5.2.

5.3    Notice Regarding Changes.

(a)    Sellers shall promptly inform Purchaser in writing of any change in facts and circumstances that could reasonably be expected to render any of the representations and warranties made herein by one or more of the Sellers inaccurate or misleading in any material respect if such representations and warranties had been made upon the occurrence of the fact or circumstance in question.

(b)    Purchaser shall promptly inform the Sellers in writing of any change in facts and circumstances that could reasonably be expected to render any of the representations and warranties made herein by Purchaser inaccurate or misleading in any material respect if such representations and warranties had been made upon the occurrence of the fact or circumstance in question.

(c)    The right to payment, reimbursement or other remedy based upon any representation, warranty, covenant or obligation under this Agreement will not be affected by any disclosures made under subsections (a) or (b) of this Section 5.3 or any investigation conducted or any knowledge acquired at any time, whether before or after execution and delivery of this Agreement or the Closing Date with respect to the accuracy or inaccuracy of, or compliance with, any such representation, warranty, covenant or obligation.

5.4    Legal Requirements.  Subject to the terms and conditions of this Agreement, each party hereto shall take or cause to be taken all reasonable actions and do or cause to be done all reasonable things required under applicable Legal Requirements to consummate the transactions contemplated hereby, including, without limitation, (a) obtaining all Permits, authorizations, consents and approvals of any Governmental Authority or other Person which are required for or in connection with the consummation of the transactions contemplated hereby and by the Collateral Agreements, including the Healthcare Approvals, (b) taking any and all reasonable actions necessary to satisfy all of the conditions to each party's obligations hereunder as set forth in Article VI, and (c) executing and delivering all agreements and documents required by the terms hereof to be executed and delivered by such party on or prior to the Closing.  Without limiting the generality of the foregoing, each Seller shall reasonably

12166182v15

cooperate with Purchaser, and provide such information as reasonably requested by Purchaser, in connection with any filings or submissions to be made by Purchaser with respect to the Healthcare Approvals. Notwithstanding the other provisions of this Section 5.4, nothing contained in this Agreement shall require, or be construed to require, Purchaser to (x) institute any legal proceeding against any Governmental Authority, or (y) agree to any terms or conditions as a condition to, or in connection with, obtaining any necessary consent or approval of any Governmental Authority that could reasonably be expected to result, individually or in the aggregate, in a significant reduction in, diminishment of or restriction upon on the assets, liabilities, business, results of operations or condition (financial or otherwise) of the Business, taken as a whole, or Purchaser, taken as a whole (each of the actions described in clause (y), a "Burdensome Condition"), and no Seller or any Affiliate thereof shall take any action that would reasonably be expected to result in a Burdensome Condition without the prior written consent of Purchaser.

5.5     Consents and Satisfaction of Conditions.  Each Seller shall obtain, at such Seller's cost and expense, on or prior to the Closing, all consents necessary for such Seller to fulfill such Seller's obligations to consummate the transactions contemplated hereby at the Closing and to fulfill all conditions precedent to Closing.  The Sellers and Purchaser shall continuously exercise their respective diligent efforts to obtain on or prior to the Closing all consents necessary to vest in Purchaser any and all participation agreements with prescription drug plans for purposes of participation in Medicare Part D Plans.  The Sellers will reasonably cooperate with Purchaser in the performance by Purchaser of its obligations under this Agreement and in obtaining all required consents.  Without limiting the foregoing, the Sellers will assist Purchaser in responding to questions raised by Governmental Authorities, will attend meetings with Governmental Authorities and will assist with the preparation and filing of documents required by Governmental Authorities in order to obtain all required approvals.

5.6     Intentionally Omitted.

5.7     Employee Matters.

(a)     Purchaser, in its discretion, may, effective upon the Closing Date, offer employment to all or any of the employees of the Business on an at will or other basis and with pay rates, salary, benefits and other terms and conditions of employment determined by Purchaser, and in connection therewith, Sellers shall permit Purchaser to communicate with their respective employees. Sellers shall cooperate with and assist Purchaser in the transition of employment of the employees of any Seller who receive offers of employment from Purchaser. The Sellers shall assume or retain, as the case may be, and be solely responsible for all liabilities arising under, resulting from or relating to the Employer Plans or any Seller's employment or termination of its employees. The Sellers will remain liable for all employee compensation, bonuses and benefits, retention and change in control payments earned by any Seller's employees prior to Closing, and severance payments for any employees not hired by Purchaser.

(b)     With respect to employees of one or more of the Sellers who worked in the Business prior to the Closing Date and (i) to whom Purchaser does not offer employment under Section 5.7(a), or (ii) who do not accept such offer of employment, Sellers, upon the written request of Purchaser, shall use commercially reasonable efforts to enforce, for two (2) years from the Closing Date, all confidentiality and restrictive covenants in any agreements with any Seller applicable to any such employees.

(c)     Nothing in this Section 5.7, (i) is intended to, or shall be construed to, confer upon any employees or any other Person other than the parties to this Agreement any rights or remedies hereunder, (ii) shall establish, amend or be deemed to establish or amend any Employee Plan or any

benefit plan, program, policy or arrangement of Purchaser (or any of its Affiliates) or (iii) shall limit the rights of any Seller, Purchaser or any of their respective Affiliates to establish, amend or terminate any Employee Plan or any other benefit plan, program, policy or arrangement, whether before or after Closing, subject to the provisions of Section 5.2(b).

5.8     WARN. The Sellers shall be responsible for timely providing all notices and other communications to their respective employees and any other Persons and making any payments that may be required under the Worker Adjustment and Retraining Act, as amended from time to time ("WARN"), and any similar Legal Requirement, relating to notice to employees, if such provisions apply to the transactions contemplated hereunder. Without altering the Sellers' obligations under the preceding sentence, the Sellers shall cooperate with Purchaser in connection with complying with WARN and any similar Legal Requirements and shall provide Purchaser with all information Purchaser reasonably requests from time to time with respect to such compliance.

5.9     Delivery of Schedules

(a)     Preparation of Schedules. The parties hereto acknowledge that due to time constraints, none of the schedules to this Agreement (none of the "Schedules") were completed on the date hereof. From and after the date hereof until all of the Schedules have been completed, the Sellers shall use their best efforts to complete the Schedules and deliver to Purchaser all associated documentation (including all Contracts, Business Permits, Employee Plans and other items set forth on or referenced in the Schedules) as soon as possible (but in any event no later than seven (7) days after the date hereof).

(b)     Purchaser Review of Schedules. The Schedules and associated documentation shall be subject to Purchaser's review, comment and approval, such approval not to be unreasonably withheld, conditioned or delayed. If Purchaser disapproves of any Schedule, the Sellers shall revise such Schedule and shall promptly (but in any event no later than two (2) Business Days after Purchaser disapproves such Schedule) re-submit such Schedule and any new associated documentation to Purchaser and shall repeat this process until Purchaser approves all of the Schedules. No Schedule shall become a part of this Agreement or may be attached hereto until Purchaser approves such Schedule in writing. Each of the Sellers agrees to cooperate with Purchaser in connection with Purchaser's review of and comment on the Schedules.

(c)     Termination. Notwithstanding anything in this Section 5.9 to the contrary, if any Schedule to this Agreement has not been approved by Purchaser (other than due to Purchaser unreasonably withholding, conditioning or delaying its approval of such schedule) on the date that is fourteen (14) days after the date the Sellers deliver the Schedules and associated documentation to Purchaser in accordance with Section 5.9(a), Purchaser may terminate this Agreement pursuant to Section 2.3(h).

5.10     Title Insurance and Survey; Environmental Assessments.

(a)     Title Insurance and Survey. Purchaser may obtain: (i) real property surveys of any of the Owned Real Property (collectively, the "Surveys"), and (ii) title commitment or commitments for any of the Owned Real Property (the "Title Commitments"), issued by a national title insurance company selected by Purchaser (the "Title Company"), which Title Commitments shall contain commitments by the Title Company to issue to Purchaser a title insurance policy or policies on extended coverage ALTA Owner's forms, in form and substance reasonably acceptable to Purchaser ("Title Policies") insuring the valid fee simple title to the Owned Real Property.  Sellers will cause all standard exceptions to be deleted from the Title Policies at the Closing, other than exceptions for (x) such itemized matters shown on the Surveys to which Purchaser does not object pursuant to the provisions hereof and

36

(y) taxes for the year in which the Closing occurs which are not yet due and payable. The Sellers will execute and deliver or otherwise obtain such documents and instruments as the Title Company shall require, including, Sellers' affidavits, gap indemnities and the like.  Purchaser may give written notice to the Sellers accepting or objecting to matters disclosed on the Title Commitments and Surveys, with any such notice of objection specifying the exceptions or other matters to which Purchaser objects.  The failure of Purchaser to object to any matter reflected in any Title Commitment or Survey shall be deemed a waiver solely for purposes of this <u>Section 5.10(a)</u> and <u>Section 6.2(n)</u> of any right to object to any matter so shown; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary contained in this Agreement, the Sellers shall be unconditionally obligated to cause the release of any, Lien, mortgage, deed of trust, deed to secure debt, security agreement, judgment, tax lien or other encumbrance affecting the Owned Real Property and capable of being released through or as a result of the payment of money (collectively, "<u>Monetary Encumbrances</u>") irrespective of whether Purchaser objects to same.  The Sellers shall be deemed to have satisfied any Monetary Encumbrance which is removed by the Sale Order approving the sale of the Purchased Assets free and clear of all Liens (other than Permitted Liens).  Notwithstanding the foregoing, Purchaser shall not have the right to object to any of the following, all of which shall be deemed to be Permitted Liens hereunder: (A) matters created or consented to in a separate written consent by Purchaser, (B) ad valorem taxes for the year in which the Closing occurs, not yet due and payable, (C) utility easements serving the Owned Real Property, and (D) matters disclosed by the Surveys provided the same do not interfere with the use and operation of the Owned Real Property as currently used and operated.  With respect to any such matter to which Purchaser so objects, the Sellers shall promptly undertake commercially reasonable efforts to cure the same (which cure may be effected by payment and discharge of the objectionable item or by causing the Title Company to remove the same as an exception or affirmatively insure over such item provided such affirmative insurance shall be reasonably satisfactory to Purchaser and any lender of Purchaser and shall be sufficient, in Purchaser's reasonable judgment, to adequately address Purchaser's and any lender's concerns with respect to such matter and as to which the Title Company shall agree to provide the same affirmative insurance to future owners and lenders of the Owned Real Property) prior to Closing or such earlier date as Purchaser may reasonably require.  If Sellers shall fail or refuse to so cure, then Purchaser, at its election, may without limitation (x) terminate this Agreement pursuant to <u>Section 2.3(h)</u>, (y) waive the matter to which Purchaser objected and proceed to the Closing or (z) refuse to take title to the parcel of Owned Real Property that is encumbered by such uncured title objection and proceed to the Closing with an appropriate reduction to the Purchase Price. If any update to any Title Commitment prior to or on the Closing Date reveals any new matter not previously shown or disclosed on the prior Title Commitment, then Purchaser will have the same rights of objection and cure, and the Sellers will have the same obligation to cure, as set forth above.

(b)    <u>Environmental Assessments</u>. Sellers will permit Purchaser and its agents to conduct environmental assessments with respect to any of the Owned Real Property (each a "<u>Phase I</u>"). To the extent Purchaser disapproves of any matter set forth in a Phase I, Purchaser shall notify the Sellers in writing of such disapproval (the "<u>Environmental Notice</u>").  The failure of Purchaser to deliver an Environmental Notice to the Sellers shall be deemed to be a waiver by Purchaser of any right to disapprove any matter specifically set forth in such Phase I.  If Purchaser delivers an Environmental Notice to the Sellers, then the Sellers will promptly undertake commercially reasonable efforts to cure the same prior to Closing or such earlier date as Purchaser may reasonably require. If the Sellers do not undertake such efforts as required by the preceding sentence, then Purchaser, at its election, may without limitation (x) terminate this Agreement pursuant to <u>Section 2.3(h)</u>, (y) waive the matter to which Purchaser objected and proceed to the Closing or (z) refuse to take title to the parcel of Owned Real Property that is encumbered by such uncured environmental matter and proceed to the Closing with an appropriate reduction to the Purchase Price.

12166182v15

(c)     Transition. If Purchaser elects to proceed to the Closing under clause (z) of (i) the penultimate sentence of Section 5.10(a) or (ii) the last sentence of Section 5.10(b), then the Sellers shall cooperate with Purchaser in connection with implementing any measures reasonably required by Purchaser to transition away from any former use of such Owned Real Property, which may include a short-term lease of such Owned Real Property from one or more of the Sellers to Purchaser.

## ARTICLE VI – CONDITIONS TO SELLERS' AND PURCHASER'S OBLIGATIONS

6.1     Conditions to Obligations of Sellers.  The obligations of the Sellers to carry out the transactions contemplated by this Agreement are subject, at the option of the Sellers, to the satisfaction, at or prior to the Closing Date, or waiver of the following conditions:

(a)     The representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects at and as of the Closing, and Purchaser shall have performed and satisfied in all material respects the covenants and agreements required by this Agreement to be performed and satisfied by Purchaser at or prior to the Closing.

(b)     As of the Closing Date, no suit, action or other proceeding (excluding any such matter initiated by or on behalf of any of the Sellers or any Affiliate thereof) shall be pending before any Governmental Authority seeking to restrain Seller or prohibit the Closing or seeking Damages against any of the Sellers as a result of the consummation of the transactions contemplated by this Agreement.

(c)     The Cash Portion of the Purchase Price shall have been paid as described in Section 1.3(b).

(d)     The Bankruptcy Court shall have entered the Sale Order, and such Sale Order shall constitute a Final Order.

(e)     Purchaser shall have executed and delivered the Operations Transfer Agreement and related documents.

6.2     Conditions to Obligations of Purchaser.  The obligations of Purchaser to carry out the transactions contemplated by this Agreement are subject, at the option of Purchaser, to the satisfaction, at or prior to the Closing Date, or waiver of the following conditions:

(a)     The representations and warranties contained in Article III other than the Fundamental Representations shall be true and correct in all material respects at and as of the date of this Agreement and the Closing, and the Fundamental Representations shall be true and correct in all respects at and as of the date of this Agreement and the Closing, and each Seller shall have performed and satisfied in all material respects the agreements and covenants required by this Agreement to be performed and satisfied by such Seller at or prior to the Closing.

(b)     There shall not have occurred from the date of this Agreement any event or development that has had or is reasonably expected to have a Material Adverse Effect.

(c)     As of the Closing Date, no suit, action or other proceeding (excluding any such matter initiated by or on behalf of Purchaser) shall be pending or threatened before any Governmental Authority seeking to restrain Purchaser or prohibit the Closing or seeking Damages against Purchaser or the Sellers as a result of the consummation of the transactions contemplated by this Agreement.

38

(d)    All approvals of Governmental Authorities listed on <u>Schedule 6.2(d)</u> and the Healthcare Approvals shall have been obtained.

