Case 18-60521-can11   Doc 375   Filed 07/03/19   Entered 07/03/19 18:59:40   Desc
Main Document    Page 1 of 18

# UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN RE: | ) |
| | ) |
| **Family Pharmacy, Inc.,** *et al.*, | ) Case No. 18-60521 |
| | ) |
| **Debtors.** | ) |

## MEMORANDUM OPINION

The issue in this case is whether the debtors and a junior lender have met their burden of rebutting a senior lender's claim to postpetition default interest[1] under its loan documents and applicable Missouri and federal bankruptcy law. For the reasons set forth below, the court finds and concludes they have.[2]

## JURISDICTION

This matter concerns the allowance or disallowance of The Bank of Missouri's claims against the bankruptcy estate and is therefore a statutorily core proceeding under 28 U.S.C. § 157(b)(2)(B). Specifically, because this proceeding involves a determination of the Bank's entitlement to default interest on claims to be paid from estate assets, it "falls squarely into the category of matters that 'necessarily be resolved in the claims allowance process.'"[3] Therefore, this court has the authority to enter a final judgment or order in this matter.[4]

---

[1] Sometimes referred in the case law as "pendency interest." *See In re Consumers Realty & Development Company*, Inc., 238 B.R. 418, 425 (B.A.P. 8th Cir. 1999). For a general overview, *see* David M. Neff, *Default Interest Claims Make Gains,* 38 AMER. BANKR. INST. J. 12, 64-65 (June 2019); Megan W. Murray, *Carrot or a Stick: When is Default Interest Not Equitable?*, 15 AMER. BANKR. INST. J. 5, 26-27 (May 2019).
[2] Fed. R. Civ. Proc. 52, as incorporated by Fed. R. Bankr. Proc. 7052.
[3] *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. 729, 735 n. 2 (Bankr. S.D. N.Y. 2019) (quoting *Stern v. Marshall*, 564 U.S. 462, 499, 131 S.Ct. 2594 (2011)).
[4] *Id.* (citations omitted). No party has contested jurisdiction or the court's authority to make a final decision.

## FINDINGS OF FACT

The facts are not disputed.[5]

Debtor Family Pharmacy, Inc. and four related entities[6] (collectively, the "Debtors") filed voluntary petitions for chapter 11 relief on April 30, 2018. Debtors' assets, consisting primarily of inventory, equipment and real estate used in operating pharmacies in southwest Missouri, were encumbered by three secured creditors, in order of priority: The Bank of Missouri, owed approximately $11 million; Cardinal Health, $1 million, and J M Smith Corp., $18 million. From the inception, all parties[7] agreed that the assets needed to be sold at a § 363[8] auction sale. Smith, the Debtors' primary supplier, agreed to advance debtor-in-possession ("DIP") financing[9] and to serve as the so-called stalking horse bidder for the sale with an $8 million opening bid.

The court entered orders authorizing the DIP financing with Smith, approving Debtors' interim and final motions for use of DIP financing and use of cash collateral, and

---

[5] The parties agreed to submit this matter to the court based on a joint stipulation of fact and agreed admissibility of certain documents in addition to live testimony from the Bank's loan officer. *Joint Stipulation of Facts and Agreement Related to the Admissibility of Certain Exhibits By and Between Debtors, JM Smith Corporation, Smith Management Services, LLC, and the Bank of Missouri* (ECF No. 328) ("Joint Stipulation"). The court hereby incorporates the parties' Joint Stipulation as part of its findings of fact.
[6] Family Pharmacy, Inc. (Case No. 18-60521); Family Pharmacy of Missouri, LLC (Case No. 18-60523); HealthTAC Logistics, LLC (Case No. 18-60526); Family Property Management, LLC (Case No. 18-60525); and Family Pharmacy of Strafford, Inc. (Case No. 18-60524).
[7] There were only two unsecured creditors in the first filed Schedule E/F: a $101,000 intercompany claim and a small utility bill. The parties stipulated that unsecured claims are now in excess of $300,000. *Joint Stipulation* (ECF No. 328) at ¶ 28.
[8] 11 U.S.C. § 363. Unless otherwise indicated, all future statutory references will be to title 11, 11 U.S.C. §§ 101 *et seq.*
[9] 11 U.S.C. § 364.

approving bid procedures for the sale.[10] After a robust auction, the court in early August 2018 – some three months after the case was filed – approved Smith as the final bidder with a cash bid of $13,975,000.[11] Under the terms of the order approving the sale, the principal claims of the Bank[12] and Cardinal Health and other fees and closing costs were paid at closing, leaving sales proceeds of approximately $556,040.59.[13]

The Bank, as an oversecured creditor, then filed its motion under § 506(b) seeking allowance of $18,271.79 in postpetition attorneys fees plus $442,843.51 in interest calculated at an 18% default rate.[14] The Debtors and Smith[15] jointly objected to the Bank's motion. The parties stipulated that Smith is owed approximately $16 million on account of its undersecured secured claim.[16]

At the hearing on the Bank's motion, the Debtors and Smith agreed to allowance of the Bank's attorney fees, leaving only the default interest at issue. Additional findings of fact will be made below.