(e)    Sellers shall have obtained and delivered to Purchaser the written consents listed on <u>Schedule 6.2(e)</u>, and all such consents shall remain in full force and effect at and as of the Closing.

(f)    Sellers shall have filed the Sale Motion and provided notice of the same to all creditors and parties in interest that are required to receive notice under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), the Local Rules of the Bankruptcy Court, and any other order of the Bankruptcy Court.

(g)    Sellers shall have provided notice of the Bidding Procedures Hearing, and the Sale Hearing to all creditors and parties in interest that are required to receive notice under the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the Bankruptcy Court, and any other order of the Bankruptcy Court.

(h)    Sellers shall have provided notice of the Sale Motion, the Bidding Procedures Hearing, and the Sale Hearing to any other party in interest not already receiving notice under <u>Section 6.2(f)</u> or <u>Section 6.2(g)</u> that Purchaser reasonably requests that Sellers provide notice.

(i)    The Bankruptcy Court shall have entered the Sale Order, and such Sale Order shall constitute a Final Order.

(j)    The Bankruptcy Court shall have entered the Bidding Procedures Order, and such Bidding Procedures Order shall constitute a Final Order.

(k)    If an Auction is held, Purchaser shall have been the Prevailing Bidder in the Auction or, if Purchaser was not the Prevailing Bidder, shall have agreed to serve as the Back-up Bidder in accordance with the terms hereof and the Prevailing Bidder shall have failed to consummate the Alternative Transaction.

(l)    All of the Assigned Contracts shall (i) be assignable to Purchaser without the consent of the counterparty to such Assigned Contract for such assignment (or such consent shall have been received prior to the Closing Date) and (ii) have had all of Seller's monetary breaches and monetary defaults thereunder cured as of the Closing Date by payment of the Cure Costs by Sellers up to the Cure Cap in accordance with the Sale Order or otherwise.

(m)    Purchaser shall have received all deliveries specified in <u>Section 2.2</u> of this Agreement.

(n)    Title to the Owned Real Property shall be as required by <u>Section 5.10</u>, Purchaser shall have received Title Policies in the form described in <u>Section 5.10</u>, and no event shall have occurred after the date of this Agreement such that as of the Closing Date the Owned Real Property does not operate substantially in the same manner as it operated prior to the occurrence of such event.

## ARTICLE VII – CERTAIN OBLIGATIONS AFTER THE CLOSING

7.1    <u>Post-Closing Mailings and Payments</u>. From after the Closing Date, Sellers hereby authorize and empower Purchaser, its Affiliates and representatives to receive and to open all mail received by Seller or in the name of one or more of the Sellers relating to the Purchased Assets, the Business or the Assumed Liabilities and to deal with the contents of such communications in accordance

39

with the provisions of this <u>Section 7.1</u>. Each Seller shall, and shall cause its Affiliates to, (a) promptly deliver to Purchaser or its Affiliates any mail or other communication received by it after the Closing Date and relating to the Purchased Assets, the Business or the Assumed Liabilities, (b) promptly transfer in immediately available funds to Purchaser or its Affiliates any cash, electronic credit or deposit received by such Seller solely to the extent that such cash, electronic credit or deposit are Purchased Assets or were paid in respect of the Purchased Assets or the Business (excluding the Purchase Price) and (c) promptly forward to Purchaser or its Affiliates any checks or other instruments of payment that such Seller receives but solely to the extent that such checks or other instruments are Purchased Assets or were paid or delivered in respect of the Purchased Assets or the Business (excluding the Purchase Price). Purchaser or its Affiliates shall (x) promptly deliver to Seller any mail or other communication received by any such Person after the Closing Date and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to the Sellers, any cash, electronic credit or deposit received by such Person but solely to the extent that such cash, electronic credit or deposit are Excluded Assets and (z) promptly forward to Seller any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets. From and after the Closing Date, Seller shall refer all inquiries with respect to the Business, the Acquired Assets and the Assumed Liabilities to Purchaser, and Purchaser shall refer all inquiries with respect to the Excluded Asset and Excluded Liabilities to Sellers.

7.2    <u>Restrictive Covenants</u>. Each of the Sellers acknowledges that Purchaser, as the purchaser of the Purchased Assets, is and will be engaged in the same business as the Business; such Seller is intimately familiar with the Business; the Business is currently conducted in the territory defined by a radius of 50 miles from each of the existing stores used in the Business (the "<u>Territory</u>"); such Seller has had access to trade secrets of and confidential information concerning the Business; and the agreements and covenants contained in this <u>Section 7.2</u> are essential to protect the Business and the goodwill included in the Purchased Assets. With respect to the foregoing, each of the Sellers covenants and agrees as follows:

(a)    <u>Non-Disparagement</u>. From and after the Closing, no Seller may, and each such Seller shall cause its Affiliates not to, disparage or criticize the Business, Purchaser, Purchaser's Affiliates, or their respective employees or agents or make any statement or engage in any conduct that would reasonably be expected to impair the goodwill of the Business, the Purchaser or Purchaser's Affiliates; provided, however, that the foregoing shall not prohibit the Seller from exercising their rights under this Agreement or any of the Collateral Agreements, or from prosecuting or defending any claim brought in connection with the transactions contemplated hereunder or thereunder.

(b)    <u>Non-Compete</u>. For a period commencing on the Closing Date and terminating on the third (3rd) anniversary of the Closing Date (such period, the "<u>Restricted Period</u>"), no Seller may, anywhere within the Territory, directly or indirectly, acting individually or as an owner, stockholder, member, partner, director, officer, consultant, agent, representative or employee of any Person, own or operate a Person engaged in the Business or a substantially similar business or otherwise compete with the Business.

(c)    <u>Non-Solicitation of Customers</u>. During the Restricted Period, no Seller may solicit, directly or indirectly, for the benefit of any Person other than Purchaser, any Person that was a customer (or an Affiliate thereof) or actively sought customer (or an Affiliate thereof) of any Seller at any time during the twenty-four (24) month period ending on the Closing Date for the purpose of providing any products or services currently included in the Business.

(d)    <u>Non-Solicitation of Employees</u>. During the Restricted Period, no Seller may solicit or hire any current or former employees or independent contractors of Purchaser or its Affiliates;

provided, however, that this Section 7.2(d) shall not prevent any Seller from soliciting or hiring (i) any employee or independent contractor who responds to a general solicitation or advertisement not specifically targeted or focused on employees or independent contractors of Purchaser or any of its Affiliates or (ii) any employee or independent contractor who was not employed or engaged by Purchaser or any of its Affiliates within six (6) months prior to such solicitation.

(e)    Confidentiality. During the Restricted Period and at all times thereafter, all information concerning Purchaser, Purchaser's business, the Purchased Assets or the Assumed Liabilities (the "Purchaser Confidential Information") shall be used by Sellers and their Affiliates solely as required to perform their respective obligations, exercise or enforce their respective rights (if any) under this Agreement (or any of the Collateral Agreements) or comply with applicable Legal Requirements, and for no other purpose. Further, subject to the following sentence, each Seller shall treat, and will cause such Seller's Affiliates and representatives to treat, the Purchaser Confidential Information as strictly confidential, using the same degree of care as such Person normally employs to safeguard such Person's own confidential information from unauthorized use or disclosure, but in no event less than a reasonable degree of care. Further, no Seller may disclose, or permit the disclosure of, any of Purchaser Confidential Information to any Person except those Persons to whom such disclosure is necessary to permit such Seller to perform such Seller's obligations, exercise or enforce such Seller's rights under this Agreement (or any of the Collateral Agreements) or comply with applicable Legal Requirements.

7.3    Rights and Remedies Upon Breach of Restrictive Covenants.  If any of the Sellers or any Affiliate thereof breaches, or threatens to commit a breach of, any of the provisions of Section 7.2 (the "Restrictive Covenants"), Purchaser shall have the following rights and remedies, each of which rights and remedies shall be independent of the others and severally enforceable, and each of which is in addition to, and not in lieu of, any other rights and remedies available to Purchaser at law or in equity:

(a)    Specific Performance. Each of the Sellers agrees that any breach or threatened breach of the Restrictive Covenants may cause irreparable injury to Purchaser and that money damages may not provide an adequate remedy to Purchaser. Accordingly, in addition to any other rights or remedies, Purchaser shall be entitled to seek to have the Restrictive Covenants specifically enforced by any court of competent jurisdiction, and to injunctive relief to enforce the terms of the Restrictive Covenants and to restrain any Seller or any Affiliate thereof from any violation of any of the Restrictive Covenants.

(b)    Accounting. Purchaser shall be entitled to require each Seller or Affiliate thereof to account for and pay over to Purchaser all compensation, profits, monies, accruals, increments or other benefits derived or received by any such Person as the result of any transactions constituting a breach of the Restrictive Covenants.

7.4    Enforceability.

(a)    Each of the Sellers acknowledges and agrees that the Restrictive Covenants are reasonable and valid in geographical and temporal scope and in all other respects. If any court determines that any of the Restrictive Covenants, or any part thereof, is invalid or unenforceable, the remainder of the Restrictive Covenants shall not thereby be affected and shall be given full effect, without regard to the invalid or unenforceable portions.

(b)    If any court determines that any of the Restrictive Covenants, or any part thereof, is unenforceable because of the duration or geographic scope of any provision, such court shall reduce the duration or scope of such provision, as the case may be, to the extent necessary to render it enforceable and, in its reduced form, such provision shall then be enforced.

12166182v15

(c)    The parties hereto intend to and hereby confer jurisdiction to enforce the Restrictive Covenants upon the courts of any jurisdiction within the geographic scope of the Restrictive Covenants. If the courts of any one or more of such jurisdictions hold the Restrictive Covenants unenforceable by reason of the breadth of their scope or otherwise, such determination shall not bar or in any way affect Purchaser's right to the relief provided above in the courts of any other jurisdiction within the geographic scope of the Restrictive Covenants as to breaches of such covenants in any of such other jurisdictions, such covenants as they relate to each jurisdiction being, for this purpose, severable into diverse and independent covenants.

(d)    The parties hereto intend that the Restrictive Covenants set forth in this <u>Section 7</u> shall be enforceable by the successors and assigns of Purchaser.

7.5    <u>Professional Liability Insurance</u>. The Sellers agree to purchase tail insurance in respect of their respective existing professional liability insurance policies, in each case covering claims made for not less than two (2) years following the Closing Date, and shall name Purchaser as an additional insured under such policies.

7.6    <u>Use of Sellers' Names</u>. At any time and from time to time after the Closing Date, each Seller shall cooperate with Purchaser to facilitate and otherwise enable Purchaser to use such Seller's corporate name and trade names and any variation thereof and, at the Closing, such Seller shall make such filings as are necessary or advisable to change its name to one that is not confusingly similar thereto. From and after the Closing Date, such Seller shall immediately cease the use of such name, such Seller's trade names, or any confusingly similar variations thereof for all purposes whatsoever.

7.7    <u>Further Assurances</u>.  From and after the Closing, Purchaser and each of the Sellers shall execute and deliver such documents, and take such other actions, as shall be reasonably requested by one or more of the other parties to carry out the transactions contemplated by this Agreement or the Collateral Agreements.

## ARTICLE VIII – BANKRUPTCY COURT MATTERS; OTHER OBLIGATIONS

8.1    <u>Competing Bids and Other Matters</u>.

(a)    <u>Filings</u>. On or prior to April 30, 2018, the Sellers filed the Chapter 11 Case in the Bankruptcy Court. On or before May 7, 2018, the Sellers shall file the Sale Motion with the Bankruptcy Court.

(b)    <u>Competing Bids and Marketing Process</u>. This Agreement, the parties' obligations hereunder and the transactions contemplated hereby are subject to approval of the Bankruptcy Court and Sellers' right and ability to pursue and consider higher or otherwise better competing bids with respect to the Purchased Assets pursuant to the Bidding Procedures Order (each a "<u>Competing Bid</u>"). During the period (such period, the "<u>Marketing Period</u>") from and after the date on which the Bidding Procedures Order is entered until the earlier of (x) the conclusion of the Auction or (y) a determination that no Auction is required, the Sellers are permitted to, and may cause their respective representatives and Affiliates to, initiate contact with, provide information to, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Purchaser and its Affiliates, agents and representatives) in connection with the sale of the Purchased Assets, subject only to the provisions of the Bidding Procedures Order and this Agreement. During the Marketing Period, Sellers shall have the responsibility and obligation to respond to any inquiries or offers in connection with the marketing activities contemplated by the preceding sentence, and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code or other applicable Law, including supplying

42

information relating to the Business and the assets of Sellers to prospective purchasers, subject only to the provisions of the Bidding Procedures Order and this Agreement.

(c)    Purchaser as Prevailing Bidder. If (i) Purchaser is the Prevailing Bidder at the Auction or (ii) Purchaser is deemed to be the Prevailing Bidder under the Bidding Procedures Order, then the Sellers shall use their best efforts to consummate the transactions contemplated by this Agreement as soon as possible.

(d)    Purchaser as Back-up Bidder. If an Auction is conducted, and Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder"), Purchaser may, in Purchaser's sole discretion, agree to serve as a back-up bidder (the "Back-up Bidder") and keep Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until 11:59 p.m. on the date that is the earlier of (i) the Termination Date and (ii) the date of closing of an Alternative Transaction with the Prevailing Bidder (the "Outside Back-up Date"). Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder will be deemed to have the new prevailing bid, and Sellers shall be required, without further order of the Bankruptcy Court, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder pursuant to the procedures set forth in the Bidding Procedures Order.

(e)    Service of Documents. Sellers shall promptly (i) serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Bankruptcy Rules, the Local Rules of the Bankruptcy Court, and any other applicable Order of the Bankruptcy Court and (ii) provide Purchaser with copies of all written expressions of interest, letters of intent, offers, and purchase agreements with respect to any of the Seller's assets with absolutely no deletions or alterations thereto within one (1) Business Day after receipt thereof by the applicable Seller or Sellers.

8.2    Sale Order. The Sale Order shall, at a minimum:

(a)    approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code: (i) the execution, delivery, and performance by Sellers of this Agreement and the Collateral Agreements,  (ii) approve the sale and transfer of the Purchased Assets to Purchaser on the terms set forth herein free and clear of all Liens (other than Permitted Liens), Claims (other than the Assumed Liabilities), interests, and encumbrances, and (iii) the performance by Sellers of their obligations under this Agreement and the Collateral Agreements;

(b)    authorize and empower Sellers to assume and assign to Purchaser the Executory Assigned Contracts and to pay the Cure Costs, subject to the Cure Cap;

(c)    find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code and grant Purchaser the protections of Section 363(m) of the Bankruptcy Code;

(d)    find that the Purchase Price for the Purchased Assets was not controlled by an agreement between any of the Qualified Bidders (as defined in the Bidding Procedures) within the meaning of Section 363(n) of the Bankruptcy Code;

43

(e)     include an injunction against any holder of a Claim against one or more of the Sellers or any of the Purchased Assets from asserting, prosecuting or otherwise pursuing such Claim against Purchaser or any Affiliate thereof (other than with respect to the Assumed Liabilities) or asserting any Lien against any of the Purchased Assets (other than a Permitted Lien);

(f)     include a finding that, upon payment of Cure Costs, all of the Executory Assigned Contracts that are subject to the provisions of Section 365 of the Bankruptcy Code or otherwise pursuant to applicable Law, remain in full force and effect with all parties to the Executory Assigned Contracts enjoined from (x) taking any remedial action under such Executory Assigned Contract as a result of the transactions contemplated by this Agreement or by the Collateral Agreements, (y) without limiting clause (x) of this subsection (f), asserting against Purchaser any default, breach, acceleration, assignment fees, increases, or any other fees resulting from one or more of the Seller's assumption and assignment of the Executory Assigned Contracts to Purchaser or (z) without limiting clause (x) or (y) of this subsection (f), otherwise asserting any Claim or claim against Purchaser or any Affiliate of Purchaser that arose prior to the effective date of the applicable assumption and assignment; and

(g)     include a finding that the transactions contemplated hereby and by the Collateral Agreements do not and will not subject Purchaser to any liability by reason of such transactions pursuant to any bulk-transfer laws, successor liability, or similar theories to the maximum extent permitted by applicable Legal Requirements, in all cases except as expressly provided in this Agreement.

Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining the Sale Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code, demonstrating that no collusion has occurred that may give rise to avoidance of the contemplated sale under Section 363(n) of the Bankruptcy Code, and establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

8.3     Bankruptcy Court Filings; Appeals. From and after the date hereof and until the Closing Date, Sellers shall deliver to Purchaser drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement or the Collateral Agreements (including, for the avoidance of doubt, the DIP Loan Agreement) for Purchaser's prior review and comment at least two (2) Business Days prior to the filing or submission thereof (to the extent reasonably practicable, and otherwise, as far in advance of such filing or submission as reasonably practicable), and such filings shall be acceptable to Purchaser, in its sole discretion, to the extent they relate to the DIP Loan Agreement, the Purchased Assets, any Assumed Liabilities or any of Sellers' or Purchaser's obligations hereunder or thereunder. Sellers agree to diligently prosecute the entry of the Bidding Procedures Order, the Sale Order, the DIP Order and any other orders identified by Purchaser from time to time. In the event the entry of any such order shall be appealed, Sellers shall use their best efforts to defend such appeal.

## ARTICLE IX – MISCELLANEOUS

9.1     Publicity. Except as required by applicable Legal Requirements (including by the Bankruptcy Court or the Bankruptcy Code or federal securities laws) or as permitted hereunder, no Seller may issue a press release or make any other public announcement concerning this Agreement or the matters or transactions contemplated hereby or by the Collateral Agreements without the prior written consent of Purchaser, except that the foregoing shall not limit the Sellers' ability to make any filings with or communications to the Bankruptcy Court in the Chapter 11 Case.

9.2     Brokers.  Regardless of whether the Closing shall occur, (i) the Sellers shall indemnify and hold harmless Purchaser and its Affiliates from and against any and all liability for any broker's or finder's fees arising with respect to brokers or finders retained or engaged by or on behalf of any of the Sellers or any of the Seller's Affiliates in respect of the transactions contemplated by this Agreement or the Collateral Agreements, and (ii) Purchaser shall indemnify and hold harmless the Sellers and their respective Affiliates from and against any and all liability for any brokers' or finders' fees arising with respect to brokers or finders retained or engaged by or on behalf of Purchaser or its Affiliates in respect of the transactions contemplated by this Agreement or the Collateral Agreements.  This Section 9.2 shall survive termination of the Agreement.

9.3     Costs and Expenses.  Except as otherwise expressly set forth herein, each of the parties to this Agreement shall bear its own expenses incurred in connection with the negotiation, preparation, execution and closing of this Agreement, the Collateral Agreements and the transactions contemplated hereby and thereby.

9.4     Notices

.

All notices, requests, demands and other communications hereunder (each of the foregoing being referred to in this Section 9.4 as a "Notice") shall be deemed to have been duly given if in writing and delivered personally, sent by email or facsimile transmission, by nationally recognized overnight delivery service, or mailed by postage prepaid registered or certified U.S. mail, return receipt requested, to the addresses designated below or such other addresses as may be designated in writing by Notice given hereunder, and shall be effective upon (a) personal delivery, (b) email transmission (if a confirmation of such email Notice is sent in the manner specified in Section 9.4(a), (d) or (e) on the same day such email Notice was transmitted)), (c) facsimile transmission (if a confirmation of such facsimile Notice is sent in the manner specified in Section 9.4(a), (d) or (e) on the same day such facsimile Notice was transmitted), (d) delivery by registered or certified U.S. mail or (e) the first Business Day following deposit with a nationally recognized overnight delivery service:

If to any of the Sellers:                    Family Pharmacy, Inc.
                                             4101 No. State Hwy NN
                                             PO Box 949
                                             Ozark, MO 65721
                                             Attention:  Tim Stallion, CFO
                                             Fax: (417) 581-0949
                                             Email: timst@thefamilyrx.com

With a copy in both cases to
(which shall not constitute notice):         Lloyd & MacLauglin, LLC
                                             4010 Washington Street, Suite 1000
                                             Kansas City, MO  64111
                                             Attn: James MacLaughlin
                                             Email: jimmac@lloydandmaclaughlin.com

                                             AND

12166182v15

> Husch Blackwell LLP
> 4801 Main Street, Suite 1000
> Kansas City, MO  64112
> Attention:  John Cruciani and David Agee
> Fax: (816) 983-8080
> Email: john.cruciani@huschblackwell.com
> david.agee@huschblackwell.com

If to Purchaser:

> J M Smith Corporation
> 101 W. St. John Street
> Spartanburg, SC 29306
> Attn: Philip J. Ryan, III, Chief Financial Officer
> Fax:  (864) 582-6585
> Email: Philip_Ryan@jmsmith.com

With a copy to
(which shall not constitute notice):

> Arnall Golden Gregory LLP
> 171 17th Street, Suite 2100
> Atlanta, GA 30363
> Attention:  Stephen D. Fox and Darryl S. Laddin
> Fax:  (404) 873-8529; (404) 873-8121
> Email: Stephen.Fox@AGG.com;
> Darryl.Laddin@AGG.com

9.5     Governing Law.  The provisions of this Agreement and the documents delivered pursuant hereto and all disputes, claims or causes of action (whether in contract or in tort, or whether at law or in equity) that may be based upon, arise out of or relate to this Agreement (such disputes, claims or causes or action, "Actions"), including any claim or cause of action based upon, arising out of or related to any representation or warranty made in or alleged to be made in connection with this Agreement or allegedly made as an inducement to enter into this Agreement, shall be governed by, and construed and enforced in accordance with, the Bankruptcy Code, federal bankruptcy law and, to the extent state law is implicated, by the internal laws of the State of Delaware, without giving effect to the principles of conflicts of law thereof. With respect to any Action, each party hereto irrevocably submits to the exclusive jurisdiction of the Bankruptcy Court; provided, however, if the Bankruptcy Court is unwilling or unable to hear any Action, each party hereto submits to the exclusive state and federal courts located in the State of Missouri; provided further, that any party may bring an Action as described in Section 7.3 or Section 7.4  and that any party seeking equitable relief may seek such equitable relief in any appropriate court and in any jurisdiction where the party against whom such equitable relief is being sought is subject to personal jurisdiction and where venue is proper. Each party irrevocably waives, to the fullest extent each may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.  EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING HEREUNDER.

9.6     Entire Agreement; Amendments and Waivers.  This Agreement and the Collateral Agreements, together with all exhibits and schedules attached hereto or referenced herein, constitutes the entire agreement between and among the parties hereto pertaining to the subject matter hereof and supersedes all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties (including any confidentiality agreement and/or letter of intent), and there are no warranties, representations, promises, assurances, guaranties, or other agreements between the parties in connection with the subject matter hereof except as set forth specifically herein or expressly contemplated hereby.

12166182v15

Except as expressly provided herein, no supplement, modification or waiver of this Agreement shall be binding unless executed in writing by the party to be bound thereby.  No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (regardless of whether similar), nor shall any such waiver constitute a continuing waiver unless otherwise expressly provided.

9.7     <u>Binding Effect and Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns; but neither this Agreement nor any of the rights, benefits or obligations hereunder shall be assigned, by operation of law or otherwise, by any party hereto without the prior written consent of the other parties; provided that, without the consent of the Sellers, Purchaser may assign this Agreement in whole or in part to one or more of its Affiliates, Purchaser may collaterally assign any or all of its rights and interests hereunder to one or more lenders of Purchaser, and Purchaser may assign its rights hereunder in connection with the sale of all or substantially all of its business or assets, whether by merger, sale of stock or assets, recapitalization or otherwise.  Nothing in this Agreement, express or implied, is intended to confer upon any Person any rights, benefits or obligations hereunder.

9.8     <u>Exhibits and Schedules</u>.  The exhibits and Schedules referred to herein are attached hereto and incorporated herein by this reference.  Disclosure of a specific item in any one Schedule shall be deemed restricted only to the representation or warranty (or portion thereof, as applicable) in <u>Article III</u> that specifically references such Schedule except where there is an explicit cross-reference to another Schedule, in which case the representation or warranty (or portion thereof, as applicable) in <u>Article III</u> that specifically references such other Schedule shall also be qualified by the disclosure in the first Schedule.

9.9     <u>Multiple Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.  Delivery of an executed counterpart of a signature page to this Agreement by facsimile, .pdf or other electronic means shall be effective as delivery of a manually executed counterpart to the Agreement.

9.10     <u>References and Construction</u>.

(a)     Whenever required by the context, and as used in this Agreement, the singular number shall include the plural; pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular or plural, as the identification of the Person may require; and use of the word "including" shall be deemed to mean "including without limitation".  References to monetary amounts, specific named statutes and GAAP are intended to be and shall be construed as references to United States dollars, statutes of the United States and United States GAAP, respectively, unless the context otherwise requires.  References in this Agreement or any of the Collateral Agreements to time of day mean local time in Springfield, Missouri, except as expressly provided otherwise. Any provision of this Agreement that has not been fully performed as of the Closing Date, together with the representations and warranties of the Sellers, shall survive the Closing.

(b)     Time is of the essence of each and every covenant, agreement and obligation in this Agreement.

(c)     Notwithstanding anything to the contrary contained herein or in any of the Collateral Agreements, the obligations of one or more of the Sellers under this Agreement constitute the joint and several obligations of all of the Sellers.

(d)    The provisions of this Agreement shall be construed according to their fair meaning and neither for nor against any party hereto irrespective of which party caused such provisions to be drafted, and no rule of strict construction shall be applied against any party.  Each of the parties acknowledges that it has been represented by an attorney in connection with the preparation and execution of this Agreement.

## ARTICLE X – DEFINITIONS

Capitalized terms used in this Agreement have the respective definitions provided in this Article X or elsewhere in this Agreement.

10.1    Accounts Receivable.  The term "Accounts Receivable" shall mean, as of any date, notes receivable, accounts receivable and other receivables of any kind of any Seller.

10.2    Affiliate.  The term "Affiliate" shall mean, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under common control with such first Person.  The term "Control" as used in the preceding sentence means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person

10.3    Alternative Transaction. The term "Alternative Transaction" means (i) a transaction or series of transactions pursuant to which one or more of the Sellers license or sell, transfer, lease or otherwise dispose of, directly or indirectly, all or any material portion of the Purchased Assets (including patient records) to a Person other than Purchaser or an Affiliate of Purchaser (such a transaction or series of transactions, a "Disposition Transaction"), or (ii) the filing of a chapter 11 plan by one or more of the Sellers or any other Person that does not contemplate the sale of the Purchased Assets to Purchaser or an Affiliate of Purchaser in accordance with the terms hereof.  For avoidance of doubt, any Disposition Transaction shall constitute an Alternative Transaction regardless of whether such Disposition Transaction is consummated in connection with the Sale Motion, the Bidding Procedures Order, the Sale Order, or otherwise.

10.4    Auction.  The term "Auction" has the meaning assigned thereto in the Bidding Procedures.

10.5    Bidding Procedures. The term "Bidding Procedures" means the rules, processes, bidding procedures and other matters set forth in Exhibit E.

10.6    Bidding Procedures Hearing.  The term "Bidding Procedures Hearing" means a hearing before the Bankruptcy Court concerning, among other things, (a) the Bidding Procedures and (b) the allowance of the Breakup Fee and the Reimbursable Expenses as administrative expense claims in the Chapter 11 Case and Sellers' payment of the Breakup Fee and the Reimbursable Expenses on the terms described in this Agreement.

10.7    Bidding Procedures Order.  The term "Bidding Procedures Order" means a Final Order from the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser, approving (a) the Bidding Procedures and certain other matters in connection with the potential Auction, (b) the Breakup Fee and the Reimbursable Expenses as allowed administrative expense claims of each of the Sellers in the Chapter 11 Case, and (c) directing the Sellers' to pay the Breakup Fee and the Reimbursable Expenses out of the proceeds of any Alternative Transaction on the terms described in this Agreement.

10.8    Breakup Fee.  The term "Breakup Fee" means $250,000.00.

10.9    Business Day.  The term "Business Day" shall mean any day that is not a Saturday, Sunday or other day on which banking institutions in New York, New York, are authorized or required by law or executive order to close.

10.10    Cash. The term "Cash" means all cash and cash equivalents.

10.11    Code.  The term "Code" shall mean the Internal Revenue Code of 1986, as amended.

10.12    Claim. The term "Claim" has the meaning assigned thereto by Section 101(5) of the Bankruptcy Code.

10.13    Cure Cap. The term "Cure Cap" means $500,000.

10.14    Cure Costs. The term "Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assigned Contracts, in each case as of the Petition Date and to the extent required by Section 365(b) of the Bankruptcy Code and any order of the Bankruptcy Court approving the assumption and assignment of the Assigned Contracts, which amounts (if not already paid or to be paid in the Ordinary Course of Business pursuant to an order of the Bankruptcy Court) shall have been identified to Purchaser in writing.

10.15    Collateral Agreements.  The term "Collateral Agreements" shall mean any or all of the exhibits to this Agreement and any and all other agreements, instruments or documents required or expressly provided under this Agreement or under such other agreements, instruments or documents to be executed and delivered in connection with the transactions contemplated by this Agreement or by such other agreements, instruments or documents, including the DIP Loan Agreement and all agreements, instruments or documents to be executed and delivered thereunder.

10.16    Contracts.  The term "Contracts," when described as being those of or applicable to any Person, shall mean any and all contracts, agreements, commitments, leases (including the Leases), licenses, mortgages, bonds, notes, guaranties, other undertakings, oral or written, to which such Person is a party or to which or by which such Person is bound, excluding any Permits.

10.17    Damages.  The term "Damages" shall mean any and all damages, liabilities, obligations, penalties, fines, judgments, deficiencies, losses, costs, penalties, wages, liquidated damages, expenses and assessments (including without limitation income and other Taxes, interest, penalties and reasonable attorneys' and accountants' fees and disbursements).