---

[10] ECF Nos. 37, 90 and 111. The Bank did object to certain provisions in the bidding procedures, but did not object to the assets being sold. ECF No. 84.

[11] ECF No. 215.

[12] The parties stipulate that that the Bank was paid $11,300,477.87, consisting of principal, estimated nondefault interest, attorneys fees and other charges, less a pro-rated portion of the broker fee.

[13] *Joint Stipulation* (ECF No. 328) at ¶¶ 26-27.

[14] *Motion for Order Allowing Secured Claims* (ECF No. 281). The court notes that the Motion requested $513,761 in interest but, at the hearing, the parties clarified that the Debtors had since paid the Bank $70,756.20 in outstanding postpetition nondefault contract interest and that the Bank was only seeking the $442,843.51 of default interest. With respect to attorney fees, the Motion was orally amended at the hearing to increase the request for attorney fees from $12,511.89 to $18,843.51.

[15] Smith transferred its claims to Smith Management Services, LLC after the sale, but for the sake of convenience, the court will continue to refer to this party as "Smith."

[16] *Joint Stipulation* (ECF No. 328) at ¶ 28.

3

## DISCUSSION

*Postpetition Interest Under the Bankruptcy Code, Generally*

As a general rule, interest ceases to accrue on prepetition debts once a bankruptcy filing occurs.[17] This rule is codified in § 502(b)(2) of the Bankruptcy Code, which disallows a claim for "unmatured interest."[18] As the Eighth Circuit has explained, "[t]he general rule 'disallowing' the payment of unmatured interest out of the assets of the bankruptcy estate is a rule of administrative convenience and fairness to all creditors. The rule makes it possible to calculate the amount of claims easily and assures that creditors at the bottom rungs of the priority ladder are not prejudiced by the delays inherent in liquidation and distribution of the estate."[19]

The Bankruptcy Code provides, however, an exception to the general rule for oversecured creditors. Section 506(b) provides:

> To the extent that an allowed secured claim is secured by property the value of which after recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided under the agreement or State statute under which such claim arose.[20]

This section authorizes an oversecured creditor, such as The Bank of Missouri here, to recover postpetition interest and reasonable attorney fees on its claims.[21]

---

[17] *In re 1111 Myrtle Ave. Group, LLC*, 598 B.R. 729, 735 (Bankr. S.D. N.Y. 2019) (citing *Vanston Bondholders Protective Comm. v. Green*, 329 U.S. 156, 163, 67 S.Ct. 237 (1946)). The reasons for this general rule include (1) the preservation and protection of the estate for the benefit of all interests; (2) avoidance of the administrative inconvenience of continuously recomputing claims; and (3) avoidance of the gain or loss as between creditors whose obligations bear different interest rates or who receive payment at different times. *Id.*
[18] 11 U.S.C. § 502(b)(2); *see also 1111 Myrtle Ave.*, 598 B.R. at 735.
[19] *In re Hanna*, 872 F.2d 829, 830 (8th Cir. 1989).
[20] 11 U.S.C. § 506(b).
[21] *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026 (1989); *In re Payless Cashways, Inc.*, 287 B.R. 482, 484-85 (Bankr. W.D. Mo. 2002).

In *United States v. Ron Pair Enterprises, Inc.*, the Supreme Court held that § 506(b) allows oversecured creditors to recover "fees, costs and charges" – such as attorney fees – only if provided for in the parties' agreement and only if the court determines they are reasonable. In contrast, recovery of postpetition interest by oversecured creditors is "unqualified."[22] Although the right of oversecured creditors to postpetition interest is "unqualified," the Supreme Court did not set the rate at which an oversecured creditor is entitled to recover postpetition interest.[23] When the debtor-creditor relationship is governed by contract, as is the case here, most courts presumptively apply the contract rate of interest under § 506(b),[24] although – as discussed more fully below – the contract rate must be enforceable under state law, and many courts also consider equitable factors in their § 506(b) analysis.[25] In addition, most courts have at least recognized a presumption of allowability of default rates of interest, provided, again, that the rate is enforceable under applicable nonbankruptcy law.[26]

---

[22] *Ron Pair*, 489 U.S. at 241, 109 S.Ct. at 1030 (1989). *See also Rake v. Wade*, 508 U.S. 464, 113 S.Ct. 2187 (1993) (holding that § 506(b) requires allowance of postpetition interest with respect to the entire claim of an oversecured creditor, including arrearages, if the contract provides for it).