10.18    DIP Facility Obligations. The term "DIP Facility Obligations" means all Obligations (as defined in the DIP Loan Agreement) under the DIP Loan Agreement as of the Closing Date.

10.19    DIP Loan Closing Date. The term "DIP Loan Closing Date" means the Closing Date (as defined in the DIP Loan Agreement).

10.20    DIP Loan Agreement. The term "DIP Loan Agreement" shall mean that certain Senior Secured Debtor-In-Possession Loan Agreement, by and among J M Smith Corporation and the Sellers, dated of even date herewith.

10.21    DIP Order. The term "DIP Order" shall mean an order from the Bankruptcy Court, whether such order is an interim or Final Order, in form and substance reasonably acceptable to Purchaser, approving the transactions contemplated by the DIP Loan Agreement.

10.22   <u>Employee Plans</u>.  The term "<u>Employee Plans</u>" means all bonus, commission, deferred compensation, incentive compensation, share purchase, share option, share appreciation, phantom share or other equity-based compensation, savings, profit sharing, retention, severance or termination  pay, change-in-control, employment, consulting, health, dental, vision or other medical, life, disability or other insurance (whether insured or self-insured), mortgage insurance, employee loan, employee assistance, supplementary unemployment benefit, pension, retirement, supplementary retirement, holiday, sick leave, vacation, overtime and automobile plans, programs, agreements, arrangements, policies and practices, and every other benefit plan, program, agreement, arrangement, policy or practice (whether written or unwritten), (i) sponsored, maintained or contributed to (or required to be contributed to) by any Seller or any of its Affiliates for the benefit of any of the current or former employees, directors, or independent contractors of such Seller or any of its Affiliates, or the dependents or beneficiaries of such a Person, or (ii) with respect to which such Seller or any of its Affiliates has any liability (whether fixed or contingent).

10.23   <u>Environmental Laws</u>.   The term "<u>Environmental Law</u>" shall mean all existing and applicable Legal Requirements and any binding order of federal, state and local Governmental Authorities concerning pollution or protection of the environment, natural resources, public health and safety or employee health and safety, including Legal Requirements relating to emissions, discharges, releases or threatened releases of Hazardous Materials into ambient air, surface water, ground water or lands or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, discharge, transport remediation or handling of, or exposure to Hazardous Materials.

10.24   <u>Final Order</u>. The term "<u>Final Order</u>" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Sellers' Chapter 11 Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari,* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

10.25   <u>Fraud</u>.  The term "<u>Fraud</u>" shall mean common law fraud and shall include intentional or willful misrepresentations of fact.

10.26   <u>Fundamental Representations</u>. The term "<u>Fundamental Representations</u>" means <u>Section 3.1</u> (Corporate Existence and Qualification), <u>Section 3.2</u> (Authority, Approval and Enforceability), <u>Section 3.3(a)</u> (Capitalization and Business Records), <u>Section 3.5</u> (No Defaults or Consents; Authorizations) <u>Section 3.7(c)</u> (Employment Matters), <u>Section 3.8</u> (Employee Plans), <u>Section 3.18(b)</u> (Equipment and Other Tangible Property) and <u>Section 3.27</u> (Tax Matters).

10.27   <u>Funded Indebtedness</u>. The term "<u>Funded Indebtedness</u>" shall mean with respect to any Person at any date, without duplication, any liability of any Person: (a) for borrowed money, including cash overdrafts, (b) under unsecured letters of credit, to the extent drawn, or under banker's acceptances or note purchase facilities, to the extent of amounts currently outstanding thereunder, (c) evidenced by a

12166182v15

bond, note, debenture or similar instrument (including a purchase money obligation), (d) for the payment of money relating to leases that are classified as capitalized lease obligations on the Financial Statements with respect to which such Person is liable as lessee, (e) created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (f) for all or any part of the deferred purchase price of property or services (excluding, for the avoidance of doubt, accounts payable incurred in the ordinary course of business), including "earnout" or similar payments or any non-compete payments, (g) under interest rate swap, hedging or similar agreements, (h) in respect of accrued but unpaid interest, and unpaid prepayment fees, premiums or penalties or other charges (including attorneys' fees) payable in connection with the retirement of or prepayment of any of the Funded Indebtedness described in the foregoing clauses (a) through (g), and (i) all indebtedness of others of a type referred to in the foregoing clauses (a) through (h) that such Person has guaranteed.

10.28   GAAP.   The term "GAAP" shall mean, at any time, the generally accepted accounting principles in the United States at such time, applied on a consistent basis.

10.29   Governmental Authorities.   The term "Governmental Authorities" shall mean the United States and any state, commonwealth, territory or possession thereof and any political subdivision of any of the foregoing, including but not limited to courts, departments, commissions, boards, bureaus, or other agencies.

10.30   Hazardous Material.   The term "Hazardous Material" shall mean any material, substance, chemical, waste, product, derivative, compound, mixture, vapor, solid, liquid, mineral or gas that is defined or listed in, or otherwise regulated, controlled or classified pursuant to, any Legal Requirements as "hazardous substances," "hazardous materials," "hazardous wastes," "toxic substances", as well as any petroleum or petroleum-based products, radon, mold, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation, and polychlorinated biphenyls.

10.31   Healthcare Approvals.   The term "Healthcare Approvals" shall mean (a) the issuance of all Business Permits by all Governmental Authorities listed on Schedule 10.30 that are necessary or required, pursuant to applicable Healthcare Laws, for consummating the transactions, changes of control and/or changes of ownership contemplated hereby, or (b) written assurance acceptable to Purchaser from the applicable Governmental Authorities with respect to the Business Permits listed on Schedule 10.30 authorizing the parties to proceed with the transactions and changes of control or changes of ownership contemplated hereby.   A Health Care Approval will be deemed to have been obtained upon the occurrence of any of the following events (each, an "Approval Event"): (i) receipt of such Business Permits, or (ii) the receipt of confirmation from the applicable Governmental Authority in writing or verbally (if such verbal confirmation is confirmed in a writing to the Governmental Authority) that the parties are authorized to proceed with the transactions and changes of ownership or changes of control contemplated hereby (each such confirmation, an "Agency Confirmation"). Following an Approval Event and prior to Closing, the applicable Health Care Approval will no longer be deemed to have been obtained if (i) the applicable Governmental Authority provides written or verbal withdrawal of authorization (if such verbal withdrawal of authorization is confirmed in a writing to the Governmental Authority) to proceed with the transactions and changes of ownership or changes of control contemplated hereby or (ii) a Governmental Authority for which the condition contained in this paragraph was previously believed to be satisfied notifies the party seeking such Health Care Approval in writing or verbally (if such verbal notification is confirmed in a writing to the Governmental Authority) that (A) formal or additional filings are required for the Governmental Authority to provide authorization to proceed with the transactions and changes of ownership or changes of control contemplated hereby, or (B) that the matter requires further consideration or review before the Governmental Authority will provide such authorization.

51

10.32    Healthcare Laws.  The term "Healthcare Laws" means any and all federal, state and locals laws, including regulations, rules, judgments, orders, manuals, program transmittals and official guidance from any Government Authorities, relating to healthcare regulatory matters, including 42 U.S.C. §§ 1320a-7, 7a, and 7b, which are commonly referred to as the "Federal Fraud Statutes"; 42 U.S.C. § 1395nn, which is commonly referred to as the "Stark Statute"; 31 U.S.C. §§ 3729-3733, which is commonly referred to as the "federal False Claims Act"; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 8701-8707; HIPAA and its implementing regulations at 45 C.F.R. Parts 160, 162 and 164 and any other rules or regulations promulgated thereunder and similar state laws; 18 U.S.C. § 1347; the Patient Protection and Affordable Care Act of 2010 (Public Law 111-148); Government Programs; any federal, state or local statute or regulation relevant to false statements or claims, or the respective state-law counterparts of any of the foregoing; and all applicable federal, state, and local licensing, certificate of need, corporate practice of medicine and fee splitting Laws applicable to the health care items and services that the Seller provides.

10.33    HIPAA.  The term "HIPAA" means the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. §§ 1320d-1329d-8, as amended by the Health Information Technology for Economic and Clinical Health Act, enacted as Title XIII of the American Recovery and Reinvestment Act of 2009, Public Law 111-5 and the regulations promulgated thereunder.

10.34    J M Smith. The term "J M Smith" means J M Smith Corporation, a South Carolina corporation.

10.35    Knowledge of the Sellers.  The term "Knowledge of Sellers" shall mean the actual knowledge after reasonable inquiry of any of Principal, Janet Morris, James G. M. MacLaughlin, Carrie Tennis and Tim Stallion, together with such knowledge as a prudent individual in a similar position in a comparable business organization could reasonably be expected to have or otherwise become aware of in the normal organizational reporting process consistent with sound business practices.

10.36    Legal Requirements.  The term "Legal Requirements," when described as being applicable to any Person, shall mean any and all laws (statutory, judicial or otherwise), principles of common law, ordinances, regulations, judgments, orders, directives, injunctions, writs, decrees or awards of, and any Contracts with, any Governmental Authority, in each case as and to the extent applicable to such Person.

10.37    Liens.  The term "Liens" shall mean all liens, mortgages, pledges, adverse claims, charges, security interests, encumbrances or other restrictions or limitations whatsoever.

10.38    Material Adverse Effect.  The term "Material Adverse Effect" shall mean any event, change, development or occurrence, that, individually or together with any other event, change, development or occurrence, (a) is materially adverse to the business, condition (financial or otherwise), assets, results of operations or prospects of the Sellers, or (b) materially adversely affects the ability of any Seller to perform its obligations under this Agreement or any Collateral Agreement.

10.39    Permits.  The term "Permits" shall mean any and all permits, rights, approvals, licenses, authorizations, legal status, orders or Contracts under any Legal Requirement or otherwise granted by any Governmental Authority and include all Business Permits.

10.40    Permitted Liens.  The term "Permitted Liens" shall mean any and all Liens on the Purchased Assets (a) for Taxes not yet due or payable; (b) in favor of vendors, carriers, warehousemen, repairmen, mechanics, workers and/or materialmen arising by operation of law in the ordinary course of business in respect of obligations that are not yet due, in each case that Purchaser agrees in writing may

remain in place; and (c) imperfections of title that, individually or in the aggregate, do not impair materially, and would not reasonably be expected to impair materially, the continued operation of the Business or the use of the Purchased Assets as presently conducted.

10.41    Person.    The term "Person" shall mean any individual, partnership, limited liability partnership, limited liability limited partnership, joint venture, firm, corporation, association, limited liability company, trust or other enterprise or Governmental Authority.

10.42    Personal Information. The term "Personal Information" shall mean a natural Person's name, address, social security number or tax identification number, driver's license number, passport number, credit card number, bank information, customer or account number or insurance plan number.

10.43    Petition Date. The term "Petition Date" means the date on which the Sellers commenced the Chapter 11 Case.

10.44    Potential Successor Taxes. The term "Potential Successor Taxes" means any Taxes owed by the Sellers as of the Closing Date with respect to which the Purchaser or its Affiliates may have successor liability.

10.45    Reimbursable Expenses. The term "Reimbursable Expenses" means the lesser of (i) all actual costs, fees, and expenses incurred or to be incurred by or on behalf of Purchaser or any Affiliate thereof in connection with evaluating, negotiating, documenting, and performing the transactions contemplated by this Agreement or the Collateral Agreements (including costs, fees, and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Purchaser or any Affiliate thereof in connection with or related to the authorization, preparation, investigation, negotiation, execution, and performance of this Agreement, the transactions contemplated hereby or by the Collateral Agreements, including the Chapter 11 Case and other judicial and regulatory proceedings related to such transactions or (ii) $250,000.00.

10.46    Release. The term "Release" means any actual or threatened release, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, abandonment, disposing or allowing to escape or migrate into or through the environment (including, without limitation, ambient air (indoor or outdoor), surface water, groundwater, land surface or subsurface strata or within any building, structure, facility or fixture).

10.47    Sale Hearing. The term "Sale Hearing" shall mean a hearing before the Bankruptcy Court concerning, among other things, the Bankruptcy Court's approval of the transactions contemplated by this Agreement and the Collateral Agreements and the Bankruptcy Court's issuance of the Sale Order.

10.48    Sale Motion. The term "Sale Motion" shall mean a motion the Sellers file with the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser, seeking the Bankruptcy Court's issuance of the Bidding Procedures Order, the Sale Order, the DIP Order and the transactions contemplated in this Agreement and the Collateral Agreements (subject to higher or otherwise better offers).

10.49    Sale Order. The term "Sale Order" shall mean the Final Order from the Bankruptcy Court, in form and substance reasonably acceptable to Purchaser, approving the transactions contemplated by the Agreement and the Collateral Agreements and meeting the minimum requirements set forth in Section 8.2 of this Agreement.

10.50   <u>Tax</u>.  The term "<u>Tax</u>" shall mean means all United States federal, state, local, foreign and other income, franchise, profits, capital gains, transfer, sales, use, value added, occupation, property, excise, severance, windfall profits, stamp, license, payroll, ad valorem, turnover, property, fuel, severance, withholding and other taxes of any kind whatsoever, all estimated taxes, deficiency assessments, additions to tax, penalties and interest.

10.51   <u>Tax Return</u>.  The term "<u>Tax Return</u>" shall mean any and all returns, reports, declarations, elections, notices, forms, designations, filings, and statements (including estimated tax returns and reports, withholding tax returns and reports, and information returns and reports) filed or required to be filed in respect of Taxes including any amendments thereto.

*[Signature Pages to Follow]*

54

EXECUTED as of the date first written above.

PURCHASER:

**SMITH MANAGEMENT SERVICES, LLC**

By: _____

Name: PHILIP J RYAN

Title: SECRETARY

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

EXECUTED as of the date first written above.

**SELLERS:**

**FAMILY PHARMACY, INC.**

By: _____
Name: LYNN A MORRIS
Title: PRESIDENT

**FAMILY PHARMACY OF STRAFFORD, INC.,**

By: _____
Name: LYNN A MORRIS
Title: PRESIDENT

**FAMILY PHARMACY OF MISSOURI, LLC**

By: _____
Name: LYNN A MORRIS
Title: MANAGING MEMBER

**FAMILY PROPERTY MANAGEMENT, LLC.**

By: _____
Name: LYNN A MORRIS
Title: MANAGING MEMBER

**HEALTHTAC LOGISTICS, LLC**

By: _____
Name: LYNN A MORRIS
Title: MANAGING MEMBER

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

**<u>Exhibit A</u>**

**Form of Escrow Agreement**

**(See attached)**

**<u>Exhibit B</u>**

**Form of Bill of Sale**

**(See attached)**

## BILL OF SALE

This Bill of Sale (this "Bill of Sale"), dated _____, 2018, is being executed and delivered by (a) Family Pharmacy, Inc., a Missouri corporation; (b) Family Pharmacy of Strafford, Inc.; (c) Family Pharmacy of Missouri, LLC, a Missouri limited liability company; (d) Family Property Management, LLC, a Missouri limited liability company; and (e) HealthTAC Logistics, LLC, a Missouri limited liability company (collectively, the "Sellers" and each of the Sellers, individually, a "Seller"), pursuant to Section **[2.2(g)]** of that certain Asset Purchase Agreement dated as of _____, 2018, by and among Sellers and FPSMS, LLC, a Delaware limited liability company (the "Purchaser") (as amended, modified or supplemented, the "Asset Purchase Agreement"), and the delivery hereof at or prior to Closing is a condition to Purchaser's obligations under the Asset Purchase Agreement. Each capitalized term used but not defined herein has the meaning ascribed thereto in the Asset Purchase Agreement

**KNOW ALL PERSONS BY THESE PRESENTS** that each Seller, for good and valuable consideration, effective as of the Closing, hereby irrevocably sells, transfers, assigns, conveys, grants, delivers, alienates and sets over to Purchaser and its successors and assigns, forever, all of such Seller's legal, beneficial and other right, title and interest in and to the Purchased Assets as contemplated by and pursuant to the Asset Purchase Agreement, free and clear of all Liens, other than Permitted Liens, to have and to hold the same, for Purchaser's and its successors and assigns use forever.