[23] *In re White*, 260 B.R. 870, 879 (B.A.P. 8th Cir. 2001).

[24] *See White*, 260 B.R. at 879 ("[M]ost courts have concluded that postpetition interest should be computed at the rate provided in the agreement, or other applicable law, under which the claim arose – the so-called contract rate of interest.") (quoting 3 Lawrence P. King, Collier on Bankruptcy ¶ 506.04[2][b][i] (15th ed. rev. 2000)). *See also KCC-Leawood Corp. Manor I v. Travelers Ins. Co.*, 117 B.R. 969, 973 (W.D. Mo. 1989) ("It is well established that, pursuant to section 506(b) of the Bankruptcy Code, an oversecured creditor is entitled to the contract rate of interest, 'up to the point where it, when added to total principal to be paid and allowable costs, equals the value of the collateral.'") (citation omitted); *In re Bryant*, 439 B.R. 724, 739 (Bankr. E.D. Ark. 2010) ("The rate of interest to be paid is the contract rate") (citations omitted); *In re Johnston*, 44 B.R. 667, 669 (Bankr. W.D. Mo. 1984) ("As the statute makes clear, if the creditor is oversecured, the rate of interest to be paid is the contract rate."). *See also In re Lockard*, 234 B.R. 484, 494 (Bankr. W.D. Mo. 1999) ("The Bank is entitled to its contract rate of interest through the date of confirmation . . . .").

[25] *See, e.g.*, *In re Northern Beef Packers L.P.*, 2015 WL 2236185 at *11 (Bankr. D. S.D. April 10, 2015) ("Many courts presumptively apply the rate set forth in the parties' agreement or applicable nonbankruptcy law. Others apply the rate set forth in the parties' agreement or applicable nonbankruptcy law *unless* the court finds equity dictates a different rate.") (emphasis in original; citations omitted).

[26] *See* 4 Collier on Bankruptcy ¶ 506.04[2][b][ii] (Richard Levin & Henry J. Sommer eds., 16th ed.) ("In general, just as there is no express mechanism in section 506(b) for adjusting basic interest rates, courts should be reluctant to infer

*Summary of the Parties' Arguments*

The parties agree that the Bank is an oversecured creditor to the extent of the remaining sales proceeds pursuant to § 506(b). The parties also agree that the Bank's various loan documents provide for nondefault contract interest of between 3.65 – 7.5%[27] and a default rate of 18% and are subject to applicable Missouri law. The parties even agree that the Debtors were current on all loans to the Bank as of the date of filing.[28] Where the parties disagree, however, is (1) whether the Debtors were in default postpetition; and (2) if so, whether application of an 18% default rate under the circumstances of this case should be disallowed as either a penalty or for equitable reasons under Missouri or federal bankruptcy law.  There are no Eighth Circuit cases on point.[29]

*I. Was the Default Rate Triggered Under the Terms of the Bank's Loan Documents?*

The court makes additional findings with respect to whether the Debtors were in default as follows:

Between July 21, 2014 and March 1, 2018, the Bank of Missouri made eight loans to the Debtors.[30] The individual promissory notes have non-default interest rates ranging between 3.65 – 7.5%.[31] Other than these non-default interest rates and the maturity dates

---

a mechanism for disallowing default rates of interest under federal law. Rather, the allowability of the rate should turn instead on applicable nonbankruptcy law.").

[27] *Motion for Allowance of Secured Claims* (ECF No. 281) at ¶ 13.

[28] Prior to the filing of the bankruptcy cases, on October 27, 2017 and March 14, 2018, the Bank sent the Debtors four notices of certain non-monetary defaults. These notices did not invoke the default interest rate and the Bank concedes that it does not rely on these prepetition non-monetary defaults or notices as triggering events for default interest.

[29] The Eighth Circuit, in discussing whether interest accrued postpetition on a state court judgment provided for under a chapter 13 plan, states generally that federal law determines creditor's rights after filing of a bankruptcy petition. *In re Brooks*, 323 F.3d 675, 678 (8th Cir. 2003), citing *Bursch v. Beardsley & Piper*, 971 F.2d 108, 114 (8th Cir. 1982).

[30] *Joint Stipulation* (ECF No. 328) at ¶ 1.

[31] *Motion for Allowance of Secured Claims* (ECF No. 281) at ¶ 13.