Such Seller agrees that such Seller will, at any time and from time to time from the date hereof, upon the request of Purchaser or a successor or assignee thereof, do, execute, acknowledge and deliver, or cause to be done, executed, acknowledged or delivered, all such further acts, deeds, assignments, transfers, conveyances and assurances as may be reasonably required for the better selling, transferring, assigning, conveying, granting, delivering, alienating, setting over to, assuring or confirming to Purchaser or a successor or assignee thereof, or for aiding in assigning and reducing to the possession of Purchaser or a successor or assignee thereof, title to and possession of any and all of the Purchased Assets sold, transferred, assigned, conveyed, granted, delivered, alienated or set over hereby, or intended so to be.

Such Seller hereby constitutes and appoints Purchaser as such Seller's true and lawful agent and attorney in fact, with full power of substitution and re-substitution, in whole or in part, in the name and stead of such Seller, but on behalf and for the benefit of Purchaser and Purchaser's successors or assigns, from time to time:

(a)  to demand, receive and collect any and all of the Purchased Assets and to give receipts and releases for and with respect to the same, or any part thereof;

(b)  to institute and prosecute, in the name of such Seller or otherwise, any and all proceedings at law, in equity or otherwise, that Purchaser or any of Purchaser's successors or assigns may deem proper in order to collect or reduce to possession any of the Purchased Assets and in order to collect or enforce any claim or right of any kind hereby sold, transferred, assigned, conveyed, granted, delivered, alienated or set over to, or intended so to be; and

(c)  to do all things legally permissible, required or reasonably deemed by Purchaser to be required to recover and collect any and all of the Purchased Assets and to use such Seller's name in such manner as Purchaser may reasonably deem necessary for the collection and recovery of same, or any part thereof.

Such Seller hereby declares that the foregoing powers are coupled with an interest and are and shall be irrevocable by such Seller.

12206986v2

The terms of the Asset Purchase Agreement, including, but not limited to, the Sellers' representations, warranties, covenants, agreements and indemnities relating to the Purchased Assets, are incorporated herein by this reference. Each party hereto acknowledges and agrees that the representations, warranties, covenants, agreements and indemnities contained in the Asset Purchase Agreement shall not be superseded hereby, but shall remain in full force and effect to the full extent provided therein. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

*[Signature Page Follows]*

12206986v2

IN WITNESS WHEREOF, each Seller has caused this Bill of Sale to be duly executed by a duly authorized representative thereof as of the date first above set forth.

**PURCHASER:**

**FPSMS, LLC**

By: _____
Name: _____
Title: _____

**SELLERS:**

**FAMILY PHARMACY, INC.**

By: _____
Name: _____
Title: _____

**FAMILY PHARMACY OF STRAFFORD, INC.,**

By: _____
Name: _____
Title: _____

**FAMILY PHARMACY OF MISSOURI, LLC**

By: _____
Name: _____
Title: _____

**FAMILY PROPERTY MANAGEMENT, LLC.**

By: _____
Name: _____
Title: _____

**HEALTHTAC LOGISTICS, LLC**

By: _____
Name: _____
Title: _____

**SIGNATURE PAGE TO BILL OF SALE**

**Exhibit C**

**Form of Assignment and Assumption Agreement**

**(See attached)**

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment And Assumption Agreement (this "Agreement") is made and entered into this _____ day of _____ 2018, by and among (a) FPSMS, LLC, a Delaware limited liability company ("Purchaser"); (b) Family Pharmacy, Inc., a Missouri corporation; (c) Family Pharmacy of Strafford, Inc.; (d) Family Pharmacy of Missouri, LLC, a Missouri limited liability company; (e) Family Property Management, LLC, a Missouri limited liability company; and (f) HealthTAC Logistics, LLC, a Missouri limited liability company (the entities listed in clauses (b)–(f), the "Assignors" and each of the Assignors, individually, an "Assignor").

## RECITALS

A.    Assignors and Purchaser have entered into that certain Asset Purchase Agreement dated as of _____, 2018 (as amended, modified or supplemented, the "Asset Purchase Agreement").

B.    This Agreement is being entered into pursuant to Section **[2.2(h)]** of the Asset Purchase Agreement, and Assignor's delivery hereof at or prior to Closing is a condition to Purchaser's obligations under the Asset Purchase Agreement.

## AGREEMENT

NOW, THEREFORE, in consideration of the premises, the mutual representations, warranties and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby agree as follows:

1.    Definitions.  Each capitalized term used but not otherwise defined herein has the meaning ascribed thereto in the Asset Purchase Agreement.

2.    Assignment of Intangible Rights and Assigned Contracts and Assumption of Assumed Liabilities.  Effective as of the Closing, each Assignor hereby irrevocably transfers and assigns to Purchaser all of such Assignor's (i) right, title and interest in and to the Intangible Rights included in the Purchased Assets (including, without limitation, all goodwill associated therewith, the exclusive right to sue for past, present or future infringements thereof and the exclusive right to all damages and payments in respect thereof), and (ii) rights in, to and under those Contracts that constitute Assigned Contracts as of the Closing (which Assigned Contracts are listed on Exhibit A hereto), and Purchaser hereby accepts such transfers and assignments and assumes all of the Assumed Liabilities (but none of the Excluded Liabilities), in each case subject to and in accordance with the terms and provisions of the Asset Purchase Agreement.

3.    Authority; Further Assurances. In furtherance of the assignments and transfers made in Section 2 hereof, each Assignor authorizes and directs each agent, official, governing body, organization, governmental authority, person or entity with authority or responsibility with respect to the transfer, registration or recordation of any of the Intangible Rights to take any and all actions necessary or appropriate to effect, reflect or record the assignments and transfers contemplated hereby. Without limiting the immediately preceding sentence, such Assignor and Purchaser authorize and direct each registrar or other legal domain name authority of the domain names included in the Purchased Assets to record Purchaser as the sole owner thereof. Such Assignor shall provide all cooperation and assistance as Purchaser may reasonably request to facilitate the transfers and assignments contemplated hereby, including, without limitation, providing a contact email address or other information of Purchaser to the registrar of such domain names, unlocking such domain names and providing Purchaser with any authorization codes associated with such domain names.

4.      <u>Integration with Asset Purchase Agreement Provisions</u>.   Nothing contained in this Agreement shall expand, reduce, modify or waive any rights or obligations of the parties under the Asset Purchase Agreement.  In the event that any of the provisions of this Agreement are determined to conflict with the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall control.

5.      <u>Counterparts</u>.  This Agreement may be executed in two (2) or more counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

6.      <u>Facsimile or E-Mail Execution</u>.   For purposes of this Agreement, a document (or signature page thereto) signed or transmitted by facsimile machine or electronic mail is to be treated as an original document. The signature of any party on such document, for purposes hereof, is to be considered as an original signature, and the document transmitted is to be considered to have the same binding effect as an original signature on an original document. At the request of any party, any facsimile or electronically transmitted document shall be re-executed in original form by the parties who executed the facsimile or electronically transmitted document.  No party may raise the use of a facsimile machine or electronic mail or the fact that any signature was transmitted through the use of a facsimile machine or electronic mail as a defense to the enforcement of this Agreement or any amendment or other document executed in compliance with this Section.

7.      <u>Applicable Law</u>.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of Delaware, without giving effect to its conflict of laws provisions.

8.      <u>Captions</u>.  The captions in this Agreement are for convenience only and shall not be considered a part hereof or affect the construction or interpretation of any provisions of this Agreement.

9.      <u>Amendment</u>.  This Agreement may be modified or amended only by a written instrument executed by all parties hereto.

10.     <u>Waiver</u>.  No waiver by any party hereto at any time of any breach of, or compliance with, any condition or provision of this Agreement to be performed by any other party hereto may be deemed a waiver of similar or dissimilar provisions or conditions at the same time or at any prior or subsequent time. Each waiver hereunder shall be in writing and signed by a duly authorized representative of the waiving party.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective duly authorized representatives on the date first above written.

**PURCHASER:**

**FPSMS, LLC**

By: _____
Name: _____
Title: _____

**ASSIGNORS:**

**FAMILY PHARMACY, INC.**

By: _____
Name: _____
Title: _____

**FAMILY PHARMACY OF STRAFFORD, INC.,**

By: _____
Name: _____
Title: _____

**FAMILY PHARMACY OF MISSOURI, LLC**

By: _____
Name: _____
Title: _____

**FAMILY PROPERTY MANAGEMENT, LLC.**

By: _____
Name: _____
Title: _____

**HEALTHTAC LOGISTICS, LLC**

By: _____
Name: _____
Title: _____

**SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION AGREEMENT**

## **Exhibit A**

Assigned Contracts

**<u>Exhibit D</u>**

**Form of Operations Transfer Agreement**

**(See attached)**

## OPERATIONS TRANSFER AGREEMENT

THIS OPERATIONS TRANSFER AGREEMENT (this "Agreement"), dated as of [_____], 2018, is by and among (a) Family Pharmacy, Inc., a Missouri corporation; (b) Family Pharmacy of Strafford, Inc., a Missouri corporation; (c) Family Pharmacy of Missouri, LLC, a Missouri limited liability company; (d) Family Property Management, LLC, a Missouri limited liability company; (e) HealthTAC Logistics, LLC, a Missouri limited liability company (the entities in clause (a)–(e), collectively, the "Transferor" or "Sellers"); and (f) Smith Management Services, LLC, a Delaware limited liability company ("New Operator") (Transferor and New Operator are sometimes each referred to hereunder individually as a "Party" and collectively as the "Parties").

A.      The Sellers, doing business as "Family Pharmacy," own and operate twenty (20) retail pharmacy locations, two (2) long-term care pharmacy locations and one (1) specialty pharmacy location from which the Sellers market and sell primarily pharmaceuticals at retail and for long-term care facilities and hospice patients (collectively, the "Business").

B.      Pursuant to that certain Asset Purchase Agreement dated as of [_____], 2018, by and among Transferor (individually, each as a "Seller" thereunder) and New Operator (as "Purchaser" thereunder), relating to, among other things, the sale and purchase of assets and properties of the Business as provided therein (the "Purchase Agreement"), Transferor and New Operator wish to provide for an orderly transition of the operations of the Business from Transferor to New Operator as of **[12:01]** a.m. **[local time in Springfield, Missouri,]** on the Closing Date (as such term is defined in the Purchase Agreement).

NOW, THEREFORE, in consideration of the foregoing premises, the mutual obligations of the Parties contained in this Agreement, and for other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, the Parties hereto, intending to be legally bound, hereby agree as follows:

## ARTICLE II
### Licenses, Accounts Receivable, Prorations, and Other Matters

Section 2.1      Transfer of Pharmacy Licenses and Provider Agreements.

(a)      New Operator shall use its commercially reasonable efforts to obtain all pharmacy licenses, permits, registrations (including DEA registrations and state-law equivalents), certifications, payor agreements, provider numbers, and provider agreements, as applicable, necessary to operate the Business as a retail, long-term care and compounding pharmacy effective as of the Closing Date or as soon after the Closing Date as reasonably practicable.  Notwithstanding the foregoing, effective on the Closing Date:  (i) to the extent permitted by applicable law, Transferor shall, as and to the extent directed by New Operator, either (A) assign all such licenses, permits, registrations, certifications, payor agreements, provider numbers, and provider agreements, including Medicare and Medicaid, as applicable, permitted to be so transferred, to New Operator, and New Operator will accept such assignment or (B) allow New Operator the benefit of the provisions of Section 1.1(b); and (ii) to the extent that any such licenses, permits, registrations, certifications, payor agreements, provider numbers, or provider agreements cannot be transferred to New Operator under applicable law, Transferor shall surrender or terminate, subject however to prior compliance with the Purchase Agreement and the provisions of, and in cooperation with New Operator as addressed in, Section 1.1(b) below, such licenses, permits, registrations, certifications, payor agreements, provider numbers, and provider agreements with the appropriate governmental agency.

(b)     Notwithstanding Section 1.1(a), New Operator and Transferor acknowledge and agree that New Operator is not expected to have received as of the Closing Date "tie in" notices or approvals from the Centers for Medicare & Medicaid Services, the Missouri Department of Social Services, or any other applicable government payor or commercial health plan with respect to participation and enrollment in Medicare, Medicaid, or any other applicable government reimbursement program or commercial health plan.  Accordingly, Transferor agrees that, to the extent permitted by law, it will permit New Operator to bill for services under Transferor's provider numbers and provider agreements for Medicare (including Medicare Part D), Medicaid, and any other applicable government reimbursement program or commercial health plan until such "tie in" notices or approvals have been received or provider numbers or provider agreements have been issued to, confirmed as assigned to, or received by New Operator, and New Operator is duly authorized to bill under the applicable laws, regulations, and requirements (including contractual requirements) of the Centers for Medicare & Medicaid Services, the Missouri Department of Social Services, and any other applicable government payor or commercial health plan (such period from the Closing Date until the last such approval is obtained by New Operator, the "Interim Billing Period").  Any amounts received by Transferor in connection with any Medicare (including Medicare Part D), Medicaid, or other government payor or commercial health plan pursuant to the rights granted to New Operator under this Section 1.1(b) shall be held in express trust for the benefit of New Operator and remitted by Transferor to New Operator in accordance with the Billing Services Agreement and the provisions of Section 1.2(b) of this Agreement. With respect to the Interim Billing Period, the parties will enter into a billing services agreement substantially in the form attached hereto as Schedule 1.1(b) (the "Billing Services Agreement").  To the extent New Operator utilizes the procedures in this Section 1.1(b) during the Interim Billing Period, and as may be more fully set forth in the Billing Services Agreement, New Operator shall assume any liability for funds billed or received to the extent arising from services or products provided by New Operator during the Interim Billing Period, and New Operator will indemnify and hold Transferor harmless with respect to such liability assumed by New Operator.