6

which vary from loan to loan, the relevant terms of the notes are, for all practical purposes, identical. They provide that "[u]pon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days. . . ." A "default" as relevant here is in turn triggered when the "Borrower fails to make any payment when due under this Note." Importantly, the notes contain no right to cure for a payment default.

The notes also contain a standard acceleration clause providing that the Bank "may" declare the entire unpaid principal balance due "upon default," in addition to a so-called ipso facto clause under which insolvency or bankruptcy constitutes an event of default. The notes provide that they are to be construed in accordance with Missouri law and contain cross-default and cross-collateralization provisions. Payments on each of the notes were due on the first of each month.

As noted previously, the Debtors were current on all the Bank's loans when they filed bankruptcy on April 30, 2018. The loan payments on most of the loans were due under the terms of the various notes the next day, May 1.[32] Except for a payment on one small vehicle loan (which the Debtor's chief reorganizing officer testified was made to the Bank in error), the Debtors did not make the May 1 or subsequent regular monthly payments. The Bank did not, however, send a notice of default or otherwise send notice of acceleration when the Debtors failed to make the postpetition payments, and otherwise made no claim for default interest until just before the auction sale was set to occur, several months later.

---

[32] On several of the loans, the next payment was not due until June 1, 2018. *See* Exhibit 1, § 506(b) Motion (ECF No. 281).

7

*Discussion Concerning Whether the Debtors Defaulted*

The Bank argues that under the plain terms of its loan documents, the Debtors defaulted when they failed to make loan payments, even when those payments became due postpetition. The Debtors and Smith vehemently disagree; they argue that the Debtors were prevented by the filing from making loan payments such that any payment default should be excused and that the ipso facto clause is not enforceable.[33] They point out that the Bank did not send a notice of payment default or even accelerate. The Bank retorts that nothing in the Bankruptcy Code or case authorities prevents a debtor in bankruptcy from continuing to make payments to creditors; that it did not have to affirmatively accelerate to trigger default; and that the cases so requiring[34] are distinguishable based on the terms of the loan documents in those cases.

Surprisingly, the case law is murky. The court found cases for the broad proposition that some (but not all) ipso facto clauses are not enforceable in bankruptcy[35] as well as for the proposition that bankruptcy effectuates an acceleration (and perhaps a default).[36] Many of the cases are distinguishable based on differences in the terms of the loan documents, the applicable state law, or precedential circuit decisions, and whether the debtor was

---

[33] It is not clear to the court that the Bank is actually relying on the ipso facto clause as a basis for triggering a default since it was not raised in the motion or in the Bank's briefing.

[34] *See First Bank Investors' Trust v. Tarkio College*, 129 F.3d 471, 475 (8th Cir. 1997), affirming *In re Tarkio College*, 195 B.R. 424, 429 (Bankr. W.D. Mo. 1996); *In re Payless Cashways, Inc.*, 287 B.R. 484-85 (Bankr. W.D. Mo. 2002).

[35] *See generally* Paul Rubin, *Not Every Ipso Facto Clause is Unenforceable in Bankruptcy*, 32 AMER. BANKR. INST. J. 12 (Aug. 2013).

[36] *See, e.g., In re Premier Entertainment Biloxi LLC*, 445 B.R. 582, 630 (S.D. Miss. 2010) (noting a distinction between the automatic acceleration effectuated by the Bankruptcy Code and an automatic acceleration effectuated by a contractual provision; the automatic acceleration by the Code allows a lender to file a proof of claim for the unmatured principal amount of the debt under § 502 without violating the stay, but such acceleration is "relatively limited' and does not change the maturity date of the debt); *In re AMR Corporation*, 485 B.R. 279 (Bankr. S.D.N.Y. 2013) (discussion of acceleration in context of lender's entitlement to make-whole premiums).

already in default before the bankruptcy was filed. Although common sense might dictate that a debtor should not continue to make regular payments to secured creditors absent court order in a bankruptcy case (otherwise, what is the point of filing bankruptcy?) the parties did not cite and the court did not find any cases quite on point.

One thing is clear (and is a fact that the Bank conveniently ignores): the court's interim and final cash collateral orders authorized the Debtors only to make such payments as were listed in the budget, and regular loan payments to the Bank were simply not there. The Bank, despite having participated in both the interim and final cash collateral hearings, did not object to the Debtors' motions nor to the court's orders. The existence of a valid, final court order barring the Debtors from making loan payments to the Bank would seem to be a valid legal defense to the Bank's argument that the Debtors defaulted by failing to make payments (but, again, the parties cited the court no authority one way or the other).