(c)     Transferor agrees to cooperate, both pre- and post-Closing Date, with New Operator: (i) to accomplish the transfer of operation and management of the Business effective on the Closing Date, including, without limitation, promptly providing New Operator or any governmental agency any information required for such transfer and entering into a power of attorney for use of DEA and other registration numbers and DEA order forms in substantially the form attached hereto as Schedule 1.1(c) and to provide and cooperate in good faith in the completion and submission of DEA Forms, including, but not limited to, DEA Form 222 and DEA Form 224, as necessary to continue the ordering of controlled substances without disruption; and (ii) in order for New Operator to obtain all pharmacy licenses, permits, certifications, payor agreements, provider numbers, and provider agreements, including Medicare and Medicaid, necessary to occupy and operate the Business from all appropriate governmental agencies, without materially interrupting the business or operation of the Business.

Section 2.2     Accounts Receivable.

(a)     Transferor has transferred to New Operator all right, title and interest in and to all accounts receivable with respect to the Business that relate to all periods as of or prior to the Closing Date.

(b)     Payments received by Transferor or New Operator after the Closing Date with respect to the Business from third party payors, such as the Medicare Program (including Medicare Part D), the Medicaid Program, the Veteran's Administration, or managed care companies or health maintenance organizations, or customers and applicable guarantors shall be handled as follows:

In the event that such payments are received by Transferor, Transferor shall promptly remit such payments to New Operator not later than five (5) business days after such payment is received, and until so forwarded, Transferor shall hold such payments in express trust for the benefit of New Operator, and in the event that such payments are received by New Operator, New Operator shall retain such payments.

(c)     Transferor shall forward promptly to New Operator via email or facsimile any and all remittance advices, explanation of benefits, denial of payment notices, and all other correspondence received by Transferor that relate to accounts receivable transferred to New Operator within four (4) business days following receipt in accordance with the notice provisions contained herein. It is expressly agreed and understood that any payments received by Transferor after the Closing Date shall not be the property of Transferor.

(d)     For a period of three hundred sixty-five (365) days after the Closing Date, New Operator and Transferor shall, upon reasonable notice and during normal business hours and subject to all applicable laws, including HIPAA, have the right to inspect all receipts and other books and records of the other Party in order to confirm the other Party's compliance with the obligations imposed on it under this Section.

(e)     If either Party fails to forward to the other Party any payment received by such Party in accordance with the terms of this Section 1.2, the other Party shall be entitled (among all other remedies allowed by law and this Agreement) to interest on the amount owed at the rate of 12% per annum, simple interest, until such payment has been paid.  The payment of any interest imposed under this Section 1.2(e), if any, shall be made together with the underlying payment therefore.

Section 2.3     Access to Records.

(a)     On the Closing Date, Transferor shall, to the extent permitted by applicable law, including HIPAA, allow all of the business records that are in Transferor's possession or control to remain at the Business or if requested by New Operator, to the extent such records are in an electronic format, provide such information directly to New Operator for downloading by New Operator on its computer system, and New Operator shall assume the obligations to retain the records in accordance with the applicable state laws and regulations.

(b)     Subsequent to the Closing Date, New Operator shall, to the extent permitted by applicable law, including HIPAA, allow Transferor and its agents and representatives to have reasonable access to (upon reasonable prior notice and during normal business hours), and to make copies of, at Transferor's expense, the books and records and supporting material of the Business relating to any period prior to the Closing Date, to the extent reasonably requested by Transferor, which access shall not unreasonably disrupt New Operator's operations.

(c)     Transferor shall, to the extent permitted by applicable law, including HIPAA, be entitled to remove the originals of any records delivered to New Operator for purposes of litigation involving a patient or employee to whom such record relates if an officer of a court of competent jurisdiction or agency official certifies that such original must be produced in order to comply with applicable law or the order of a court of competent jurisdiction in connection with such litigation, and Transferor shall provide New Operator with a complete copy of such records prior to its removal at Transferor's reasonable cost and expense and as a condition precedent to receiving such original record. Any record so removed shall promptly be returned to New Operator following its use.

(d)     New Operator agrees to maintain the Business Records that have been received by New Operator from Transferor or otherwise, including patient records, for (i) a period of six (6) years from the date of the record or (ii) such period as required under applicable law, whichever is longer.

(e)     New Operator agrees to use commercially reasonable efforts to cooperate with Transferor in complying with any request for information from third-parties as may be reasonably requested by Transferor.

Section 2.4     <u>Post-Closing Date Billing</u>.  New Operator shall have no obligation to take any affirmative collection efforts on behalf of Transferor, other than to provide Transferor access to such records (subject to all applicable privacy laws and in accordance with <u>Section 1.4(b)</u> herein above) that Transferor may reasonably need to collect such amounts.

Section 2.5     <u>Certain Definitions</u>.  For purposes of this Agreement, the following terms shall have the meanings set forth herein below:

(a)     "<u>HIPAA</u>" means the *Health Insurance Portability and Accountability Act of 1996*, Public Law 104-191, and the regulations promulgated thereunder, and as amended by the HITECH Act.

(b)     "<u>HITECH Act</u>" means the *Health Information Technology for Economic and Clinical Health Act* provisions of the *American Recovery and Reinvestment Act of 2009*, Public Law 111-005, and the regulations promulgated thereunder.

# ARTICLE III

## <u>Miscellaneous</u>

This Agreement, together with Schedules and Exhibits identified herein, (a) may be executed in any number of counterparts, each of which, when executed and delivered (including delivery by pdf or other electronic communication) by both Parties to this Agreement, shall be deemed to be an original, and all of which counterparts together shall constitute one and the same instrument; (b) shall be governed by and construed under the laws of the State of Delaware without regard to principles of conflicts of laws; (c) constitutes the entire agreement of the Parties with respect to its subject matter, superseding all prior oral and written communications, proposals, negotiations, representations, understandings, courses of dealing, agreements, contracts, and the like between the Parties in such respect; (d) may be amended, modified, or terminated only by a writing signed by both Parties; (e) contains headings only for convenience, which headings shall not be used in construction of this Agreement; and (f) shall bind and inure to the benefit of the Parties and their respective successors and assigns.  The terms and provisions of this Agreement shall survive the Closing.  If any particular provision of this Agreement shall be determined by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.  If any such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement.  The word "including" shall mean including without limitation.  All notices, requests and other communications hereunder shall be deemed to have been duly given if in writing and either delivered personally, sent by nationally recognized overnight delivery service or mailed by postage prepaid registered or certified U.S. mail, return receipt requested, to the address below or to such other addresses as may be designated in writing by notice given hereunder, and shall be effective upon personal delivery or upon delivery by registered or

certified U.S. mail or one business day following deposit with a nationally recognized overnight delivery service:

To Transferor:                              Family Pharmacy, Inc.
                                            4101 N. State Hwy NN
                                            Ozark, MO 65721
                                            Attention:  Tim Stallion, CFO
                                            Phone: (417) 551-0311

To New Operator:                            J M Smith Corporation
                                            101 W. St. John Street
                                            Spartanburg, SC 29306
                                            Attn: Philip J. Ryan, III, Chief Financial Officer
                                            Fax:  (864) 582-6585

*[Signatures on next page]*

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed on the date first above written.

**NEW OPERATOR:**

**SMITH MANAGEMENT SERVICES, LLC**

By: _____
Name: _____
Title: _____


**TRANSFEROR:**

**FAMILY PHARMACY, INC.**

By: _____
Name: _____
Title: _____


**FAMILY PHARMACY OF STRAFFORD, INC.**

By: _____
Name: _____
Title: _____


**FAMILY PHARMACY OF MISSOURI, LLC**

By: _____
Name: _____
Title: _____


**FAMILY PROPERTY MANAGEMENT, LLC**

By: _____
Name: _____
Title: _____


**HEALTHTAC LOGISTICS, LLC**

By: _____
Name: _____
Title: _____


*[Signature page to the Operations Transfer Agreement]*

## SCHEDULE 1.1(b)

## FORM OF BILLING SERVICES AGREEMENT

**THIS BILLING SERVICES AGREEMENT** (this "<u>Agreement</u>") is dated as of _____, 2018, by and among (a) Family Pharmacy, Inc., a Missouri corporation; (b) Family Pharmacy of Strafford, Inc., a Missouri corporation; (c) Family Pharmacy of Missouri, LLC, a Missouri limited liability company; (d) Family Property Management, LLC, a Missouri limited liability company; (e) HealthTAC Logistics, LLC, a Missouri limited liability company (the entities in clause (a)–(e), collectively, the "<u>Transferor</u>"); and (f) Smith Management Services, LLC, a Delaware limited liability company ("<u>New Operator</u>") (Transferor and New Operator are sometimes each referred to hereunder individually as a "<u>Party</u>" and collectively as the "<u>Parties</u>") (each a "<u>Party</u>" and collectively, the "<u>Parties</u>").

WHEREAS, the Parties are parties to that certain Operations Transfer Agreement (the "<u>OTA</u>") dated even herewith, by and between Transferor and New Operator. Each capitalized term not otherwise herein defined shall have the meaning given to it in the OTA.

WHEREAS, the Parties anticipate that during the Interim Billing Period (as defined in <u>Section 1.1(b)</u> of the OTA), New Operator may provide services to beneficiaries of Medicare, Medicaid, and other applicable government reimbursement programs (collectively the "<u>Government Programs</u>") and applicable commercial health plans (collectively with the Government Programs, the "<u>Third Party Payors</u>"); and

WHEREAS, New Operator seeks Transferor's assistance and cooperation to enable New Operator to provide services to beneficiaries of the Third Party Payors during the Interim Billing Period, to the extent not prohibited by applicable law, and Transferor is willing to provide such assistance and cooperation pursuant to the terms and conditions of this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Transferor and New Operator agree as follows:

1.      To the extent permitted by applicable law, during the Interim Billing Period, New Operator may submit claims for services provided by New Operator at the Business for which payment will be made to Transferor's lock-box account(s) or pursuant to existing electronic funds transfer arrangement(s) with the Third Party Payors.  Transferor shall not close or otherwise modify such lock-box account(s) or the electronic funds transfer arrangement(s) with the Third Party Payors until New Operator has been enrolled or received approvals to participate in all of such Third Party Payor health plans.

2.      Amounts received pursuant to Section 1 of this Agreement shall not be considered Transferor's Accounts Receivable, but shall be considered New Operator's Accounts Receivable, under the OTA. It is expressly agreed and understood that any such amounts received by Transferor after the Closing Date shall not be the property of Transferor and shall be considered New Operator's Accounts Receivable as described in the preceding sentence.

3.      Transferor shall turn over to New Operator funds received by Transferor in connection with this Agreement in accordance with the provisions of <u>Section 1.2(b)</u> of the OTA.

4.      This Agreement shall automatically terminate upon the expiration of the Interim Billing Period.

5.       New Operator shall be responsible for the accuracy of all billing requests in the Interim Billing Period to the extent arising from services or products provided by New Operator during the Interim Billing Period, and New Operator will indemnify and hold Transferor harmless for any liability arising from such billing requests and from any acts by New Operator taken pursuant to the Limited Power of Attorney.

*[Signatures on next page]*

IN WITNESS WHEREOF, Transferor and New Operator have caused this Agreement to be executed as a sealed instrument as of the date first above written and effective as of the Closing Date set forth in the OTA.

**NEW OPERATOR:**

**SMITH MANAGEMENT SERVICES, LLC**

By: _____
Name: _____
Title: _____

**TRANSFEROR:**

**FAMILY PHARMACY, INC.**

By: _____
Name: _____
Title: _____

**FAMILY PHARMACY OF STRAFFORD, INC.**

By: _____
Name: _____
Title: _____

**FAMILY PHARMACY OF MISSOURI, LLC**

By: _____
Name: _____
Title: _____

**FAMILY PROPERTY MANAGEMENT, LLC**

By: _____
Name: _____
Title: _____

**HEALTHTAC LOGISTICS, LLC**

By: _____
Name: _____
Title: _____

*[Signature page to the Billing Services Agreement]*

**SCHEDULE 1.1(c)**

**LIMITED POWER OF ATTORNEY**
**FOR USE OF DEA REGISTRATION NUMBER**
**AND DEA ORDER FORMS**

Each of (a) Family Pharmacy, Inc., a Missouri corporation; (b) Family Pharmacy of Strafford, Inc., a Missouri corporation; (c) Family Pharmacy of Missouri, LLC, a Missouri limited liability company; (d) Family Property Management, LLC, a Missouri limited liability company; and (e) HealthTAC Logistics, LLC, a Missouri limited liability company (the entities in clause (a)–(e), collectively, the "Transferor") is or was licensed to operate a pharmacy under the laws of the State of Missouri, and is authorized to sign the current applications for registration and licensure as the registrant under the Controlled Substances Act of the United States.

The Transferor has made, constituted, and appointed, and hereby makes, constitutes and appoints Smith Management Services, LLC, a Delaware limited liability company ("Agent"), as the Transferor's agent and true and lawful attorney-in-fact for the purposes of utilizing Transferor's controlled substances registrations, DEA registration, and any other registrations required under the laws of the United States or the State of Missouri to continue all pharmacy operations of Transferor at the locations set forth on the attached Exhibit A (the "Pharmacies").  Agent may act in this capacity until such time as Agent or its designee obtains new controlled substances registrations, DEA registrations and such other registrations for the Pharmacies but in no event shall this Limited Power of Attorney continue more than ninety (90) calendar days after the effective date of the transaction, unless, despite Agent's good faith efforts, the issuance of new controlled substances registrations, DEA registrations and such other registrations for the Pharmacies is delayed by the applicable governmental agency.  The Transferor further grants this Limited Power of Attorney to Agent to act as the true and lawful agent and attorney-in-fact of the Transferor, and to act in the name, place, and stead of the Transferor, to execute applications for books of official order forms, and to sign such order forms in requisition for controlled substances, in accordance with Section 308 of the Controlled Substances Act (21 U.S.C. § 828) and Part 1305 of Title 21 of the Code of Federal Regulations.

The Transferor recognizes that it remains legally responsible for the controlled substances registrations and DEA and other registrations issued to it, during the period in which this Limited Power of Attorney is in effect.  Therefore, the Transferor grants this Limited Power of Attorney based upon the following covenants and warranties of Agent: (a) Agent shall follow and abide by and comply with all federal and state laws governing the regulation of controlled substances and pharmacy practice at all times while utilizing this limited power of attorney; (b) Agent, or its designee, shall make application for and pursue its own DEA and other registrations which are required for the distribution of pharmaceuticals, including but not limited to controlled substances, at the Pharmacies, as soon as practicable; and (c) Agent shall indemnify and hold Transferor harmless from all claims, judgments, expenses, costs, liability, and all amounts whatsoever arising out of or related to Agent's utilization of Transferor's controlled substances registrations, DEA registration and any other pharmacy registrations utilized by Agent or its designee hereunder.  Notice of any claims or liability arising pursuant to or in connection with this Power of Attorney, and the control of any litigation relating thereto, shall be governed by the terms and provisions of that certain Asset Purchase Agreement dated as of [_____], 2018, by and among Agent and the Transferor.

IN WITNESS WHEREOF, Transferor and Agent have executed this Limited Power of Attorney For Use of DEA Number and DEA Order Forms as of _____, 2018.