Given, however, that the court ultimately concludes default interest is not allowable under the circumstances of this case, the court need not decide the issue. The court will presume for purposes of this opinion that the Bank became entitled to default interest when the Debtors did not pay the loan payments when they came due on May 1, the day after the bankruptcy was filed.[37]

***II. Should the Default Rate of Interest be Disallowed as a Penalty?***

The Bank argues that Missouri law governs, such that this court has no power or authority to disallow default interest to which it is entitled under the terms of its loan

---

[37] The court is mindful that determining a default was triggered under these circumstances may have ramifications in other contexts, such as a lender's entitlement to make-whole premiums. In the absence of clear authority cited by the parties or guidance by the Eighth Circuit, the court believes it is not necessary to reach this determination.

documents. The Bank argues that the Eighth Circuit has not found such power or authority to exist in the bankruptcy court or in the Bankruptcy Code and that the other Circuits that have found so – including the Second, Third, Fifth, and Ninth, among others – are wrong. The Bank misconstrues both Missouri and federal bankruptcy law. But, taking Missouri law first.

It is true that Missouri law generally authorizes parties to a business loan to "agree in writing to any rate of interest, fees, and other terms and conditions in connection with" the loan.[38] Thus, an 18% interest rate (whether default or otherwise) in connection with a business loan, such as the one here, is not *per se* illegal under Missouri law.

Missouri law distinguishes, however, between liquidated damages clauses, which are valid, and penalty clauses, which are not:[39]

> A penalty provision specifies a punishment for default, while liquidated damages are provided as a measure of compensation that, at the time of contracting, the parties agree will represent damages in the event of a breach. For a damage clause to be valid as setting liquidated damages, the amount fixed as damages must be a reasonable prediction for the harm caused by the breach and the harms must be of a kind difficult to estimate accurately. In determining whether an agreement sets forth liquidated damages or a penalty, this Court looks to the intent of the parties as determined from the contract as a whole.[40]

While it is not necessary to actually prove damages in the same amount as stated in a liquidated damages provision, without evidence of damages, a liquidated damages clause actually becomes a penalty and is unenforceable.[41] "For the amount to be a reasonable

---

[38] Mo. Rev. Stat. § 408.035.
[39] *Phillips v. Missouri TLC, LLC*, 468 S.W.3d 398, 407 (Mo. Ct. App. S.D. 2015) (citation and internal quotation marks omitted).
[40] *Id.* (quoting *City of Richmond Heights v. Waite*, 280 S.W.3d 770, 776 (Mo. Ct. App. E.D. 2009)).
[41] *Id.*

forecast of damages, it must not be unreasonably disproportionate to the amount of harm anticipated when the contract was made."[42]

The evidence in this case convincingly proved that the Bank's 18% default rate constituted an unenforceable penalty under Missouri law. The Bank's loan documents provided that a default occurs upon a failure to make a payment; that such default is not curable; and that default interest automatically is triggered without notice or acceleration. The court would be speculating if it concluded that this language was written to avoid the highly publicized result in two cases, *Tarkio College* and *Payless Cashways*, in which the bankruptcy court held (and in *Tarkio*, the Eighth Circuit affirmed) that a bank was not entitled to default interest when it failed to give notice of default and acceleration.

But no matter. The effect is stark: if the Debtors were one day late or missed one payment – say the $765.45 payment due on Loan # 3291, a $26,000 car loan bearing 3.650% interest – then 18% default interest would be triggered not only on that loan but on the entire $11 million of debt, and without notice or opportunity to cure.

The Bank adduced no evidence showing that a spread of between 10.5 and 14.35 between contract and default rate was either intended or a reasonable prediction for any harm caused by a presumed default, and in fact adduced no evidence of any harm. Although the Bank's counsel argued the Bank was "harmed" because it paid a portion of the broker's fee, the Bank agreed to do so. The Bank also benefitted from the broker's services, in that

---

[42] *Paragon Group, Inc. v. Ampleman*, 878 S.W.2d 878, 881 (Mo. Ct. App. E.D. 1994) (citation and internal quotations omitted). *See also Kansas City Live Block 139 Retail, LLC v. Fran's K.C., Ltd*, 504 S.W.3d 725, 731 (Mo. Ct. App. W.D. 2016).

11

those services resulted in a successful auction turning the Bank from an undersecured creditor (with the $8 million opening bid) to an oversecured creditor[43] paid in full, including postpetition non-default interest and all attorney fees, expenses and costs.[44]

If acceleration without clear and unequivocal notice is considered by Missouri courts to be "a harsh remedy" as the Eighth Circuit said in *Tarkio*,[45] default interest on an entire $11 million obligation, without notice and opportunity to cure, for missing a small car loan payment most certainly is. More importantly, such a result has no correlation to damages the Bank would incur as the result of missing such a payment. Taken together, the court concludes that, under Missouri law, these provisions would be deemed an unenforceable penalty. The Bank's argument that Missouri law gives it unfettered rights to charge what interest it wants is simply not an accurate portrayal of Missouri law.