**AGENT:**

**SMITH MANAGEMENT SERVICES, LLC**

By: _____
Name: _____
Title: _____


**TRANSFEROR:**

**FAMILY PHARMACY, INC.**

By: _____
Name: _____
Title: _____


**FAMILY PHARMACY OF STRAFFORD, INC.**

By: _____
Name: _____
Title: _____


**FAMILY PHARMACY OF MISSOURI, LLC**

By: _____
Name: _____
Title: _____


**FAMILY PROPERTY MANAGEMENT, LLC**

By: _____
Name: _____
Title: _____


**HEALTHTAC LOGISTICS, LLC**

By: _____
Name: _____
Title: _____


*[Signature page to the Limited Power of Attorney]*

## **EXHIBIT A**

Pharmacy Locations

**[To be provided]**

**<u>Exhibit E</u>**

**Bidding Procedures**

**(See attached)**

## BIDDING PROCEDURES

These bidding procedures (the "<u>Bidding Procedures</u>") govern (a) whether an Auction (defined below) of all or substantially all of the assets of the Debtors (defined below) is necessary in connection with their respective Chapter 11 bankruptcy cases; (b) the conduct of the Auction, if any; and (c) the other matters described herein, including the process for conducting due diligence on the Debtors and their assets, the prerequisites for qualifying to place bids in the Auction, if any, and the treatment and disposition of Bid Deposits (defined below).

These Bidding Procedures are an integral part of that certain Asset Purchase Agreement, dated _____, 2018 (the "<u>Stalking Horse Agreement</u>"), by and among (a) Smith Management Services, LLC (the "<u>Stalking Horse Bidder</u>"), (b) Family Pharmacy, Inc., (c) Family Pharmacy of Strafford, Inc., (d) Family Pharmacy of Missouri, LLC, (e) Family Property Management, LLC, and (f) HealthTAC Logistics, LLC (the entities listed in clauses (b)–(f), the "<u>Debtors</u>"), a copy of which Stalking Horse Agreement is attached to the Sale Motion **[Docket No. [_____]]** the Debtors filed in the United States Bankruptcy Court for the Western District of Missouri (the "<u>Bankruptcy Court</u>") on [_____], 2018.  Each capitalized term used but not defined in these Bidding Procedures shall have the meaning assigned to such term in the Stalking Horse Agreement.

1.1    <u>Diligence</u>

.

(a)    From and after the Bankruptcy Court's entry of the Bidding Procedures Order, the Debtors may grant any Person (each a "<u>Potential Bidder</u>") that is interested in acquiring the Purchased Assets access to information about the Debtors and the Purchased Assets for the purpose of facilitating a Potential Bidder's due diligence investigation (a "<u>Diligence Investigation</u>"), subject to the terms of these Bidding Procedures.  As a condition to such access, each Potential Bidder must enter into a confidentiality agreement, which agreement shall be in form and substance satisfactory to the Debtors (each a "<u>Confidentiality Agreement</u>").  In addition, each Potential Bidder must also have the financial means to consummate a transaction described in a Bid (defined below) that constitutes a Qualified Bid (defined below), as determined by the Debtors in their sole discretion.  Each Potential Bidder shall promptly provide any information the Debtors reasonably request to verify such Potential Bidder's credit, financial resources, and ability to close an Alternative Transaction.

(b)    Potential Bidders who are performing a Diligence Investigation may request a reasonable amount of additional and supplemental diligence information in addition to the diligence information made available under <u>Section 1.1(a)</u> of these Bidding Procedures.  The Debtors may, in their sole discretion, provide additional diligence to such Potential Bidder.  If the Debtors intend to provide any diligence information to a Potential Bidder that has not been provided to the Stalking Horse Bidder, they shall concurrently provide such materials to the Stalking Horse Bidder.

(c)    Each Potential Bidder agrees to conduct its Diligence Investigation as quickly and efficiently as possible and in no event later than the Bid Deadline (defined below).  The Debtors may bar a Potential Bidder from submitting a Bid if such Potential Bidder does not comply with this <u>Section 1.1</u> of these Bidding Procedures.

1.2    <u>Bidders and Bidding</u>.

(a)    <u>Potential Bidder Qualification Process</u>.

i.    <u>Qualified Bidder</u>.  To participate in any Auction, a Potential Bidder must be a Qualified Bidder.  A "<u>Qualified Bidder</u>" means a Potential Bidder that has submitted a Qualified Bid (as defined below) and that the Debtors determine, in their sole discretion, will be able to consummate the transactions described in the Qualified Bid and would reasonably be expected to consummate the transactions described in the Qualified Bid as its terms may be improved at an Auction, if any.

ii.    <u>Bidder Information</u>.  To help the Debtors determine if a Potential Bidder is a Qualified Bidder, such Potential Bidder shall provide the following (the "<u>Bidder Information</u>") to the Persons identified in Section 1.2(b)(i) of these Bidding Procedures on or prior to the Bid Deadline (defined below): (A) copies of current audited financial statements (or such other form of financial disclosure and credit support or enhancement acceptable to the Debtors) of such Potential Bidder or of those entities that will guarantee the obligations of such Potential Bidder; (B) contact names and numbers for verification of all financing sources (whether internal, external or both); (C) evidence of such Potential Bidder's internal resources and, if applicable, if external financing or resources are involved, proof of unconditional debt or equity funding commitments; (D) information that sets forth adequate assurances of future performance with respect to such Potential Bidder under Section 365 of the Bankruptcy Code, in a form approved by the Debtors and sufficient to allow the Debtors to serve such information on counterparties to the Executory Assigned Contracts; and (E) information about the identities of such Potential Bidder and its Affiliates and their respective businesses and any Person on whose behalf such Potential Bidder is directly or indirectly acting.  Each Potential Bidder shall also promptly provide the financial and other information the Debtors reasonably request from time to time to help the Debtors determine if a Potential Bidder is a Qualified Bidder.

(b)    <u>Bid Qualification</u>.  To be eligible to participate in any Auction, a Potential Bidder (other than the Stalking Horse Bidder) must submit a bid, offer or proposal (a "<u>Bid</u>") that meets each of the following requirements (a Bid meeting such requirements, a "<u>Qualified Bid</u>"):

i.    <u>Bid Deadline</u>.  Such Bid has been submitted with all information required by this Section 1.2(b) of these Bidding Procedures to each of the following Persons on or prior to 5:00 p.m. **[local time in Springfield, Missouri,]** ten (10) days prior to the Auction (the "<u>Bid Deadline</u>"): (A) **[Debtors' counsel]**; (B) counsel to the Stalking Horse Bidder, Arnall Golden Gregory LLP, 171 17th Street NW, Suite 2100, Atlanta, GA 30363, ATTN: Darryl S. Laddin; and (C) **[other counsel]**.

ii.    <u>Same or Better Terms</u>. Such Bid provides for the Potential Bidder's irrevocable agreement to purchase of all of the Purchased Assets on terms that are substantially the same as or better than the terms of the Stalking Horse Agreement (except with respect to the Purchase Price in the Stalking Horse Agreement and except as otherwise required herein).  The Bid shall include (A) a term sheet that describes all material terms of such Bid and (B) (x) an executed asset purchase agreement for the Purchased Assets (the "<u>Bidder Agreement</u>"), as well as all schedules and executed copies of any exhibits thereto or other transactions documents, and (y) a marked copy of the Bidder Agreement that shows any differences between the Stalking Horse Agreement and the Bidder Agreement.  Without limiting anything in this Section 1.2(b)(ii), the Bid may not be subject to any conditions to Closing other than those expressly set forth in the Stalking Horse Agreement (including, without limitation, any condition based on (x) obtaining financing or any internal or credit committee approval, (y) meeting any syndication requirement or (z) the outcome of a Diligence Investigation or similar review).

iii.    <u>Amount of Bid</u>.  Such Bid provides that the purchase price payable for the Purchased Assets is no less than $8,600,000.00 (the "<u>Initial Bid Price</u>") and provides for such Potential Bidder's assumption of all of the Assumed Liabilities (including, upon closing, payment in full in cash of all of the DIP Facility Obligations).  Credit bids by a Person other than the Stalking Horse Bidder must include a cash component sufficient to pay the DIP Facility Obligations, the Break-up Fee and Expense Reimbursement required to be paid to the Stalking Horse Bidder under the Bidding Procedures Order. The Initial Bid Price is equal to the sum of the following: (A) the Cash Portion of the Purchase Price, plus (B) the Break-Up Fee, plus (C) the maximum amount of Reimbursable Expenses, plus (D) a $100,000.00 initial overbid minimum.  Such Bid shall include, if applicable, information sufficient to allow the Debtors to evaluate the value of any non-cash consideration (other than the assumption of the Assumed Liabilities) the Potential Bidder proposes to pay for the Purchased Assets. Any disputes related to the ability of a Potential Bidder to provide a credit bid for all or any portion of its Bid, including Initial Bid Price, or any Overbid (as defined below) shall be decided by the Bankruptcy Court.

iv.    <u>Bid Deposit</u>. Such Bid is delivered concurrently with such Potential Bidder's payment of an earnest money deposit (the "<u>Bid Deposit</u>") to the Debtors.  The Bid Deposit shall be $1 million, except as described in the following sentence.  If all or any portion of a Bid is comprised of a credit bid in an amount that is greater than $5 million, then the Bid Deposit shall be at least $500,000.00. The Potential Bidder (including any Potential Bidder that is credit bidding in an amount that is greater than $5 million) shall pay the Bid Deposit to the Debtors by wire transfer of immediately available funds denominated in U.S. Dollars.  The Debtors shall hold all Bid Deposits in accordance with the terms of <u>Section 1.5</u> and <u>Section 1.7</u> of these Bidding Procedures.

v.    <u>Irrevocability of Bid</u>. Such Bid must be irrevocable until the later of (A) the end of the Auction and (B) the selection of Bids other than such Bid as the Winning Bid or Back-up Bid; <u>provided</u>; <u>however</u>, such Bid may be improved at any Auction.

vi.    <u>Evidence of Authority</u>.  Such Bid includes evidence reasonably satisfactory to the Debtors of (A) the authorization from such Potential Bidder's board of directors (or comparable governing body) with respect to the submission of the Bid, the execution and delivery of the Bidder Agreement and the consummation of the transactions contemplated by the Bidder Agreement and (B) the authority of the Potential Bidder (or its representatives on its behalf) to bid and act in accordance with its Bid at any Auction.

vii.    <u>Certain Limitations</u>.  Such Bid may not provide for the Debtors' payment of any break-up fees, expense reimbursements, topping fees, termination fees or any similar payment by or obligation of the Debtors or include any of <u>Section 2.4</u>, <u>Section 2.5</u>, <u>Section 8.1</u> or <u>Section 8.3</u> (or any terms substantially similar to those of any of such sections) of the Stalking Horse Agreement.

viii.    <u>Miscellaneous</u>.  Such Bid shall also include (A) a duly executed copy of the Confidentiality Agreement; (B) a list of all executory contracts and unexpired leases of the Debtors that the Potential Bidder wishes to have assumed and assigned to it pursuant to the Bidder Agreement and the corresponding Cure Amounts; (C) a certification that such Potential Bidder has not engaged in any collusion with respect to any of the matters contemplated by these Bidding Procedures; and (D) all additional information and materials reasonably requested by the Debtors.

(c)    <u>Review of Bids and Bidder Information</u>.  The Debtors shall review as promptly as possible (but in any event no later than five (5) Business Days before the Auction) (i) each Bid to determine if such Bid is a Qualified Bid and (ii) all Bidder Information to determine if the Potential Bidder that provided such Bidder Information is a Qualified Bidder.  If the Debtors determine, after

consultation with the official committee of unsecured creditors (if one is formed), that a Bid is a Qualifying Bid and that the Potential Bidder that submitted such Bid is a Qualified Bidder, the Debtors shall notify such Potential Bidder as soon as reasonably practicable (but in any event no later than three (3) Business Days before the Auction) that such Potential Bidder is a Qualified Bidder and shall concurrently notify the Stalking Horse Bidder and provide the Stalking Horse Bidder with the terms of such Qualified Bid.  Before or after the determinations described in the preceding sentence, the Debtors may discuss, negotiate or seek clarification of any Bid or Qualified Bid from a Potential Bidder or Qualified Bidder, as applicable.  For the avoidance of doubt, such discussions, negotiations or clarifications shall not affect the irrevocability of any Bid or Qualified Bid, as applicable.  If the Debtors receive a Qualifying Bid from two or more Qualified Bidders, the Debtors shall determine the Qualified Bid that is the highest and best Qualified Bid (the "Auction Baseline Bid").

(d)     Certain Rights of Stalking Horse Bidder.  Notwithstanding anything in these Bidding Procedures to the contrary, the Stalking Horse Bidder constitutes a Qualified Bidder, has submitted a Qualified Bid and shall be entitled to participate in any Auction in accordance with these Bidding Procedures.  No Person may waive compliance with any term of these Bidding Procedures without the prior written consent of the Debtors and the Stalking Horse Bidder.

1.3     Agreements of Potential Bidders.  By submitting a Bid, each Potential Bidder (including each Potential Bidder that becomes a Qualified Bidder) agrees to all terms of these Bidding Procedures. Each Potential Bidder other than the Stalking Horse Bidder waives the right to assert or seek payment of any break-up fees, expense reimbursements, topping fees, termination fees or any similar payment or other post-filing claim, including administrative expense claims, and to the extent otherwise applicable, a substantial contribution claim under Section 503 of the Bankruptcy Code, with respect to its Bid or the Auction.  All Potential Bidders consent to the core jurisdiction of the Bankruptcy Court to enter a final order or final orders, which shall be binding in all respects, in any way related to the Sale Motion, the Bidding Procedures, the Stalking Horse Agreement or the Auction, and waive any right to a jury trial in connection with any disputes relating to the Sale Motion, the Bidding Procedures, the Stalking Horse Agreement, the Auction or the construction and enforcement of these Bidding Procedures, the Stalking Horse Agreement or any Bidder Agreement, except in each case as may be otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bidder.

1.4     Auction.

(e)     Auction Determination.  If a Qualified Bidder other than the Stalking Horse Bidder submits a Qualified Bid, then (and only then) the Debtors shall conduct an auction for the sale of the Purchased Assets (the "Auction").  If no Qualified Bidder other than the Stalking Horse Bidder has submitted a Qualified Bid, then the Stalking Horse Bidder shall be deemed the Prevailing Bidder, no Auction shall occur, and the Debtors shall use their best efforts to seek entry of the Sale Order and consummate the transactions contemplated by the Stalking Horse Agreement as soon as possible.