### III. Should the Default Rate of Interest be Disallowed for Equitable Reasons?

Even if the cumulative effect of the notes' terms do not amount to an unenforceable penalty under Missouri law, the court finds that the equities of this case under applicable federal bankruptcy law mandate disallowance of default interest on the Bank's claim.

In the bankruptcy court's opinion in *In re Tarkio College*, Judge Federman did not ultimately decide whether default interest was permitted because his decision rested on the conclusion that the lender had not properly accelerated and thus did not trigger the default

---

[43] *See* § 506(a)(1) (value determined in light of the purpose of the valuation and of the proposed use or disposition of the collateral).
[44] According to the Bank's Exhibit 2, the Bank was paid $241,790.17 in estimated nondefault interest on August 31, 2018, the date of closing, plus $38,154.65 in attorney fees. With the addition of the $70,756.20 in nondefault interest the Debtors paid after this Motion was filed, the Bank's total postpetition nondefault interest was $312,546.37 for the approximately four months from filing to closing, compared to a total of $755,389.88 the Bank would have been paid if the court allowed default interest.
[45] *Tarkio College*, 129 F.3d at 475.

interest pursuant to the particular loan documents in that case.[46] He stated in dicta, however, that "the language of section 506(b) may give courts flexibility to adjust a default interest rate based on the equities of the case."[47]

The Eighth Circuit affirmed Judge Federman's decision, but did not have to decide the equities issue because, one, it agreed with Judge Federman that the default rate had not been triggered by the payment default without acceleration and, two, the lender had not raised the application of default interest upon maturity (which had occurred postpetition) below.[48] The Eighth Circuit hinted, however, that if that issue had been properly raised and developed in the record below, Judge Federman may have properly considered the reasonableness of the default rate.[49]

The Eighth Circuit has not definitively answered that question post-*Tarkio*. All circuits that have decided the issue either hold outright or at least suggest that courts may consider equitable factors in allowing postpetition interest at the contract rate under § 506(b). According to the Seventh Circuit, although creditors have a right to bargained-for postpetition interest, "[w]hat emerges from the post-*Ron Pair* decisions is a presumption in favor of the contract rate subject to rebuttal based upon equitable considerations."[50]

---

[46] *Tarkio College*, 195 B.R. 428-29.
[47] *Id.* at 428.
[48] *Tarkio College*, 129 F.3d at 477.
[49] *Id.* at 477-78 ("Similarly, the record has not been developed with respect to the reasonableness of the post-maturity interest rate of sixteen percent under 11 U.S.C. § 506(b)."). *See also In re Payless*, 287 B.R. at 489 (stating, without deciding, that "cases hold that section 506(b) contemplates the award of interest to an oversecured creditor at the contract rate *barring equitable considerations or restrictions under state law*.") (emphasis added). *Compare, In re Smith,* 2008 WL 185784 at *8 (Bankr. W.D. Mo. Jan. 19, 2008) (Judge Federman holding, in the context of a loan that had been accelerated prepetition, that "the plain language of § 506(b) allows oversecured creditors to receive their contract rate of postpetition interest, regardless of any reasonableness or equitable considerations" but holding that the 4% default rate there was nevertheless reasonable and equitable).
[50] *In re Terry Ltd. Partnership*, 27 F.3d 241, 243 (7th Cir. 1994) (citations omitted).

The Second, Third, Fifth, and Ninth Circuits all likewise hold that equitable factors may be considered.[51] Most recently, the First Circuit held, interpreting *Ron Pair*, that "the statutory language does not dictate that bankruptcy courts look to the applicable contract provisions, if any, when computing postpetition interest."[52] Rather, the First Circuit said, "courts are largely in agreement that, although the appropriate rate of pendency interest is within the limited discretion of the court, where the parties have contractually agreed to interest terms, those terms should presumptively apply *so long as they are enforceable under state law and equitable considerations do not dictate otherwise*."[53]

Although courts may disagree on who has the burden of proof and what factors to consider, the overwhelming majority of courts – including all circuits to have addressed it – recognize the bankruptcy courts' equitable power to disallow interest under certain circumstances. The Bank makes no persuasive argument why the Eighth Circuit would likely buck this consensus; in fact, the Eighth Circuit often observes that federal bankruptcy