(f)     Auction Information and Access.  If an Auction is required under Section 1.4(a) of these Bidding Procedures, then the Debtors shall, as soon as reasonably practicable (but in any event no later than 5:00 p.m. **[local time in Springfield, Missouri,]** two (2) Business Days before the Auction), provide each Qualified Bidder with terms of the Qualified Bids submitted by any other Qualified Bidders and shall clearly identify the Auction Baseline Bid.  The Debtors shall hold the Auction at [_____] a.m. **[local time in Springfield, Missouri,]** on [_____], 2018 **[NTD: To be a specific date no later than July 16, 2018]**, at the offices of Debtors' counsel in [_____] and shall give notice of the Auction to all Qualified Bidders and counsel for the official committee of unsecured creditors (if one is formed), counsel for Bank of Missouri, and counsel for Cardinal Health.  No Person other than the

Debtors, the Qualified Bidders and **[_____]** and their respective representatives may attend the Auction.

(g)    <u>Auction Requirements</u>.   All Qualified Bidders must appear in person to participate at the Auction, or through their respective duly authorized representatives.  The Debtors and their respective representatives shall conduct, direct, and preside over the Auction, subject to these Bidding Procedures.  The following rules will apply to the Auction:

i.    the Auction will be conducted in view and within earshot of all of the Qualified Bidders, and only the Qualified Bidders and their respective representatives shall be entitled to: (A) make any Overbids (defined below) at the Auction; (B) make statements on the record at the Auction; or (C) otherwise participate at the Auction in any manner whatsoever;

ii.    each Qualified Bidder shall be required to represent that it has not engaged in any collusion with respect to the bidding or any matter contemplated by these Bidding Procedures;

iii.    each bid at the Auction (each "<u>Overbid</u>"), whether such Overbid is the form of cash bid, a credit bid or some combination, must (A) exceed the Auction Baseline Bid by at least $100,000.00 (in the case of the first Overbid) or exceed the immediately preceding Overbid by at least $50,000.00 (in the case of all Overbids after the first Overbid) and (B) be irrevocable until the conclusion of the Auction and the selection of the Winning Bid (defined below) and the Back-up Bid (defined below) (and thereafter in accordance with these Bidding Procedures if such Overbid is the Winning Bid or the Back-up Bid);

iv.    no Overbid may be made after the Auction closes;

v.    no Overbid may change the terms of the Qualified Bid of the Qualified Bidder that submitted it, except that such an Overbid may change the terms of such a Qualified Bid if the changes, viewed as a whole, improve the terms of such Qualified Bid;

vi.    the Auction shall proceed as reasonably determined by the Debtors, provided such determinations are consistent with these Bidding Procedures and the Stalking Horse Agreement;

vii.    the Auction shall be transcribed or videotaped, at the Debtors' election;

viii.    the Debtors may, in their reasonable business judgment, make one or more continuances of the Auction to, among other things: (A) facilitate discussions among the Debtors and the Qualified Bidders; (B) allow Qualified Bidders to consider how they wish to proceed; and (C) give Qualified Bidders the opportunity to provide the Debtors additional evidence of their ability to consummate the transactions contemplated by their respective Qualified Bids (as they are improved based on Overbids);

ix.    the Stalking Horse Bidder shall be given the final opportunity to Overbid in each round of bidding;

x.    if the Debtors reasonably determine that the Stalking Horse Bidder's Overbid is not the Winning Bid, the Stalking Horse Bidder shall be given an additional opportunity to submit an Overbid;

xi.    the Auction shall continue until all Qualifying Bidders have been given a reasonable opportunity to submit an Overbid to the Auction Baseline Bid or most recent Overbid, as applicable, and the Debtors reasonably determine that the Auction Baseline Bid or any Overbid, as applicable, is the highest or otherwise best offer (the "Winning Bid");

xii.    in selecting the Winning Bid (the Person submitting the same, the "Prevailing Bidder"), the Debtors shall consult with the official committee of unsecured creditors (if one has been formed) and may consider all relevant factors, including, without limitation, the amount of the Auction Baseline Bid or any Overbid, as applicable, the form and total amount of consideration being offered, a Qualified Bidder's ability to consummate the transactions contemplated by its Qualified Bid (as it may be improved at the Auction) and the speed of a potential closing; and

xiii.    the Debtors shall close the Auction once they determine that there are no additional Overbids, and they have selected the Prevailing Bidder and the Back-up Bidder, and otherwise identified the Winning Bid.

(h)    Bid Protections.  If the Stalking Horse Bidder is not the Prevailing Bidder, and the Debtors consummate an Alternative Transaction with the Prevailing Bidder, the Prevailing Bidder and the Debtors shall consistent with the Bidding Procedures Order cause the Stalking Horse Bidder to be paid the Break-up Fee and the Reimbursable Expenses at or prior to the closing of the Alternative Transaction.

1.5    <u>Back-up Bidder</u>.  Notwithstanding anything in these Bidding Procedures or any Bidder Agreement to the contrary, if an Auction is conducted, the party with the Qualified Bid that is next highest or otherwise best relative to the Winning Bid at the Auction (as reasonably  determined by the Debtors after consultation with the official committee of unsecured creditors, if one is formed) shall be required to serve as a back-up bidder (the "<u>Back-Up Bid</u>" and the "<u>Back-Up Bidder</u>," respectively) and keep such Bid or Overbid (as the case may be) open and irrevocable until 11:59 p.m. **[local time in Springfield, Missouri,]** on the date that is the earlier of (the "<u>Outside Back-up Date</u>"): (i) sixty (60) days after the date that the Sale Order is entered and (ii) the closing of the Alternative Transaction with the Prevailing Bidder; <u>provided</u>, <u>however</u>, that the Stalking Horse Bidder shall only be required to serve as the Back-Up Bidder to the extent required by the Stalking Horse Agreement.  If, after the Sale Hearing and before the Outside Back-up Date, the Prevailing Bidder fails to consummate the Alternative Transaction with the Debtors because of a breach or failure to perform on the part of such Prevailing Bidder, the Debtors shall retain the Bid Deposit of the Prevailing Bidder and shall designate the Back-Up Bidder as the new "Prevailing Bidder," and the Debtors shall consummate an Alternative Transaction with the Back-Up Bidder or the transactions contemplated by the Stalking Horse Agreement if the Stalking Horse Bidder is the Back-Up Bidder (as the case may be) as contemplated by the Back-Up Bid without further order of the Bankruptcy Court.

1.6    <u>Sale Hearing</u>.  The Winning Bid and the consummation of the transactions contemplated by the Winning Bid will be subject to approval by the Bankruptcy Court at the Sale Hearing.  The Sale Hearing shall be held at the Bankruptcy Court at [_____] on [_____], 2018 **[NTD: To be a specific date no later than July 17, 2018]**.  The Debtors, the Back-up Bidder, and the Prevailing Bidder shall use their respective commercially reasonably efforts to obtain the Bankruptcy Court's approval of the Winning Bid and the Back-up Bid at the Sale Hearing as soon as possible and to cause the Bankruptcy Court to enter the Sale Order.

1.7    <u>Disposition of Bid Deposits</u>.

(i)    <u>Bid Deposits</u>.  Except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bidder, the Bid Deposits of all Qualified Bidders shall be held in segregated accounts by the Debtors but shall not become property of their respective bankruptcy estates.

(j)    <u>Return of Bid Deposits of Potential Bidders</u>.  The Bid Deposits of each Potential Bidder that does not become a Qualified Bidder shall be returned promptly after the determination that such Person will not become a Qualified Bidder.

(k)    <u>Return of Bid Deposits of Qualified Bidders</u>.  The Bid Deposits of each Qualified Bidder that is neither the Prevailing Bidder nor the Back-up Bidder shall be retuned no later than three (3) Business Days after the Auction.

(l)    <u>Return of Bid Deposit of the Back-up Bidder</u>.  If the Back-up Bidder is not designated as the Prevailing Bidder in accordance with these Bidding Procedures, the Bid Deposit of the Back-Up Bidder shall be returned to the Back-up Bidder no later than three (3) Business Days after the Outside Back-up Date.  If the Back-up Bidder is designated as the Prevailing Bidder in accordance with these Bidding Procedures and the Back-up Bidder and the Debtors consummate the Alternative Transaction or the transactions contemplated by the Stalking Horse Agreement if the Stalking Horse Bidder is the Back-up Bidder (as the case may be) in accordance with these Bidding Procedures and the Sale Order, the disposition of the Back-up Bidder's Bid Deposit shall be governed by the terms of the Bidder Agreement between the Back-up Bidder and the Debtors or the Stalking Horse Agreement if the Stalking Horse Bidder is the Back-up Bidder (as the case may be).  If the Back-up Bidder is designated as the Prevailing Bidder in accordance with these Bidding Procedures and the Back-up Bidder and the

Debtors do not consummate the Alternative Transaction or the transactions contemplated by the Stalking Horse Agreement if the Stalking Horse Bidder is the Back-up Bidder (as the case may be) in accordance with the Sale Order because of a breach or failure to perform on the part of such Back-up Bidder, (i) such Back-up Bidder's Bid Deposit shall be forfeited to the Debtors and (ii) except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bidder, all parties in interest, and the Debtors specifically, reserve the right to seek all available damages caused by the default of such defaulting Back-up Bidder.

(m)     <u>Return of Bid Deposit of the Prevailing Bidder</u>.  If the Prevailing Bidder and the Debtors consummate the Alternative Transaction or the transactions contemplated by the Stalking Horse Agreement if the Stalking Horse Bidder is the Back-up Bidder (as the case may be) in accordance with these Bidding Procedures and the Sale Order, the disposition of the Prevailing Bidder's Bid Deposit shall be governed by the terms of the Bidder Agreement between the Prevailing Bidder and the Debtors or the Stalking Horse Agreement if the Stalking Horse Bidder is the Back-up Bidder (as the case may be). If the Prevailing Bidder and the Debtors do not consummate the Alternative Transaction or the transactions contemplated by the Stalking Horse Agreement if the Stalking Horse Bidder is the Back-up Bidder (as the case may be) in accordance with these Bidding Procedures and the Sale Order because of a breach or failure to perform on the part of such Prevailing Bidder, (i) such Prevailing Bidder's Bid Deposit shall be forfeited to the Debtors and (ii) except as otherwise provided in the Stalking Horse Agreement with respect to the Stalking Horse Bidder, all parties in interest, and the Debtors specifically, reserve the right to seek all available damages caused by the default of such defaulting Prevailing Bidder.

## FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

THIS FIRST AMENDMENT (this "Amendment") is made and entered into as of the 12th day of July, 2018, by and among Smith Management Services, LLC, a Delaware limited liability company ("Purchaser"); Family Pharmacy, Inc., a Missouri corporation ("FP"); Family Pharmacy of Strafford, Inc., a Missouri corporation ("FP Strafford"); Family Pharmacy of Missouri, LLC, a Missouri limited liability company ("FP Missouri"); Family Property Management, LLC, a Missouri limited liability company ("FP Management"); HealthTAC Logistics, LLC, a Missouri limited liability company ("FP Logistics") (FP, FP Strafford, FP Missouri, FP Management and FP Logistics are collectively referred to as the "Sellers"); and Lynn A. Morris and Janet Morris, individual residents of the State of Missouri (collectively, the "Morrises" and individually "L. Morris" and "J. Morris").

## RECITALS

A.    In accordance with that certain Asset Purchase Agreement dated as of May 7, 2018, between Purchaser and Sellers, Sellers agreed to sell to Purchaser the Purchased Assets.

B.    It is in the interest of and to the benefit of the Morrises, as the direct or indirect owners or other affiliates of the Sellers, to enter into this Amendment.

C.    Purchaser, Sellers and the Morrises desire to amend the Agreement as more particularly set forth in this Amendment.

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained herein, the parties agree as follows:

1.    Defined Terms.  Initially capitalized terms used in this Amendment which are not otherwise defined by this Amendment are used with the same meaning ascribed to such terms in the Agreement.

2.    Amendment.  The parties amend the Agreement as follows:

(a)    In addition to the deliveries and actions required from or by the Sellers in accordance with the Agreement, the Morrises agree to execute and deliver such bills of sales, assignment and assumption agreements, certificates of title and other appropriate instruments of assignment and conveyance, in form and substance reasonably satisfactory to Purchaser, conveying title to the Purchased Assets free and clear of all liens in, to or with respect to which any of the Morrises may have any right, title or interest.

(b)    To the extent requested by Purchaser, the Sellers and the Morrises shall cause the tenant's interests in the Leases identified as items 4, 15 and 17 of Schedule 3.14(d) to be assigned to the appropriate Seller identified in such schedule by the execution and delivery on or before July 23, 2018, of assignment documents in form and

substance reasonably satisfactory to Purchaser, and Sellers shall provide to Purchaser a copy of such assignment documents as so executed and delivered on or before July 23, 2018.

(c)     The Sellers and the Morrises shall exercise their respective diligent and commercially reasonable efforts to facilitate the execution and delivery by Purchaser and the applicable respective lessors of amendments or agreements to amend those Leases designated by Purchaser to address extensions of the duration of the tenancy under such Lease(s) and such other matters which Purchaser deems important to the on-going operation of the Business from and after the Closing, with each such amendment being effective only upon the occurrence, and each such agreement to amend being no longer effective in the absence, of the Closing under the Agreement.

(d)     The Sellers and the Morrises agree to exercise their respective diligent and commercially reasonable efforts to facilitate the identification and transfer of all such Government Programs and Private Programs, and any associated Contracts, in which any Seller participates, directly or indirectly, through any such Seller's relationship with Pharmacy Providers of Oklahoma.

(e)     The Sellers and the Morrises represent a warrant to Purchaser that the lessor under the Lease identified at item 11 of Schedule 3.14(d) as "Morris Properties" is neither directly nor indirectly related to the Morrises.

(f)     From and after Closing, the Morrises shall execute and deliver such documents and take such other actions that shall be reasonably requested by one or more of the other parties to carry out the transactions contemplated by this Agreement or the Collateral Agreements.

3.     Miscellaneous.  This Amendment is not intended to amend or modify the terms of the Agreement except as expressly set forth herein, and all other terms of the Agreement shall remain in full force and effect and shall unaffected hereby.  This Amendment may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one in the same agreement, with the same effect as if signatures thereto were in the same agreement.  This Amendment shall be effective and binding on all parties when each of the undersigned has executed and delivered a counterpart of this Amendment.  Any signature received by electronic mail in a portable document format shall be deemed to be an original and shall be fully binding on the parties.

[Signature page follows]

12357807v1

IN WITNESS WHEREOF, the Purchaser, Sellers and Morrises have executed and delivered this Amendment as of the date first written above.

PURCHASER:

SMITH MANAGEMENT SERVICES, LLC

By: _____
Name: PHILIP J RYAN
Title: SECRETARY

FAMILY PHARMACY, INC.

By: _____
Name: Lynn A. Morris
Title: President - Owner

FAMILY PHARMACY OF STRAFFORD, INC.

By: _____
Name: Lynn A. Morris
Title: President - Owner

FAMILY PHARMACY OF MISSOURI, LLC

By: _____
Name: Lynn A. Morris
Title: President - Owner

FAMILY PROPERTY MANAGEMENT, LLC

By: _____
Name: Lynn A. Morris
Title: President - Owner

HEALTHTAC LOGISTICS, LLC

By: _____
Name: Lynn A. Morris
Title: President - Owner

**MORRISES:**

Name:  Lynn A. Morris

Name:  Janet Morris