---

[51] *See In re Milham*, 141 F.3d 420, 423 (2d Cir. 1998) ("The appropriate rate of pendency interest is therefore within the limited discretion of the court. . . . Most courts have awarded pendency interest at the contractual rate; but nevertheless, however widespread this practice may be, it does not reflect an entitlement to interest at the contractual rate.") (citation omitted); *In re Nixon*, 404 Fed. Appx. 575, 578-79 (3d Cir. 2010) (acknowledging that entitlement to postpetition interest under § 506(b) is unqualified, but holding that "the Bankruptcy Code does not specify, however, that an oversecured creditor must receive interest indefinitely or at the contract rate"; rather, "[i]n several instances, courts have used equitable considerations to modify the interest awarded oversecured creditors within the parameters of the code.") (citations omitted); *In re Laymon*, 958 F.2d 72, 75 (5th Cir. 1992) (adopting a "flexible approach," allowing a determination of whether the higher default rate "would produce an inequitable or unconscionable result. . .") (citations omitted); *In re Southland Corp.*, 160 F.3d 1054, 1059-60 (5th Cir. 1998) ("The cases find that a default interest rate is generally allowed, unless the higher rate would produce an inequitable . . . result.") (citation and internal quotations omitted); *Gen. Elec. Cap. Corp. v. Future Media Prods, Inc.*, 536 F.3d 969, 974 (9th Cir. 2008) (adopting the rule "adopted by the majority of federal courts" that the "bankruptcy court should apply a presumption of allowability for the contracted for default rate, provided that the rate is not unenforceable under applicable nonbankruptcy law") (citation and internal quotations omitted), *amended on other grounds*, *Gen. Elec. Cap. Corp. v. Future Media Prods, Inc.*, 547 F.3d 956, 961 (9th Cir. 2008).

[52] *In re SW Boston Hotel Venture, LLC*, 748 F.3d 393, 413 (1st Cir. 2014).

[53] *Id.* (emphasis added; internal quotation marks and ellipses omitted) (citing *Gen. Elec. Cap. Corp. v. Future Media Prods, Inc.*, 536 F.3d 969, 974 (9th Cir. 2008); *In re Terry L.P.*, 27 F.3d 241, 243 (7th Cir 1994) (additional citations omitted)).

14

law supersedes parties' state law rights and has stated so in a similar context involving postpetition interest.[54]

The Supreme Court reasoned in *Ron Pair* that § 506(b)'s phrase "interest on such claim" is not limited by the subsequent language "provided for under the agreement under which claim arose."[55] "As such, the Court concluded that, unlike an award of fees, costs or charges, the grant of interest is not dictated by the loan agreement,"[56] which is why many courts only presume the contract rate applies, subject to other considerations. The court therefore concludes that although a party's contract default rate of interest is presumed enforceable, the presumption may be rebutted and default interest disallowed when allowance would be inequitable.

***Consideration of Equitable Factors***

The balancing of the equities does not require resort to a particular list of factors; rather, "[t]he very purpose of equity is to exalt the individual circumstances of a case of law's hard and fast rules."[57] Courts nonetheless have considered several factors when deciding whether to enforce a contractual default rate as opposed to the nondefault rate, including:

(1) The difference between the default and nondefault rates;

(2) The reasonableness of the differential between the rates;

---

[54] *In re Brooks*, 323 F.3d at 678 (federal law determines creditor's rights after filing of petition). *In re Black Ranches, Inc.*, 362 F.2d 8, 16 (8th Cir. 1966) (allowance of postpetition interest under the Bankruptcy Act, observing "that there may be situations where the higher rate would produce an inequitable or unconscionable result, so as to require disallowance thereof"); *see also Vanston Bondholders Protective Committee v. Green*, 329 U.S. 156 (1946) (under the Act; whether interest allowed on claims has long been decided by federal law).
[55] *In re Johnson*, 184 B.R. 570, 572 (Bankr. D. Minn. 1995).
[56] *Id.*
[57] *In re Southland Corp.*, 160 F.3d at 1060.

15

(3) The relative distribution rights of other creditors and whether enforcement of the higher rate will do injustice to the concept of equitable distribution of the estate's assets; and

(4) The purpose of the higher interest rate. Specifically, does the default rate merely compensate the creditor for any loss resulting from the nonpayment of the principal at maturity, or is it a disguised penalty?[58]

The debtor (or objecting party) bears the burden of rebutting the presumption that the contract rate of interest applies post-petition.[59]

Here, for the same reasons discussed above, the spread between the nondefault and default rates of interest are between 10.5 and 14.35, which is a significant spread and not within a range other courts have found reasonable,[60] and there was no evidence regarding the purpose of such a difference.

More importantly, allowing the Bank default interest in effect gives it a windfall at the expense of Smith. At the default rate, the Bank claims $755,389.88 in postpetition interest for four months, compared to $312,546.37 at the nondefault rate – a difference of almost $443,000.[61] Yet it was through Smith's efforts as DIP financer and stalking horse bidder that the Bank went from being an undersecured creditor as of filing to an oversecured creditor paid in full. Despite many hearings on cash collateral and sale matters, the Bank did not assert that its loans were in default or that it was claiming default interest,

---

[58] *In re Johnson,* 184 B.R. at 573 (citations omitted).
[59] *1111 Myrtle Ave.* 598 B.R. at 736. *But see In re Jack Kline Co., Inc.*, 440 B.R. 712, 732-33 (Bankr. S.D. Tex. 2010) (oversecured creditors have the ultimate burden of showing they are entitled to pospetition fees).
[60] *E.g., In the Matter of Bowles Sub Parcel C, LLC v. Wells Fargo Bank, N.A.*, 2015 WL 7573189 (D. Minn. 2015) (5% spread not so high as to raise equitable concerns), citing *In re 785 Partners LLC*, 470 B.R. 126, 134 (Bankr. S.D.N.Y. 2012) (upholding default rate of 10% where the non-default rate was 5%); *In re Cliftondale Oaks, LLC*, 357 B.R. 883 (Bankr. N.D. Ga. 2006) (5% spread reasonable); *In re Route One West Windsor LP*, 225 B.R. 76, 92 (Bankr. D.N.J. 1998) (upholding 8% spread); *In re White*, 88 B.R. 494, 498 (Bankr. D. Mass. 1988) (affirming default rate of 19.25% where non-default rate was 14.25%).
[61] See fn. 44, *infra.*

16

until just before the auction sale occurred. The Bank's attorney fees invoices reveal that the Bank's attorneys did not begin to research or discuss entitlement to default rate interest until August 9, 2018, the day after the court entered its order approving the auction and when it then became clear that there were a number of other interested bidders.[62]

Without question, Smith is a sophisticated creditor who made loans to the Debtors that were lower in priority to the Bank's liens, and "[t]he general rule of freedom of contract includes the freedom to make a bad bargain."[63] But the Bank's loan provisions allowing default interest without notice greatly compounds the injustice to the concept of equitable distribution of the estate's assets in this particular bankruptcy case; neither the Debtors nor the court – and certainly not Smith or the other bidders –were aware that the Bank intended to claim default interest at the time the court approved the bid procedures and granted the motion to sell. The Debtors and Smith assert that the Bank's failure to notify the court and parties earlier of its intent to assert default interest amounts to a "waiver" of its rights to do so. Regardless of whether a lender may waive default interest under Missouri law, the court concludes the Bank's delay in making known to the court and the parties that it intended to claim more than $400,000 of default interest in lieu of nondefault interest weighs heavily against the Bank.

The Fifth Circuit has held that when a bank ambushes other parties by claiming default interest, this may be a factor to be considered.[64] The court does not mean to suggest

---

[62] Bank Exhibit1 Itemized Fee Statements. The statements also show that the Bank's attorneys spent $8,702 in fees researching the issue, which is being paid out of the estate.
[63] *R&R Land Dev., L.L.C v. Am. Freightways, Inc*, 389 S.W.3d 234, 243-44 (Mo. Ct. App. 2012) (citing *Byrd v. Liesman*, 825 S.W.2d 38, 41 (Mo. Ct. App. 1992)).
[64] *In re Southland Corp.,* 160 F.3d at 1060.

that ambush was on the Bank's mind, but it was clear at the hearing that at least the Debtors and Smith had been surprised by the late claim to more than $400,000 in additional interest.[65] And it appears to the court that the Bank's claiming of default interest came only as an afterthought, once it became apparent that the auction might be more of a success than anyone anticipated.

## CONCLUSION

The court concludes that The Bank of Missouri's claim for default interest constitutes an unenforceable penalty under Missouri law. In the alternative, the court concludes that allowance of default interest would be inequitable under federal bankruptcy law. The Bank's motion to allow postpetition attorney fees and interest at the contract rate is allowed; the request to allow default interest is denied. All other arguments and requests for relief are rejected.

A separate order will issue.

/s/ Cynthia A. Norton
Chief Judge Cynthia A. Norton

Dated: July 3, 2019

---

[65] The court is aware that in *1111 Myrtle Ave.*, 598 B.R. at 736-37, the court held that notice was not required and that the equities did not mandate disallowance of the claim. That case is distinguishable because the debtor there knew from the beginning – even without notice – that the bank was going to claim default interest, and that case did not involve an auction with bidders relying on the bank's claims.